**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

IMMIGRATION EQUALITY
25 Broadway, 10th floor New York, NY 10004;

OASIS LEGAL SERVICES
1900 Addison Street, Suite 100
Berkeley, CA 94704;

HIAS
1300 Spring Street, Suite 500
Silver Spring, MD 20910; and

FLORENCE IMMIGRANT AND REFUGEE RIGHTS PROJECT
P.O. Box 86299
Tucson, AZ 85754,

*Plaintiffs*,

*v.*

MARKWAYNE MULLIN, in his official capacity as Secretary of Homeland Security,
2707 Martin Luther King Jr. Avenue SE
Washington, DC 20529;

U.S. DEPARTMENT OF HOMELAND SECURITY,
2707 Martin Luther King Jr. Avenue SE
Washington, DC 20529;

JOSEPH EDLOW, in his official capacity as Director of U.S. Citizenship and Immigration Services,
5900 Capital Gateway Drive
Camp Springs, MD 20588; and

U.S. CITIZENSHIP AND IMMIGRATION SERVICES,
5900 Capital Gateway Drive
Camp Springs, MD 20588,

*Defendants.*

**COMPLAINT**

**Case No. 26-2921**

## INTRODUCTION

1. Since January 2025, the Department of Homeland Security (DHS) and the Department of Justice (DOJ) have taken numerous steps to dismantle the U.S. asylum system. Some of those efforts are obvious attacks. Others seem, at first glance, to constitute merely technical changes—but are no less insidious. This case involves a change of the latter kind.

2. There are two primary methods for people to apply for asylum and related relief in the United States. People in removal proceedings can file a "defensive" application seeking relief from removal in immigration court. Unaccompanied children and anyone not in removal proceedings may file an "affirmative" application with U.S. Citizenship and Immigration Services (USCIS), the benefits agency housed within DHS. These forums differ greatly. Immigration court is adversarial, quasi-judicial, and often requires the presentation of multiple witnesses, including experts. In contrast, USCIS provides applicants with a non-adversarial interview conducted by an asylum officer trained to elicit relevant information using trauma-informed interviewing techniques.

3. For decades, USCIS regulations guaranteed affirmative asylum applicants an interview before USCIS adjudicated their applications—which, in the case of people without other status in the United States, resulted either in a grant of asylum or a "referral" to immigration court for removal proceedings, where they could renew their asylum applications. DHS and USCIS have long understood that the interview is an essential tool without which meaningful adjudication of applications is impossible, not least because the applicant's testimony is the most critical evidence in an asylum case.

4. In late July 2026, however, USCIS published an interim final rule, *Affirmative Asylum Referrals Without Interview*, 91 Fed. Reg. 47101 (July 28, 2026) (Summary Referral IFR

or IFR), that took effect immediately. The IFR purported to end the right to an asylum interview for everyone who did not yet have an interview scheduled—including hundreds of thousands of people who submitted applications on the understanding that they would receive an interview. The inevitable result of the Summary Referral IFR is that many affirmative asylum applications will be referred to immigration court without an interview and with little to no meaningful review by USCIS.

5. USCIS did not seek public notice and comment before making this change—and it shows. The Summary Referral IFR fails to consider a host of important issues, including the fact that the immigration court system has lost any semblance of neutrality over the last 18 months; that children are categorically unable to represent themselves in immigration court; that people with pending applications were guaranteed an interview when they applied and have a strong reliance interest in retaining that right; and that many people referred to immigration court will face supposedly "mandatory" civil detention in deplorable conditions and far from counsel and family members. As a supposed justification for this sudden removal of a critical right, the Summary Referral IFR blames the backlog of affirmative asylum applications. Defendants have otherwise largely ignored that backlog, and cases referred under the IFR will be shifted to the backlog of more than three million cases awaiting adjudication in immigration court.

6. The removal of the interview right harms not only asylum applicants but also legal service providers. The Plaintiffs and many other organizations built their service models around representing people before USCIS and not only the immigration courts. Indeed, the representation models of some of the Plaintiffs simply will not work for cases in immigration court.

7. The Summary Referral IFR, like the vast majority of recent assaults on the asylum system, is illegal. The IFR's substantive nature means that notice and comment was required before it could become effective; the IFR violates the INA's guarantee of an asylum "interview or hearing" as well as Congress's special protections for unaccompanied children; and the IFR is arbitrary and capricious for a host of reasons.

**JURISDICTION AND VENUE**

8. This case arises under the Immigration and Nationality Act, 8 U.S.C. § 1101 *et seq*.; its implementing regulations; and the Administrative Procedure Act (APA), 5 U.S.C. § 551 *et seq*. & 5 U.S.C. § 701 *et seq*.

9. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1346.

10. The waiver of sovereign immunity in 5 U.S.C. § 702 applies to this action, in which the Plaintiffs seek only non-monetary relief.

11. The Court has authority to enter a declaratory judgment under 28 U.S.C. §§ 2201 and 2202. The APA authorizes the Court to stay, set aside, and vacate unlawful agency action. 5 U.S.C. §§ 705-06.

12. Venue is proper in this district under 28 U.S.C. § 1391(e) because Defendants are agencies and officers of the United States acting in their official capacity, and Defendants Markwayne Mullin and Department of Homeland Security reside in this district.

**PARTIES**

13. Plaintiffs Immigration Equality, Oasis Legal Services, HIAS, and Florence Immigrant and Refugee Rights Project are legal services organizations that represent noncitizens filing affirmative asylum applications with USCIS.

14. Plaintiff Immigration Equality is a non-profit organization based in New York, NY that provides legal services to noncitizens. Immigration Equality's mission is to promote justice for LGBTQ and HIV-positive immigrants through representation or pro se support in asylum applications and other applications for immigration benefits.

15. Plaintiff Oasis Legal Services (Oasis) is a non-profit legal services organization based in Berkeley, California. Oasis's primary work is representing LGBTQ+ and HIV-positive people in their affirmative asylum applications before USCIS's asylum office.

16. Plaintiff HIAS is a global nonprofit organization and resettlement agency based in Silver Spring, Maryland and dedicated to ensuring that forcibly displaced people find welcome, safety, and freedom. HIAS operates in eleven countries, including the United States, supporting refugees, asylum seekers, and other forcibly displaced people.

17. Plaintiff Florence Immigrant & Refugee Rights Project (Florence Project or FIRRP) is a nonprofit organization based in Tucson, Arizona, with offices in Phoenix and Florence, Arizona. FIRRP provides free legal and social services to adults and unaccompanied children in immigration custody in Arizona.

18. Defendant Markwayne Mullin is the Secretary of the U.S. Department of Homeland Security. He is responsible for the administration of U.S. immigration laws under 8 U.S.C. § 1103. Defendant Mullin oversees each of the component agencies within DHS, including USCIS, and has ultimate authority over all DHS policies, procedures, and practices. Defendant Mullin is sued in his official capacity.

19. Defendant Department of Homeland Security is the cabinet-level agency of the U.S. government responsible for enforcing the immigration laws of the United States and for

adjudicating applications for relief, including affirmative asylum applications, that fall outside the jurisdiction of the immigration courts.

20. Defendant Joseph Edlow is Director of U.S. Citizenship and Immigration Services. He oversees all functions of that agency, including the adjudication of affirmative asylum applications. Defendant Edlow is sued in his official capacity.

21. Defendant U.S. Citizenship and Immigration Services (USCIS) is the sub-agency of the Department of Homeland Security tasked with adjudicating, among other things, affirmative asylum applications.

## FACTUAL BACKGROUND

### A. Asylum and Related Relief

22. Congress has long recognized an obligation to provide protection to those fleeing persecution or torture. The modern U.S. asylum system took shape with the Refugee Act of 1980, Pub. L. 96-212, 94 Stat. 102, which reflects "one of the oldest themes in America's history—welcoming homeless refugees to our shores"—and "gives statutory meaning to our national commitment to human rights and humanitarian concerns." S. Rep. No. 96-256, 1st Sess. at 1 (1979), *reprinted in* 1980 U.S.C.C.A.N. 141. One of Congress's "primary purposes" in enacting the Refugee Act was "to bring United States refugee law into conformance" with relevant U.S. treaty obligations and the bedrock principle of non-refoulement. *INS v. Cardoza-Fonseca*, 480 U.S. 421, 436 (1987).

23. Federal law provides three primary forms of protection for individuals fleeing persecution or torture: asylum under 8 U.S.C. § 1158; withholding of removal under 8 U.S.C. § 1231(b)(3); and protection under the Convention Against Torture (CAT), *see* 8 U.S.C. § 1231 note; 8 C.F.R. § 1208.16. All three forms of protection are available to noncitizens who are

removable under the INA. Indeed, withholding of removal and CAT protection are, unlike asylum, available *only* to individuals who receive orders of removal.

24. "Any [noncitizen] who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival … ), irrespective of such [noncitizen's] status," may apply for asylum. 8 U.S.C. § 1158(a)(1). To qualify for asylum, a noncitizen must show a "well-founded fear of persecution" on account of one or more of five protected grounds—race, religion, nationality, membership in a particular social group, and political opinion—and that their country is unable or unwilling to protect them from that harm. *Id.* § 1101(a)(42)(A). Defendants may issue grants of asylum to those eligible as a matter of discretion. *See id.* § 1158(b)(1)(A).

25. The INA contains a handful of narrow bars to asylum. *See* 8 U.S.C. § 1158(a)(2) & (b)(2)(A). Some of these bars prevent grants of asylum to those who persecuted others, were convicted of a particularly serious crime, committed a serious nonpolitical crime outside the United States, endanger national security, or engaged in acts of terrorism as broadly defined by the INA. 8 U.S.C. § 1158(b)(2)(A)(i)-(v). Others prevent a person from applying for asylum if they were firmly resettled in a third country before reaching the United States or can be removed under a safe-third-country agreement with another nation. *Id.* § 1158(a)(2)(A), (b)(2)(A)(vi). The remainder bar asylum applications from those who did not file an application within one year after arriving in the United States or who previously had an application denied, absent changed or extraordinary circumstances. *See id.* § 1158(a)(2)(B)-(D). Unaccompanied children are exempt from the safe-third-country bar and the one-year filing deadline. *Id.* § 1158(a)(2)(E).

26. Withholding of removal under the INA and CAT must be granted to anyone who qualifies and is not subject to any statutory bars. *See* 8 U.S.C. § 1231(b)(3)(A); *id.* § 1231 note;

*Cardozo-Fonseca*, 480 U.S. at 429, 432-35, 436-38. Those who qualify for protection under CAT but are subject to one or more statutory bars to withholding of removal are granted temporary protection called deferral of removal. 8 C.F.R. § 1208.17. All of these non-asylum forms of relief require the applicant to meet a higher burden on the likelihood of harm by showing that either persecution or torture is more likely than not to occur. *See* 8 C.F.R. §§ 208.16(c) & 1208.16(c); *INS v. Stevic*, 467 U.S. 407, 429-30 (1984). Withholding of removal and CAT protection also come with fewer benefits: they allow the noncitizen to be removed to safe third countries, do not provide a path to citizenship, cannot be extended to immediate family members, and do not allow international travel.

**B. Affirmative and Defensive Asylum Applications**

27. Both USCIS asylum officers and immigration judges employed by the Executive Office for Immigration Review (EOIR) within DOJ may adjudicate Form I-589 Applications for Asylum and for Withholding of Removal.

28. A person not in removal proceedings may file an "affirmative" asylum application with USCIS. This is true whether or not the person has another type of immigration status in the United States.

29. Prior to the Summary Referral IFR, USCIS would—after the noncitizen submitted an application and supporting materials—schedule an interview with an asylum officer who elicits testimony to determine the person's eligibility for asylum.

30. Proceedings before USCIS are non-adversarial. The applicant may have an attorney present at the asylum interview, but that attorney's role is limited. And no one argues the case for the applicant's removal from the United States. If USCIS determines that it needs

additional information following the interview, it may issue a request for evidence or schedule a second interview. Otherwise, the agency will issue a decision on the asylum application.

31. If USCIS grants asylum, its decision is final. For people without other immigration status, however, USCIS does not deny an asylum application. Rather, if USCIS finds that a person without status cannot be granted asylum, it refers that person to immigration court, where the person can renew their application and receive de novo review before an immigration judge. USCIS can issue denials to people with immigration status; such a decision, on its own, does not allow a person to be removed from the United States.

32. In 2008, Congress provided special protections for unaccompanied children as part of the Trafficking Victims Protection Reauthorization Act (TVPRA). Among other things, the TVPRA gave USCIS initial jurisdiction over all asylum applications filed by unaccompanied children, exempted unaccompanied children from the one-year filing deadline and safety third country exceptions to the right to apply for asylum, and required access to counsel for them "to the greatest extent practicable." Pub. L. 110-457, 122 Stat. 5044, § 235 (2008); *see* 8 U.S.C. §§ 1158(a)(2)(E) & (b)(3)(C).

33. Anyone in removal proceedings before an immigration judge under 8 U.S.C. § 1229a—including people referred to immigration court from USCIS—may file a "defensive" asylum application with the immigration court. Immigration judges adjudicate claims for withholding of removal and relief under CAT as well as asylum claims.

34. After an immigration judge adjudicates a defensive application, either the noncitizen or DHS may appeal that decision to the Board of Immigration Appeals (BIA), which is also part of EOIR. If the BIA grants relief, its decision is final; if it denies relief, DHS issues a

final order of removal permitting the noncitizen's deportation absent the intervention of a federal court of appeals.

35. Affirmative and defensive asylum proceedings typically occur under very different circumstances. People who file affirmative applications are almost never detained and are thus in a much better position to present their cases. For example, they have far greater access to counsel, translators, online legal resources, and country conditions information, as well as the ability to contact people in their country of origin for assistance in gathering other types of evidence. In contrast, people in removal proceedings are much more likely to be detained—and face an even higher risk of detention in light of Defendants' newfound and expansive interpretations of the mandatory-detention provisions of the INA. *See, e.g.*, ICE, *Interim Guidance Regarding Detention Authority for Applicants for Admission* (July 8, 2025);[1] *Matter of Yajure Hurtado*, 29 I&N Dec. 216 (BIA 2025). Defendants thus routinely force people with pending defensive asylum applications to endure many months of civil detention—under conditions that are often inhumane and unsanitary and that severely restrict access to counsel and information.

### C. History of Affirmative Asylum Adjudications

36. Interim regulations published shortly after the enactment of the Refugee Act of 1980 gave officers of the former Immigration and Naturalization Service (INS) the authority to grant asylum to noncitizens who were not in deportation or exclusion proceedings. *See* 45 Fed. Reg. 37392 (June 2, 1980). These officers were treated as low-level functionaries—underpaid and overworked—and lacked both necessary training in asylum law and resources about

---

[1] https://tinyurl.com/yc355fhy.

conditions in other countries. *See, e.g.*, USCIS, *History of the Affirmative Asylum Program Lesson Plan* (May 9, 2013) (*Affirmative Asylum*).[2]

37. The INS established an asylum office in the wake of *American Baptist Churches v. Thornburgh*, 760 F. Supp. 796 (N.D. Cal. 1991), a class action lawsuit that challenged the Reagan administration's asylum adjudication practices. The class, comprised of over 500,000 Salvadoran and Guatemalan asylum applicants, alleged that the government processed asylum applications based on improper foreign policy considerations, border enforcement considerations, and political and ideological beliefs.

38. During settlement negotiations in *American Baptist Churches*, the INS announced new asylum regulations intended to create a fairer asylum system and fulfill the humanitarian mission of the Refugee Act. *See* 55 Fed. Reg. 30674 (July 27, 1990). The regulations, which became effective on October 1, 1990, mandated the establishment of a "corps of professional Asylum Officers" to adjudicate affirmative asylum claims in a non-adversarial setting. 55 Fed. Reg. at 30680 (revising 8 C.F.R. § 208.1). The INS then made significant efforts to hire asylum officers with a wide variety of backgrounds; overseas experience, foreign language proficiency, and cross-cultural skills were viewed favorably. *Affirmative Asylum* 20.

39. To improve the quality and consistency of asylum adjudications, asylum officers received specialized training in international human rights and international refugee law; U.S. asylum law; asylum procedures and operations instructions; conditions in asylum applicants' countries of origin; interviewing techniques; cross-cultural communication; interviewing survivors of torture and other severe trauma; asylum case analysis and decision-writing; and quality control, among other topics. Interested nongovernmental organizations participated

---

2 https://tinyurl.com/yc5hvvur.

actively in developing the training program. Each individual officer was assessed on both interviewing techniques and analytical abilities.

40. The 1990 regulations also required the creation of a documentation center that would compile and disseminate information from governmental and non-governmental sources on human rights conditions in asylum seekers' countries of origin. *See* 55 Fed. Reg. at 30676. This information assisted asylum officers in assessing eligibility for asylum.

41. The new system was intended to improve the quality of asylum adjudications and to expedite both the approval of meritorious applications and the issuance of adverse decisions for applicants who could not substantiate an asylum claim. To this end, asylum officers conducted non-adversarial interviews with asylum applicants and wrote individualized analyses of their eligibility for asylum based on application of the law to the facts of each case.

42. Through 1996 amendments to the INA, Congress expressly gave the executive branch the authority to "establish a procedure for the consideration of asylum applications" and specified that this "procedure … shall provide" an "initial interview or hearing on the asylum application" that occurs within a set timeframe absent exceptional circumstances. *Id.* § 1158(d)(5)(A)(ii).

43. The Homeland Security Act of 2002 split the functions of the former INS between DHS and DOJ, and it established USCIS to focus exclusively on the administration of applications for immigration benefits, including asylum. Pub. L. 107-296, § 451(b), 116 Stat. 2135, 2196 (Nov. 25, 2002). Asylum officers continued to receive specialized training in asylum and refugee law, country-conditions research, non-adversarial interviewing techniques, cross-cultural communication, and other issues relevant to asylum adjudications. *See* USCIS, *RAIO*

*Directorate Officer Training Manual* (*Training Manual*).[3] According to DHS, the training asylum officers receive is extensive and is designed to enable them to conduct non-adversarial interviews in a fair and sensitive manner. *See, e.g.*, 87 Fed. Reg. 18078, 18090 (Mar. 29, 2022).

**D. The Critical Role of Asylum Interviews**

44. Consistent with congressional intent, the asylum interview has long been an integral part of the affirmative asylum process. In 1994, the INS proposed making asylum interviews discretionary but rejected the idea after an outpouring of negative comments. Between 1997 and the promulgation of the IFR, permanent regulations guaranteed noncitizens the right to an interview before USCIS adjudicates an affirmative asylum application. Until Defendants promulgated the Summary Referral IFR, the instructions to the Form I-589 Application for Asylum and Withholding of Removal likewise guaranteed an interview. *See, e.g.*, I-589 Instructions 10 (Jan. 20, 2025).

45. According to Defendants, "[i]t is well established that a non-adversarial approach in which the interviewer builds rapport is the most effective interview style for eliciting credible information." USCIS, *Interviewing—Introduction to the Non-Adversarial Interview* 14 (Dec. 13, 2024) (*Non-Adversarial Interview*).[4]

46. Defendants' regulations similarly state that the purpose of an interview is to "elicit all relevant and useful information bearing on the applicant's eligibility." 8 C.F.R. § 208.9(b).

47. Asylum interviews take place in office settings, with the asylum officer sitting at a desk and the asylum applicant sitting across from them. The asylum applicant's attorney and interpreter, if any, sit with the applicant as the officer conducts the interview. Attorneys are

---

3 https://tinyurl.com/yjy6p6b7.
4 https://tinyurl.com/22adcfne.

encouraged not to interrupt the interview and are usually allowed to make only a summation or closing statement. As a result, the interview, while conducted under oath, is less formal than proceedings in a courtroom. *See, e.g.*, *Non-Adversarial Interview* 12-27.

48. During an asylum interview, the asylum officer greets the participants and explains their respective roles. The officer then explains the purpose of the interview, confidentiality protections, the interview process, and the oath. The officer places the applicant under oath. Throughout the interview process, officers are expected to be alert to any possible concerns regarding the validity of family relationships, vulnerability to trafficking or other forms of coercion by another party present at the interview, and national security. In the case of the latter two concerns, officers are instructed to alert their supervisors and seek further guidance. *Non-Adversarial Interview* 17-23.

49. The asylum officer questions the applicant about how the asylum application was prepared, whether the applicant is aware of the information in the application, and whether the information is true and correct. The officer reviews the information in the application form, making any updates or corrections as needed, and provides the applicant an opportunity to present additional documents or other evidence in support of the asylum claim.

50. As factfinders in non-adversarial proceedings, asylum officers are instructed that they are responsible for eliciting all relevant information from applicants and that they must pursue all relevant lines of inquiry until they are certain they have enough information to make a decision on the asylum claim. Asylum officers also must give applicants the opportunity to explain any inconsistencies within their testimony or between their testimony and other evidence in the record. At the end of the asylum interview, the asylum officer asks the applicant and any representative in attendance to make final comments or ask questions. After the asylum officer

has explained and confirmed any corrections made to the application, the officer and applicant then sign the application form. The officer may request that the applicant submit additional evidence in support of the claim. Finally, the officer explains the next steps in the process, including how the applicant will receive the decision on their application. *Non-Adversarial Interview* at 25-27.

51. The interview is the only opportunity an asylum applicant before USCIS has to present the evidence typically accorded the most probative weight in the adjudication of any asylum claim: the applicant's own testimony. Courts have routinely held that credible testimony alone is sufficient to sustain an asylum claim. And in 2005 amendments to the INA, Congress likewise clarified that testimony can be all that is necessary. REAL ID Act of 2005, Pub. L. 109-13, § 101(a)(3), 119 Stat. 302 (May 11, 2005) (codified at 8 U.S.C. § 1158(b)(1)(B)(ii)).

52. The interview is, in most cases, the noncitizen's only chance to address any concerns the asylum officer has with the application.

53. The interview further provides an opportunity, where appropriate and necessary, for the noncitizen to update evidence about conditions in their country of origin and their eligibility for relief. These updates are often necessary due to the passage of time following the filing of the asylum application.

54. As Defendants have recognized, the interview also helps the applicant understand what information they need to provide. That recognition reflects the fact that many asylum applicants file applications *pro se* but lack either English fluency or familiarity with U.S. asylum law. *See* USCIS, *Interviewing—Eliciting Testimony Lesson Plan* 12-13 (Feb. 5, 2025) (*Eliciting Testimony*).[5]

[5] https://tinyurl.com/yafy53y5.

55. Defendants' training materials make clear that the asylum interview is often the only source of individualized evidence relevant to whether a bar to asylum applies. *See Training Manual* at 647.

56. Defendants' training materials also emphasize that evaluating the credibility of an applicant's oral testimony is fundamental to the evaluation of eligibility and, in many cases, is the determining factor. They also require officers to evaluate credibility in every case and carefully analyze an applicant's testimony in light of all the evidence in the record. *Training Manual* at 105, 109.

57. Finally, Defendants have stated that asylum officers interview noncitizens not only to determine if they are eligible for asylum, but also to "safeguard the security and integrity of [the] immigration system." USCIS, *Exploring Asylum Officer Careers*.[6]

58. In short, the interview is necessary for the asylum officer to have a complete understanding of the events giving rise to the asylum claim, address any credibility concerns (including concerns resulting from the effects of trauma on memory), and elicit information relevant to the elements of the claim and the application of the statutory bars. The paper asylum application, in contrast, provides only minimum information and is not sufficient, without an interview, to determine eligibility. *See, e.g.*, *Eliciting Testimony* 12.

**E. Referrals from USCIS to Immigration Court**

59. Noncitizens whose asylum applications are referred to immigration court are thrust into a very different, adversarial process.

---

[6] https://tinyurl.com/4n9tcck8.

60. Unlike asylum officers, immigration judges do not specialize in asylum but instead handle a variety of applications that can be filed before the immigration court. The same is true of the DHS attorneys who represent the government in immigration court.

61. Immigration court hearings are adversarial proceedings. The immigration judge sits on a bench, above the other participants in the courtroom. There are often lengthy, technical discussions between counsel and the immigration judge. Witnesses other than the applicant often need to testify, and the applicant and other witnesses are subject to cross-examination by DHS and active questioning by the immigration judge.

**F. The Affirmative Asylum Backlog**

62. At the end of 2025, more than 1.4 million asylum applications were pending before USCIS. This backlog includes a substantial number of applications filed more than five years ago. And as of June 2026, more than 2.3 million asylum applications were pending before the immigration courts. While the backlogs have complex roots, Defendants have obvious ways to reduce the affirmative asylum backlog.

63. Defendants have, for the first time, begun charging a fee for asylum applications. An additional fee is charged every year that an asylum application remains pending. Given that USCIS is primarily a fee-funded agency, this charge opened up a major new source of revenue—but the increased funds have not led to additional adjudications or the additional hiring of qualified asylum officers. To the contrary, USCIS has begun paying some asylum officers (now tagged with the Orwellian title "Homeland Defenders") significantly *less* than in prior years.

64. Since 2025, the southern border of the United States has been largely closed to people seeking asylum as the result of a presidential proclamation that the federal courts have held to be unlawful. *See RAICES v. Mullin*, 174 F.4th 81 (D.C. Cir. 2026). Defendants, however,

have not used the opportunity provided by the closed border to reduce the affirmative asylum backlog. To the contrary, in November 2025, Defendants implemented the most recent in a series of pauses on asylum adjudications. That pause lasted for months until a court required Defendants to resume adjudications. *See Dorcas Int'l Inst. of R.I. v. USCIS*, ___ F. Supp. 3d ___, 2026 WL 1622708 (D.R.I. June 5, 2026).

65. Defendants and EOIR have also traded cases back and forth. For example, DHS previously used principles of prosecutorial discretion to seek the termination of removal proceedings so that noncitizens could pursue relief before USCIS. The IFR now shunts some of the same cases back to the immigration court.

66. Defendants have declined to pursue various internal operating changes recommended by others at DHS that would help reduce the affirmative asylum backlog.

67. On at least three separate occasions, the USCIS Ombudsman has stated that the use of asylum officers for tasks other than adjudicating affirmative asylum interviews contributes significantly to the backlog. Defendants have not acted on those statements.

68. In 2022, the USCIS Ombudsman recommended that USCIS prioritize affirmative asylum applications from people who are ineligible for other types of relief. *See* USCIS, *USCIS Response to the Citizenship & Immigration Services Ombudsman's 2022 Annual Report to Congress* 20 (2022).[7] USCIS has never done so. The Ombudsman also recommended, among other things, orientation of asylum applicants prior to interviews to ensure that they are aware of the process in advance and the creation of focused interview guidance for specific caseloads, allowing asylum officers a degree of specialization that would facilitate more efficient adjudications. *Id.* at 22-23. USCIS has not implemented these recommendations either.

---

[7] https://tinyurl.com/mzsecajy.

69. In July 2024, the DHS Office of the Inspector General issued a report urging USCIS to create "a multi-year operational plan that will enable USCIS to adjudicate new affirmative asylum claims consistent with the law and reduce the backlog," with specific attention to "clear priorities and goals, appropriate staffing levels, an analysis of funding, and how that funding will be generated." DHS OIG, *USCIS Faces Challenges Meeting Statutory Timelines and Reducing Its Backlog of Affirmative Asylum Claims* 11 (July 3, 2024).[8] Although USCIS agreed to do so, *id.*, it has not implemented any such plan.

**G. Demolition of the Asylum System By DHS and DOJ**

70. Since the beginning of 2025, USCIS has departed from its long-established role as a benefits agency and has instead recast itself as an enforcement agency committed to this administration's "rigorous immigration crackdown." USCIS, *Making America Safe Again* (Dec. 22, 2025).[9]

71. Among other things, USCIS has allowed ICE to arrest and detain noncitizens at their asylum interviews. It has dismissed affirmative asylum applications to place people in expedited removal, which would subject them to supposedly "mandatory" detention. As noted above, USCIS paused all asylum applications until required to fulfill its adjudicatory duty by another federal court. And USCIS announced that it will take sweeping, secret "country-specific factors" into account when determining whether an *individual* noncitizen should receive asylum as a matter of discretion. *See USCIS Announces Consideration of Country-Specific Factors when Adjudicating Benefits* (Nov. 27, 2025).[10]

---

8 https://tinyurl.com/4fyhv8xu.
9 https://tinyurl.com/2kfu4xm8.
10 https://tinyurl.com/mw6jkvhn.

72. Recent events at EOIR, meanwhile, have deprived the immigration courts and BIA of any pretense of fairness and impartiality.

73. EOIR has systematically purged immigration judges and BIA members perceived as sympathetic to noncitizens. These experienced judges have been largely replaced by "temporary" immigration judges and others with no immigration experience whatsoever. The positions are advertised as "deportation judges" and attract people who believe in the anti-immigrant policy goals of the current administration.

74. Top officials at EOIR have issued dozens of centralized memoranda directing how immigration judges should act to speed up removal orders.

75. EOIR has adopted or proposed directives and policies that directly favor DHS counsel over noncitizens and their lawyers.

76. EOIR has begun holding "mega-masters" in immigration court—initial hearings involving groups of noncitizens so large that they cannot fit in a courtroom. Many noncitizens never receive timely notice of these hearings, and nonattendance leads to an in absentia removal order. As a result, the volume of such orders issued by EOIR has risen sharply.

77. The BIA has issued a series of decisions that allow—and in fact aggressively encourage—immigration judges to "pretermit" asylum applications without a hearing. *See, e.g.*, *Matter of H-A-A-V-*, 29 I&N Dec. 233 (BIA 2025); *Matter of C-A-R-R-*, 29 I&N Dec. 13 (BIA 2025); *Matter of E-A-R-M-*, 29 I&N Dec. 746 (BIA 2026); *Matter of N-E-R-S-*, 29 I&N Dec. 753 (BIA 2026); *Matter of T-A-G-*, 29 I&N Dec. 715 (BIA 2026); *Matter of A-C-M-*, 29 I&N Dec. 703 (BIA 2026); *Matter of C-I-G-M- & L-V-S-G-*, 29 I&N Dec. 291 (BIA 2025).

78. The bases for such pretermissions include supposed amenability to being removed to a third country, often without a meaningful opportunity to assert a fear as to that country.

79. The BIA has also issued an unprecedented number of precedential decisions that radically change the substance and procedure of asylum law—often in cases of unrepresented respondents that are designated for precedential status only after the period for seeking federal court review has closed. Many of these decisions upend decades of asylum law.

**H. The Summary Referral IFR**

80. On July 28, 2026, Defendants took yet another step toward dismantling the U.S. asylum system by issuing the Summary Referral IFR. The IFR purports to terminate the right to an asylum interview before a noncitizen's case is referred to immigration court. *See* DHS, *Affirmative Asylum Interviews Without Interview*, 91 Fed. Reg. 47101 (July 28, 2026).

81. The Summary Referral IFR allows referral of applications without an interview on all conceivable grounds for declining to approve an application. Such grounds include Defendants' view that a bar to asylum applies, that the applicant "is not eligible on the merits of the claim," or that the applicant "does not merit a grant as a matter of discretion." 91 Fed. Reg. at 47128 (new 8 C.F.R. § 208.9(a)(2)). The IFR purports to allow asylum officers to refer a case on discretionary grounds without assessing the merits of the underlying asylum claim. *See id.* at 47102.

82. The Summary Referral IFR applies to unaccompanied children with the narrow exception that, because such children are exempt from the one-year deadline, an unaccompanied child's application cannot be referred on that basis. 91 Fed. Reg. at 47113; *see* 8 U.S.C. § 1158(a)(2)(E).

83. The Summary Referral IFR applies to all asylum applications pending on July 28, 2026, no matter when the application was filed, unless an interview had been scheduled before promulgation of the IFR. *See* 91 Fed. Reg. at 47102, 47110.

84. Defendants did not provide notice in the Federal Register or solicit public comments before publishing the Summary Referral IFR. 91 Fed. Reg. at 47101. They further declined to provide the usual 30-day time period between publication in the Federal Register and the effective date of a rule, instead making the IFR effective on the date of its publication. *Id.* Although Defendants invoke the foreign-affairs and procedural-rule exceptions to the APA's notice-and-comment requirements to justify forgoing the normal procedures, *see id.* at 47115-16, neither exception applies.[11]

85. The IFR is purportedly intended "to reduce the affirmative asylum backlog, improve efficiency of operations, safeguard national security and public safety, and ensure consistency with agency priorities." 91 Fed. Reg. at 47102.

86. The IFR includes no discussion of the causes of the affirmative asylum backlog aside from a conclusory assertion that the backlog "is due," in some unspecified "part," to "USCIS' long-standing practice of offering all asylum applicants an interview." 91 Fed. Reg. at 47109. It also fails to consider any alternative policies that would reduce the backlog without stripping noncitizens of their rights. *See id.* at 47125-26.

87. The IFR cites no evidence that referring affirmative asylum applications to EOIR without interviews will have a perceptible impact on national security or public safety, and no such evidence exists.

88. The IFR asserts that it serves public safety by "[m]oving dangerous [noncitizens] … more quickly through the removal process." 91 Fed. Reg. at 47104. Even before the IFR,

---

[11] A sentence in the IFR asserts that "[a]s stated in this preamble, DHS has found there is good cause to make this rule effective immediately upon publication." 91 Fed. Reg. at 47126. No such statement exists, and the IFR does not rely on the good-cause exception to APA rulemaking procedures.

however, DHS had the ability to issue any individual applicant it considered dangerous with a Notice to Appear in immigration court, an act that removes the applicant from the affirmative asylum process.

89. The IFR rests on a completely implausible reading of the asylum statute. The IFR reads the language in 8 U.S.C. § 1158(d)(5) stating that an interview or hearing "shall" take place within 45 days of filing as making only the timeframe—and not the fact of the interview or hearing—mandatory. *See* 91 Fed. Reg. at 47107 & n.21.

90. Because immigration judges now pretermit asylum applications without a hearing, many people who file asylum applications with USCIS and are referred to immigration court without an interview will never receive *any* kind of hearing on their asylum applications.

91. A footnote in the nonbinding preamble to the Summary Referral IFR claims that it does not apply to the safe-third-country bar or the previous-denial bar. *See* 91 Fed. Reg. 47112 n.46. The regulations themselves, however, contain no such exception. *See id.* at 47128.

92. The IFR's sole statement about the safe-third-country bar is that "in such cases, the [noncitizen] would be removed using expedited removal authority rather than" via full removal proceedings. 91 Fed. Reg. 47112 n.46. However, immigration judges around the country have begun pretermitting cases and issuing regular (as opposed to expedited) removal orders to third countries, without ever entertaining an asylum application on the merits, based on so-called "asylum cooperative agreements" and purported "diplomatic assurances."

93. The Summary Referral IFR reverses a position Defendants took in 2024 regarding the ability of USCIS to consider factually and legally complex bars to asylum. At that time, Defendants promulgated a rule allowing asylum officers to consider bars in the rushed context of screening interviews, and in doing so, Defendants denied that the bars are especially complex

and contended that asylum officers are well equipped to do so. *See* 89 Fed. Reg. 103370, 103376 (Dec. 18, 2024). The IFR, in contrast, says that the bars are so complex they should not be determined in even full affirmative interviews but instead only in removal proceedings. 91 Fed. Reg. at 47109. The IFR does not acknowledge Defendants' prior position.

94. When the IFR took effect, Defendants had not settled on, much less implemented, any mechanism to inform noncitizens that their applications could be referred without an interview. *See* 91 Fed. Reg. at 47112. The IFR fails to consider how a lack of notice will impact noncitizens, especially those with pending applications who have not yet had interviews scheduled.

95. By Defendants' estimation, the Summary Referral IFR affects up to 444,724 people. 91 Fed. Reg. at 47103. This includes people who would have otherwise been *granted* asylum following an interview—an eventuality the IFR expressly concedes will occur. *Id*. at 47104. And the IFR admits that people whose cases are referred to immigration court "may come to" the "attention" of U.S. Immigration and Customs Enforcement "more quickly." *Id.* at 47110. But the IFR does not mention the inevitable consequence of such "attention"—that, as a result of summary referrals, more people will be subjected to supposedly "mandatory" detention.

96. In assessing the costs and benefits of its provisions, the IFR does not address the financial costs of increased detention, which run at least $45,000 per person per year.

97. The Summary Referral IFR does not consider the inability of children to represent themselves in immigration court. Nor does it consider that DOJ attempted to strip funding for children's representation in immigration court in 2025 and has since decided not to renew the representation contract that allowed an experienced network of legal providers to represent children.

98. The IFR does not acknowledge, much less account for, recent changes at EOIR that have severely eroded the neutrality and independence of immigration judges.

99. Although the IFR gestures at reliance interests and cites those interests as a reason not to apply its provisions to people who cannot be referred to immigration court because they have valid immigration status, *see* 91 Fed. Reg. at 47116-17, it never addresses the reliance interests of the hundreds of thousands of noncitizens with pending asylum applications who *can* be referred to immigration court.

100. The INA allows consideration of discretionary factors only after a noncitizen demonstrates eligibility for asylum. 8 U.S.C. § 1158(b)(1)(A). Moreover, longstanding BIA precedent—which is binding on USCIS, 8 C.F.R. § 1003.1(g)—requires consideration of factors related to a noncitizen's eligibility for relief. *Matter of Pula*, 19 I&N Dec. 467, 473-74 (BIA 1987). And Defendants' own training materials make clear that factors tied to eligibility deserve "the most weight" in the discretionary analysis. USCIS, *Discretion* 19-20 (Jan. 27, 2025).[12] The IFR, however, permits the consideration of discretionary factors at any time and in a vacuum.

**HARMS TO THE PLAINTIFFS**

101. Plaintiffs Immigration Equality, Oasis, HIAS, and FIRRP are nonprofit organizations that provide legal services to people seeking asylum. Absent a decision staying implementation of the Summary Referral IFR, followed by vacatur of the IFR and/or declaratory relief preventing it from remaining in effect, the IFR will irreparably harm these Plaintiffs by directly interfering with their core activities of providing legal representation and pro se support to individuals applying for asylum affirmatively before USCIS.

---

12 https://tinyurl.com/5a7d6ktr.

102. The Summary Referral IFR harms the Plaintiffs in multiple ways. *First*, it directly impairs their ability to represent asylum applicants before the USCIS asylum office by allowing the removal of cases from that forum at a preliminary stage.

103. *Second*, given the imminent risk of referral of cases from the asylum office to immigration court without any notice, based only on an asylum application form that asks applicants to briefly summarize their often-complex claims, Plaintiffs must expend significant time and resources to supplement pending asylum applications on a much more expedited timeline than before the IFR. Before the IFR, the interview served as an important deadline for filing updates to an asylum application. But the IFR provides no timeframe for referrals without an interview. The Plaintiffs will therefore need to continuously update their applications to address changes in law, country conditions, or the personal circumstances of the applicant. This greatly increases the work required to effectively represent people before the asylum office.

104. *Third*, the Summary Referral IFR will hinder the Legal Service Plaintiffs' ability to rely on pro bono partners to represent their clients due to the uncertainty surrounding the timing of referrals to immigration court and the added burden of continually supplementing pending applications. And with an increase in the speed and rate of referrals, more cases will end up before the immigration courts. The increased complexity of immigration-court representation—and the possible need to pursue appeals to the BIA and a federal court of appeals—make it much more difficult to recruit and train volunteers to represent clients seeking asylum.

105. *Fourth*, the Plaintiffs must now expend significant resources and time to train their staff and volunteers to handle cases referred to immigration court or else terminate representation of existing clients. The latter course will cause reputational damage and prevent

the Plaintiffs from providing legal services to people seeking asylum.

106. *Fifth*, representation before the immigration court is much more resource-intensive than representation at the asylum office. While the USCIS asylum office adjudicates only asylum claims, the immigration courts adjudicate claims for asylum, withholding of removal, and relief under CAT—each of which has its own elements and standards of proof—and attorneys who represent noncitizens in immigration court generally have an ethical duty to pursue all three kinds of relief. The fact that most immigration judges now lack asylum expertise and independence further increases the burden of representation before the immigration court. And unlike a grant of asylum by the USCIS asylum office, DHS may appeal a victory in immigration court to the BIA.

107. Finally, Plaintiffs will endure greater staff turnover as a result of the IFR, which likewise impairs their ability to perform their core activities. The uncertainty the IFR introduces as to timing and the resulting need to update applications before the asylum office more often will strain staff capacity to maintain their current caseloads. And the increased number of cases before the immigration court will increase the stakes of the representation and the work required to provide effective representation.

108. Each of these changes will make representation of people seeking asylum more difficult and time-consuming—and, in some cases, impossible. As a result, each of the Plaintiffs faces the prospect of having to reduce the number of people they represent or assist. This will impair the financial situation of at least some of the organizations and impede their ability to provide their core services and fulfill their missions.

109. Plaintiffs Immigration Equality and Oasis primarily represent LGBTQ+ people and people who are HIV-positive. Those people often cannot file their applications within one

year of entry to the United States for a variety of reasons, including a fear of disclosure to their families or communities. The Summary Referral IFR, however, specifically singles out one-year filing deadline issues as a reason for referring applications to immigration court without interviews. *See* 91 Fed. Reg. at 47103, 47105-06, 47109, 47112-13, 47117, 47122. The ability of Immigration Equality and Oasis to engage in their core activities will therefore be especially affected by the IFR.

110. Indeed, because of the Summary Referral IFR's focus on the one-year deadline issue, Plaintiff Oasis has already stopped accepting new affirmative asylum cases of individuals who were unable to submit their applications within one year of their arrival in the United States. Prior to the IFR, applicants who applied outside the one-year deadline, but qualified for an exception based on extraordinary circumstances, made up more than 70% of Oasis's clients. And Oasis's success rate for clients who applied outside the one-year filing deadline was 97%. Plaintiff Oasis's inability to accept as many affirmative asylum cases will have a significant negative impact on its budget, which would cause them to lay off at least one staff member.

111. Plaintiffs Immigration Equality and Oasis would have to drastically change the nature of the work their staff and volunteers perform in order to continue providing representation and pro se support to people who are LGBTQ+ and HIV-positive. Less than a quarter of Immigration Equality's currently pending asylum cases are before the immigration courts. For Oasis, the difference is even starker: it has only 22 cases pending before the immigration courts but 1,100 pending before the USCIS asylum office. Both organizations have staff who are dedicated to affirmative asylum applications with little to no experience before the immigration courts. Indeed, nearly half of Oasis's staff is not permitted to represent people before EOIR and would need to obtain additional training and seek permission from DOJ to do

so in the future. Simply put, because of the Summary Referral IFR, Immigration Equality and Oasis must either dramatically shift their work from affirmative asylum cases to defensive asylum cases in immigration court or severely curtail the number of cases they accept. Either option directly interferes with their missions and core activities.

112. Plaintiff HIAS primarily focuses its asylum representation on assisting affirmative asylum applicants, with more than 180 clients with cases pending before the USCIS asylum office and less than half as many cases pending in immigration court. And for good reason: HIAS receives some funding that does not allow for representation of individuals in immigration court. HIAS also has staff who do not or cannot represent people in immigration court. As a result, the IFR will require HIAS to reallocate unrestricted funds to train or hire staff who can represent people in immigration court. But because those unrestricted funds are limited, HIAS is not able to represent nearly as many people seeking asylum in immigration court as they can represent in the asylum office. And withdrawing from cases referred to immigration court under the IFR would cause reputational damage and an ethical conundrum for staff.

113. Plaintiff FIRRP currently represents approximately 600 unaccompanied children in their immigration proceedings; about half of those children have asylum applications pending with the USCIS asylum office. The imminent threat of referral to immigration court in those 300 cases greatly frustrates FIRRP's ability to carry out its core mission of providing legal services to those children. FIRRP faces pressure to immediately and continually supplement each pending asylum application to protect its clients' interests.

114. Moreover, FIRRP has built its unaccompanied child asylum practice around the right to a non-adversarial interview at the asylum office, where adjudicators use trauma-informed interviewing strategies that allow young children to testify openly and honestly regarding their

asylum claims. In contrast, representing a young child who has experienced trauma in immigration court is often unworkable. Even the initial step of attempting to explain complex court proceedings to young children requires substantial preparation and experience. Unaccompanied children have also usually experienced significant trauma and thus require months, if not years, of working with counsel before they feel comfortable discussing the facts of their asylum claims. But given that the immigration courts are "pretermitting" asylum applications, often without individualized consideration of the application, and fast-tracking removal orders, FIRRP attorneys will have little time to prepare their child clients' asylum cases for a full merits hearing.

115. Referral of affirmative asylum applications to fast-track proceedings in immigration court also prevents FIRRP from pursuing other types of relief for clients who are eligible. Special Immigrant Juvenile Status, for instance, requires a state-court proceeding and then a years-long wait for two USCIS adjudications and an available visa. The inevitable result of the Summary Referral IFR is therefore that FIRRP will be able to serve far fewer unaccompanied child clients.

**COUNT I**
**Violation of the Administrative Procedure Act' s Procedural Requirements, 5 U.S.C. §§ 553 & 706(2)(D)**

116. Plaintiffs repeat and incorporate by reference each of the prior paragraphs as if fully set forth here.

117. The APA generally requires agencies to provide public notice and an opportunity to comment before promulgating a rule. 5 U.S.C. § 553(b)-(c). It also authorizes courts to set aside agency action made "without observance of procedure required by law." *Id.* § 706(2)(D).

118. No exception to the notice-and-comment requirement applies to the Summary Referral IFR.

119. Defendants did not provide the public with notice or an opportunity to comment before the Summary Referral IFR's effective date.

120. The Summary Referral IFR violates the notice-and-comment requirements of 5 U.S.C. § 553 and constitutes agency action made "without observance of procedure required by law" under 5 U.S.C. § 706(2)(D).

**COUNT II**
**Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) – Contrary to Law**

121. Plaintiffs repeat and incorporate by reference each of the prior paragraphs as if fully set forth here.

122. The APA provides that a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be … not in accordance with law." 5 U.S.C. § 706(2)(A).

123. In the TVPRA, Congress gave USCIS initial jurisdiction over all asylum applications filed by unaccompanied children. 8 U.S.C. § 1158(b)(3)(C). But USCIS will never provide a merits adjudication on the applications of children referred without an interview under the Summary Referral IFR, rendering Congress's choice effectively meaningless.

124. The Summary Referral IFR violates the TVPRA. It is therefore contrary to law in violation of the APA.

125. The INA guarantees an asylum "interview or hearing" in every case. 8 U.S.C. § 1158(d)(5)(A)(ii).

126. Given the increasing prevalence of pretermission of asylum cases by immigration judges, asylum applicants whose cases are referred to immigration court based on the Summary Referral IFR are not assured of a hearing on the merits.

127. The INA requires the discretionary component of asylum to be considered after a noncitizen demonstrates eligibility for asylum. 8 U.S.C. § 1158(b)(1)(A).

128. The Summary Referral IFR allows asylum officers to consider discretionary factors without assessing eligibility for asylum.

129. The Summary Referral IFR violates the INA. It is therefore contrary to law in violation of the APA.

**COUNT III**
**Violation of the Administrative Procedure Act – Arbitrary and Capricious, 5 U.S.C. § 706(2)(A)**

130. Plaintiffs repeat and incorporate by reference each of the prior paragraphs as if fully set forth here.

131. The APA provides that a "reviewing court shall … hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A).

132. The Summary Referral IFR is arbitrary and capricious for reasons including, but not limited to, the following: Defendants failed to consider important aspects of the problem; failed to consider significant reliance interests; failed to provide a reasoned, non-arbitrary explanation for the IFR; relied on erroneous assumptions; made determinations contrary to the record; failed to explain changes in position; and failed to take into account the effect of related, contemporaneous policy changes.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully pray for the following relief:

a. A stay under 5 U.S.C. § 705 to preserve status and rights pending the Court's final adjudication of the claims in this case;

b. A declaration pursuant to 28 U.S.C. § 2201 that the Summary Referral IFR is procedurally invalid, contrary to law, and arbitrary and capricious;

c. Vacatur of the Summary Referral IFR in its entirety;

d. An order awarding Plaintiffs the costs of suit and reasonable attorneys' fees and expenses pursuant to any applicable law; and

e. Such other and further relief as the Court deems equitable, just, and proper.

Dated: August 19, 2026

Respectfully Submitted,

*/s/ Richard Caldarone*
Keren Zwick (D.D.C. Bar No. IL0055)
Richard Caldarone (D.C. Bar No. 989575)
Mary Georgevich*
Maria Dambriunas (D.C. Bar No. 1738154)
Gerardo Romo*
Mark Scaggs*
NATIONAL IMMIGRANT JUSTICE CENTER
111 W. Jackson Blvd., Suite 800
Chicago, IL 60604
(312) 660-1531
kzwick@immigrantjustice.org
rcaldarone@immigrantjustice.org
mgeorgevich@immigrantjustice.org
mdambriunas@immigrantjustice.org
gromo@immigrantjustice.org
mscaggs@immigrantjustice.org

Anwen Hughes*
HUMAN RIGHTS FIRST
121 W. 36th St., PMB 520
New York, NY 10018
(212) 845-5244
HughesA@humanrightsfirst.org

Melissa Crow (D.C. Bar No. 453487)
CENTER FOR GENDER & REFUGEE STUDIES
1901 Pennsylvania Avenue, NW
Suite 900, PMB 228
Washington, DC 20006
(202) 355-4471
crowmelissa@uclawsf.edu

Robert Pauw*
CENTER FOR GENDER & REFUGEE STUDIES
c/o Gibbs Houston Pauw
1000 Second Avenue, Suite 1600
Seattle, WA 98104
(206) 682-1080
rpauw@ghp-law.net

Peter Habib*
CENTER FOR GENDER & REFUGEE STUDIES
200 McAllister Street
San Francisco, California 94102
(415) 610-5729
habibpeter@uclawsf.edu

**Application for admission or admission pro hac vice forthcoming*