**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IMMIGRATION EQUALITY, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>MARKWAYNE MULLIN, *et al.*,<br><br>*Defendants*. | Case No.: 1:26-cv-2921 |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR STAY OF EFFECTIVE DATE OF ADMINISTRATIVE ACTION**

## INTRODUCTION

The Department of Homeland Security (DHS) and U.S. Citizenship and Immigration Services (USCIS) have eliminated the right to an asylum interview—a right guaranteed for decades to people seeking asylum before USCIS. The asylum interview is critical for fact-finding purposes. Asylum cases turn on testimony more than anything else, and interviews—which are conducted in a non-adversarial manner by an asylum officer trained in trauma-informed interviewing—are the best way to elicit relevant testimony. Indeed, Defendants have repeatedly trumpeted the importance of the interview. But thanks to the interim final rule challenged in this case, no one who files a new application for asylum will be assured of an interview. *See Affirmative Asylum Referrals Without Interview*, 91 Fed. Reg. 47101 (July 28, 2026) (Summary Referral IFR or IFR). And more than one million people with asylum applications that remain pending before USCIS were guaranteed an interview and now—after waiting months or years—have been told that guarantee is meaningless.

This Court should stay the Summary Referral IFR. Defendants issued it without notice and comment, which are required because the IFR revokes a longstanding right, forces applicants—including children—into an adversarial forum, and will change the outcome of many applications before USCIS. The IFR is also arbitrary and capricious. It masquerades as a backlog-reduction measure, but Defendants failed to consider other ways to reduce the background recommended by DHS officials. The IFR glosses over the reliance interests of people with long-pending applications. It applies to unaccompanied children but says nothing about either Congress's decision to give USCIS initial jurisdiction over these children's cases or the inability of many children to represent themselves in immigration court. The IFR will lead to

many people being detained but refuses to acknowledge the costs, both human and economic, of that consequence.

Plaintiffs are therefore likely to succeed on the merits of this case. They also satisfy the remaining elements for preliminary relief, not least because the Summary Referral IFR completely upends—and threatens to eviscerate—the legal-service model Plaintiffs use. The effective date of the Summary Referral IFR should be stayed under 5 U.S.C. § 705 pending a final resolution of this case.

## BACKGROUND

### A. Asylum Interviews and Immigration Court Proceedings

Noncitizens who apply for asylum in the United States must clear three hurdles. First, they must show that they are a refugee within the meaning of the INA—*i.e.*, that they suffered past persecution, or have a well-founded fear of persecution, on account of race, religion, nationality, membership in a particular social group, or political opinion. 8 U.S.C. § 1101(a)(42)(A). Second, they cannot be subject to any of the statutory bars to asylum. *See id.* §§ 1158(a)(2) & (b)(2). And third, they must receive a favorable exercise of discretion from the government. *See id.* § 1158 (b)(1)(A) (officials "may grant asylum" to an eligible applicant).

Two different federal agencies adjudicate asylum applications. For people who are in removal proceedings in immigration court, an immigration judge employed by the Executive Office for Immigration Review (EOIR) within the Department of Justice adjudicates the application. *See* 8 U.S.C. § 1229a. People not in removal proceedings, and unaccompanied children, may instead apply for asylum with the USCIS asylum office. *See* 8 U.S.C. § 1158(b)(3)(C); 8 C.F.R. § 208.2(a). Until recently, longstanding regulations and the Form I-589 Application for Asylum and Withholding of Removal guaranteed the right to an interview. *See,*

*e.g.*, 8 C.F.R. § 208.10 (2025); Form I-589 Instructions 10 (2025). The INA, meanwhile, guarantees an "initial interview or hearing" on every asylum application. 8 U.S.C. § 1158(d)(5)(A)(ii).

Consistent with those guarantees, asylum interviews have been an integral part of adjudications made by the USCIS asylum office for decades. As USCIS's training materials make clear, the asylum interview serves several key purposes: it provides the most effective way of eliciting relevant information, allows asylum officers to assess credibility, clarifies for *pro se* applicants what information they must provide, and yields the most relevant evidence concerning the statutory bars to asylum. *See* 8 C.F.R. § 208.9(b); USCIS, *Interviewing—Eliciting Testimony Lesson Plan* 12-13 (Feb. 5, 2025) (*Eliciting Testimony*);[1] USCIS, *Interviewing—Introduction to the Non-Adversarial Interview* 14 (Dec. 13, 2024) (*Non-Adversarial Interview*);[2] USCIS, *RAIO Directorate Officer Training Manual* 105, 109, 647.[3]

The interview is also the only opportunity applicants have before USCIS to provide their own testimony—evidence that can be sufficient, standing alone, to show eligibility for asylum, *see, e.g.*, 8 U.S.C. § 1158(b)(1)(B)(ii)—and usually the only opportunity to address potential concerns that the asylum officer has with the application, *see* 8 C.F.R. § 208.13 (setting out the applicant's burden of proof). The scheduling of an interview provides an important signal to the applicant that they should, after having waited years for an interview and adjudication, provide updated evidence about conditions in their country of origin and other facts that bear on eligibility for asylum. Dec. of Aaron Morris ¶¶ 12-13, 35; Dec. of Rachel Kafele ¶¶ 29, 35, 37-38; Dec. of Stephen Marvin Brown ¶¶ 18, 25, 30-3l; Dec. of Roxana Avila-Cimpeanu ¶¶ 15-16,

1 https://tinyurl.com/yafy53y5.
2 https://tinyurl.com/22adcfne.
3 https://tinyurl.com/yjy6p6b7.

47. And by doing all these things, the interview—as Defendants have recognized—plays a crucial role in safeguarding the integrity of the U.S. asylum system. *See* USCIS, *Exploring Asylum Officer Careers*.[4]

Although noncitizens in removal proceedings may submit an asylum application to an immigration judge, asylum interviews are fundamentally different from proceedings before the immigration courts. Interviews are non-adversarial, *see Non-Adversarial Interview* 12-27, whereas in immigration court, a DHS attorney argues the case for denying the application and removing a noncitizen, *see* 8 U.S.C. § 1229a (setting out immigration-court procedures). In an asylum interview, only the applicant provides oral testimony, *see* 8 C.F.R. § 208.9, whereas in immigration court a noncitizen often needs to call on both fact witnesses and expert witnesses to testify about country conditions, mental health, and other topics*, see, e.g.*, 8 U.S.C. § 1229a(b)(4) (right to call and cross-examine witnesses).

Further, unlike immigration judges, the asylum officers who conduct interviews are trained in trauma-informed techniques, meaning that it is more likely that unaccompanied children and other survivors of persecution will be able to testify to their full range of experiences in an interview with an asylum officer. *See* USCIS, *Interviewing—Interviewing Survivors of Torture and Other Severe Trauma* (*Interviewing Survivors*) (Dec. 13, 2024).[5] That distinction has become even sharper given the myriad recent changes that act to prevent people seeking asylum from presenting any kind of testimony in immigration court. *See, e.g.*, Compl. ¶¶ 72-79. And as the extensive training manuals cited above demonstrate, asylum officers—unlike immigration judges—are specialists in a particular type of relief on which they receive

---

4 https://tinyurl.com/4n9tcck8.
5 https://tinyurl.com/3kxh2np9.

extensive training. And unlike immigration-court proceedings, an asylum interview cannot result in removal from the United States but only in a grant, a referral to immigration court, or (for people with other valid immigration status) a denial. *See* 8 C.F.R. § 208.14(b)-(c).

**B. The Summary Referral IFR**

On July 28, 2026, Defendants broke from decades of practice and their prior statements about the importance of asylum interviews by issuing an interim final rule that purports to revoke the right to such interviews. *See* 91 Fed. Reg. 47101. The Summary Referral IFR permits USCIS to refer asylum applications to immigration court on any conceivable basis for denial—the applicability of a bar to asylum, not being "eligible on the merits of a claim," or "not merit[ing] a grant as a matter of discretion." *Id.* at 47128 (new 8 C.F.R. § 208.9(a)(2)). The IFR allows summary referrals on discretionary grounds even without consideration of the merits of the claim. *See id.* at 47124. This, too, is a departure from decades of practice; it was previously the view of both Defendants and the Board of Immigration Appeals (BIA) that the facts underpinning eligibility are highly relevant to the application of discretion, meaning that discretion should generally be exercised only *after* an applicant's eligibility was determined. *See Matter of Pula*, 19 I&N Dec. 467, 474 (BIA 1987); USCIS, *RAIO Directorate: Discretion* 12 (Jan. 27. 2025).[6]

The IFR applies both to future asylum applications and to all pending applications for which Defendants had not yet scheduled an interview as of the effective date. 91 Fed. Reg. at 47110. By Defendants' own estimation, the IFR will result in hundreds of thousands of people not receiving an interview even though they applied when regulations guaranteed them an interview and on a Form I-589 that likewise guaranteed them an interview. *See id.* at 47117. And

---

6 https://tinyurl.com/5a7d6ktr.

the IFR does not exempt unaccompanied children, whose applications Congress expressly directed should be decided by asylum officers in the first instance.[7] *Id.* at 47113.

Defendants did not engage in public notice and comment before promulgating the Summary Referral IFR. *See* 91 Fed. Reg. at 47101. Rather, the IFR claims—solely on the basis of a blanket assertion by the Secretary of State purporting to interpret the Administrative Procedure Act (APA)—that the foreign-affairs exception to the APA's notice-and-comment procedures applies. *Id.* at 47116. And although the IFR repeatedly and expressly states that it revokes the right to an interview, it then asserts that the procedural-rule exception to notice and comment applies because it does *not* affect rights or interests. *See id*. at 47102-03, 47105, 47108, 47110 & n.40, 47111, 47115-16, 47119.

The preamble to the Summary Referral IFR fails to consider several consequences of the IFR. The preamble does not meaningfully engage with the reliance interests of people who were guaranteed an asylum interview when they applied. *See* 91 Fed. Reg. at 47116-17. The preamble does not mention either Congress's choice in the Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA), Pub. L. 110-457, 122 Stat. 5044, § 235 (2008), to direct the applications of unaccompanied children to the USCIS asylum office or the inability of children to represent themselves in adversarial proceedings in immigration court. Indeed, although the TVPRA appears in the IFR's "Table of Abbreviations," 91 Fed. Reg. at 47101-02, the text of the IFR never mentions it.

---

[7] The INA exempts unaccompanied children from a subset of the statutory bars to asylum. *See* 8 U.S.C. § 1158(a)(2)(E). The IFR acknowledges that a child's asylum application may not be summarily referred to immigration court based on one of those bars, but it does not exempt them wholesale from the summary referral process. *See* 91 Fed. Reg. at 47113.

Moreover, although the preamble recognizes that noncitizens referred to immigration court are more likely to come to the attention of U.S. Immigration and Customs Enforcement, *see* 91 Fed. Reg. at 47110, it does not acknowledge that this means referred noncitizens face a high risk of detention under new DHS and EOIR policies. *See, e.g.*, ICE, *Interim Guidance Regarding Detention Authority for Applicants for Admission* (July 8, 2025) (*Interim Guidance*);[8] *Matter of Yajure Hurtado*, 29 I&N Dec. 216 (BIA 2025). It also does not acknowledge that such detention comes with significant costs to both the noncitizen and U.S. taxpayers. Although the preamble treats the reduction of the affirmative asylum backlog as the primary purpose of the Summary Referral IFR, *see id.* at 47102, it does not engage with the various causes of that backlog and does not consider as alternatives various measures that other government officials have urged USCIS to implement. And the preamble fails to acknowledge that many people referred to immigration court without an interview will also not receive a hearing before an immigration judge due to a new DHS and EOIR policy of "pretermitting" asylum applications—despite the INA's guarantee of an "interview or hearing" in every case. 8 U.S.C. § 1158(d)(5)(A)(ii).

**C. The Plaintiffs**

The Plaintiffs are four legal services organizations whose core work includes assisting vulnerable asylum seekers apply for asylum before USCIS.

Plaintiffs Immigration Equality and Oasis Legal Services (Oasis) both represent people primarily before the asylum office and focus their work on LGBTQ+ and HIV-positive asylum seekers. More than 75% of Immigration Equality's clients have pending affirmative asylum applications. Morris Dec. ¶ 7. Oasis's clients have 1,100 asylum applications pending before

---

[8] https://tinyurl.com/yc355fhy.

USCIS, but Oasis has only 22 asylum cases pending before the immigration court. Kafele Dec. ¶ 5. For reasons tied to the nature of their claims, the clients of both Immigration Equality and Oasis are much more likely to have filed outside the one-year filing deadline because of changed or extraordinary circumstances than other asylum applicants. *See* Morris Dec. ¶ 11 (timing of HIV diagnosis); Kafele Dec. ¶¶ 11, 35-36 (inability to come out or affirm gender within the one-year period).

Plaintiff HIAS "primarily, though not exclusively" represents people before USCIS. Brown Dec. ¶ 16. HIAS has 182 asylum applications pending before USCIS and fewer than half that number pending before the immigration courts. *Id.* ¶ 13. And Plaintiff Florence Immigration and Refugee Rights Project (FIRRP) provides affirmative asylum representation to hundreds of unaccompanied children in Arizona each year. Avila-Cimpeanu Dec. ¶ 11. The TVPRA gives FIRRP's child clients, including children under the age of 12, the right to an affirmative asylum adjudication even if the immigration court would otherwise have jurisdiction over their cases. *Id.* ¶¶ 5, 12.

Each of the Plaintiffs relies on representation by people for whom appearances in immigration court are very difficult or impossible. Plaintiffs Oasis and HIAS have non-lawyer staff members accredited by the Department of Justice to represent people before USCIS but not the immigration courts. Kafele Dec. ¶ 20; Brown Dec. ¶ 22. The pro bono volunteers on whom all the Plaintiffs—and especially Immigration Equality—rely also have limited experience working in adversarial systems and often accept cases only because they are adjudicated before the asylum office instead of in immigration court. *See* Morris Dec. ¶¶ 22, 24, 29; Kafele Dec. ¶ 28; Brown Dec. ¶ 29; Avila-Cimpeanu Dec. ¶ 47.

Until the Summary Referral IFR took effect, Plaintiffs organized their practices based on the assumption that—as stated in the regulations and the asylum application form—applicants would receive an interview before the asylum office. *See, e.g.,* Morris Dec. ¶ 33; Kafele Dec. ¶ 30; Brown Dec. ¶ 19; Avila-Cimpeanu Dec. ¶¶ 15, 24. Because applications for asylum, even if pending for years, are decided based on the facts at the time of adjudication rather than the facts at the time of application, Plaintiffs generally filed applications with sufficient information to be accepted by the asylum office, with the intent to update and supplement them at the time of the interview. Morris Dec. ¶¶ 12-13, 35; Kafele Dec. ¶¶ 29, 35, 37-38; Brown Dec. ¶¶ 18, 25; Avila-Cimpeanu Dec. ¶¶ 15-16, 20, 47. Without the interview, there is no guaranteed mechanism to notify applicants about when their applications will be adjudicated. Kafele Dec. ¶ 30; *see also* Brown Dec. ¶ 25; Avila-Cimpeanu Dec. ¶¶ 20-21; Morris Dec. ¶ 33. Applicants who have been waiting for years to have their applications decided must now continuously provide updates to law, country conditions, or personal circumstances in order to demonstrate their eligibility for asylum. The Summary Referrals IFR eliminates the certainty that applicants and their representatives will receive notice and an opportunity to provide those updates before and during an interview.

## LEGAL STANDARD

The APA authorizes a court reviewing an agency action to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings" on "such conditions as may be required and to the extent necessary to prevent irreparable injury." 5 U.S.C. § 705. In deciding whether to issue a § 705 stay, the Court considers the familiar four-factor test governing preliminary injunctions. *See, e.g.*, *Dist. of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 15 (D.D.C.

2020). A stay is warranted if Plaintiffs show that "(1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in their favor, and (4) an injunction is in the public interest." *Id*. (citing *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 20 (2008)).

## ARGUMENT

Plaintiffs satisfy each of the preliminary-relief factors. Plaintiffs are likely to succeed on the merits of their claim that Defendants were required to use the APA's notice-and-comment procedures. Although Defendants rely on the foreign-affairs and procedural-rule exceptions to those procedures, the Summary Referral IFR is not about foreign affairs and, by its own repeated admission, revokes a substantive right. Plaintiffs are also likely to succeed on the merits of their claim that the IFR is arbitrary and capricious because it ignores significant reliance rights, fails to consider several important aspects of the problem, and also fails to consider alternatives proposed by other DHS officials. Moreover, the Plaintiffs—whose business models revolve around representing people in affirmative asylum proceedings—will be severely and irreparably harmed absent a stay, and the equities and the public interest tilt heavily in Plaintiffs' favor.

### I. Plaintiffs Are Likely to Succeed on the Merits of Their Claims

#### A. The Summary Dismissal IFR Required Notice and Comment

"The APA generally requires substantive rules to be promulgated through notice-and-comment rulemaking." *Cap. Area Immigrants' Rts. Coal. v. Trump*, 471 F. Supp. 3d 25, 44 (D.D.C. 2020) (*CAIR Coal.*). A "notice of proposed rule making shall be published in the Federal Register," and the agency "shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments." 5 U.S.C. § 553(b)-(c). Only

"[a]fter consideration of the relevant matter presented" may the agency finalize a rule. *Id.* § 553(c).

Defendants took none of these required steps before issuing the Summary Referral IFR. Instead, they contend that both the foreign-affairs and procedural-rule exceptions excuse notice-and-comment rulemaking. But exceptions to the APA's notice-and-comment requirements are "narrowly construed and only reluctantly countenanced." *N.J. Dep't of Envtl. Prot. v. EPA*, 626 F.2d 1038, 1045 (D.C. Cir. 1980). The "'onus is on the [agency]'" to overcome the "uphill battle" of establishing "'that notice and comment' should not be given." *Nat'l Venture Capital Ass'n*, *v. Duke*, 291 F. Supp. 3d 5, 16 (D.D.C. 2017) (alteration in original) (quoting *Action on Smoking & Health v. Civ. Aeronautics Bd.*, 713 F.2d 795, 801 n.6 (D.C. Cir. 1983)). Defendants cannot meet their burden as to either exception.

**1. The foreign-affairs exception does not apply**

Under the foreign-affairs exception, an agency may forgo notice-and-comment procedures where a rule implicates a "foreign affairs function of the United States." 5 U.S.C. § 553(a)(1). In this circuit, a rule implicates a foreign-affairs function under the APA only if it "clearly and directly involve[s] activities or actions characteristic to the conduct of international relations." *E.B. v. U.S. Dep't of State*, 583 F. Supp. 3d 58, 64 (D.D.C. 2022); *see Humana of S.C., Inc. v. Califano*, 590 F.2d 1070, 1082 (D.C. Cir. 1978) (APA procedures govern unless an agency action "clearly and directly" implicates an exception) (quotation omitted). The exception thus "covers heartland cases in which the rule itself directly involves the conduct of foreign affairs." *E.B*, 583 F. Supp. 3d at 65. It would apply, for instance, to the implementation of an international agreement between the United States and another sovereign state, *Int'l Bhd. of Teamsters v.*

*Pena*, 17 F.3d 1478 (D.C. Cir. 1994), or a rule regulating foreign diplomats in the United States, *City of N.Y. v. Permanent Mission of India to United Nations*, 618 F.3d 172 (2d Cir. 2010).

Defendants cannot satisfy this exacting standard for the simple reason that the IFR governs domestic asylum applications under domestic law and is not about foreign affairs. Even cases involving removal or border policies do not trigger the foreign-affairs exception. *See, e.g.*, *Amica Ctr. for Immigr. Rts. v. EOIR*, 822 F. Supp. 3d 119, 164 (D.D.C. 2026) ("rules governing BIA appeals" not subject to the foreign-affairs exception); *E.B.*, 583 F. Supp. 3d at 67 (rule regulating documents needed to enter the United States with a diversity visa did not implicate foreign-affairs functions); *CAIR Coal.*, 471 F. Supp. 3d at 55 (rule regulating asylum access for noncitizens arriving on the southern border did not implicate foreign-affairs function); *Narenji v. Civiletti*, 481 F. Supp. 1132, 1137 (D.D.C.) ("the executive [may not] invoke the foreign affairs exemption to control a matter that essentially involves naturalization and deportation"), *rev'd on other grounds*, 617 F.2d 745 (D.C. Cir. 1979); *Hou Ching Chow v. Att'y Gen.*, 362 F. Supp. 1288, 1290-91 (D.D.C. 1973) ("If deportation proceedings do not come within the foreign affairs exemption, most certainly mere adjustment of … status and labor certification requirements are not so exempt."). And the IFR is farther removed from foreign affairs than those policies, because a noncitizen subject to the IFR has not recently crossed the border and cannot be immediately removed as a result of the IFR.

The IFR makes no serious attempt to argue otherwise. Instead, Defendants cite a blanket assertion by the Secretary of State that any action conducted by "'any agency of the federal government'" related to "'the status, entry, and exit of people'"—which is to say, any rule that involves immigration law—triggers the foreign-affairs exception. 91 Fed. Reg. at 47116 (quoting 90 Fed. Reg. 12200 (Mar. 14, 2025)). But that assertion, which purports to interpret the APA and

was made without any reference to this particular IFR, *see* 90 Fed. Reg. at 12200, receives no deference and cannot override the cases that more narrowly circumscribe the exception. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024). Indeed, the Secretary's blanket invocation of foreign affairs embodies the "dangers of an expansive reading of the foreign affairs exception" because it would "eliminate[] public participation in [an] entire area of administrative law." *City of N.Y.*, 618 F.3d at 202; *see Amica Ctr. for Immigr. Rts.*, 822 F. Supp. 3d at 165 (D.D.C. 2026); *CAIR Coal.*, 471 F. Supp. 3d at 55-56.

Defendants also rely on the notion that the Secretary's statements "implement[] numerous Presidential actions reflecting the President's top foreign policy priorities." 91 Fed. Reg. at 47116 n.70. But "[n]owhere does the statutory text suggest that being linked intimately with the Government's overall political agenda concerning relations with another country meets the exception." *CAIR Coal.*, 471 F. Supp. 3d at 56 n.23. And "[e]ven assuming that the United States has a legitimate interest in demonstrating to its international partners that it is proceeding with dispatch, it can do so within the framework that Congress established for promoting both reasoned administrative decision-making." *Amica Ctr. for Immigr. Rts.*, 822 F. Supp. 3d at 165. Accordingly, the Secretary of State's attempt to declare whole fields of law exempt from notice and comment by fiat does not satisfy Defendants' burden of showing that the foreign-affairs exception applies.

#### 2. The procedural-rule exception does not apply

The IFR also relies on the exception to notice-and-comment procedures for "rules of agency organization, procedure, or practice." 5 U.S.C. § 553(b)(A); *see* 91 Fed. Reg. at 47115-16. That exception "is intended for internal house-keeping measures" and "must be narrowly construed." *Am. Fed'n of Lab. & Cong. of Indus. Orgs. v. NLRB*, 57 F.4th 1023, 1034-35 (D.C.

Cir. 2023) (quotation omitted) (*AFL-CIO*). "[T]he distinction between substantive and procedural rules is one of degree depending upon whether the substantive effect is sufficiently grave so that notice and comment are needed to safeguard the policies underlying the APA." *Elec. Priv. Info. Ctr. v. DHS*, 653 F.3d 1, 5-6 (D.C. Cir. 2011) (quotations omitted). "The critical feature of a rule that satisfies the so-called procedural exception is that it covers agency actions that do not themselves alter the rights or interests of parties, although it may alter the manner in which the parties present themselves or their viewpoints to the agency." *AFL-CIO*, 57 F.4th at 1034 (cleaned up). "Where a rule imposes substantive burdens, encodes a substantive value judgment, trenches on substantial private rights or interests, or otherwise alters the rights or interests of parties," the exception does not apply. *Id*. at 1034-35 (cleaned up).

The Summary Referral IFR is substantive. There can be no question that the IFR alters the rights of parties because it removes the right to an interview for affirmative asylum applicants. Indeed, the IFR expressly and repeatedly concedes that it is "removing" the regulatory "'right' to an interview." 91 Fed. Reg. at 47102; *accord id.* at 47103, 47105, 47108, 47110 & n.40, 47111. And it removes that right not only from future applicants but also from people with pending applications who were guaranteed an interview by the regulations and application instructions in force when they applied for asylum. Defendants' position that the IFR does not "alter [the] rights" of applicants—a position the IFR adopts solely for the purpose of seeking to circumvent notice-and-comment procedures—is thus both self-contradictory and wrong. *Id.* at 47116.

The IFR also impinges on the underlying right to seek asylum under 8 U.S.C. § 1158(a)(1). Under the IFR, an applicant may be referred to immigration court based on application materials that are years old without having received an opportunity to present

updated written materials or their own testimony to the asylum office. Then, in immigration court, the same applicant could be forced into a mass hearing in which they face pressure to give up their claims without individualized consideration. *See, e.g.*, *Chaotic, Crowded Chicago Immigration Mega Court Hearings Are Fueling Record Deportation Orders,* Chicago Sun Times (July 24, 2026);[9] *Immigration Court Are Using a New Tactic to Speed up Deportations*, NPR (May 26, 2026).[10] They could also face a situation in which DHS and DOJ determine that their asylum application can be "pretermitted" and they can be removed without a hearing or full merits adjudication. That might occur because of supposed deficiencies in their application papers. *Matter of C-A-R-R-*, 29 I&N Dec. 13 (BIA 2025). Many of these third countries are unsafe for asylum seekers and lack functioning asylum systems—but people DHS wants to send to third countries lack any meaningful chance to raise those arguments. *See, e.g.*, *Matter of C-I-G-M- & L-V-S-G-*, 29 I&N Dec. 291 (BIA 2025) (requiring applicants to show a likelihood of torture or persecution and prohibiting immigration judges from considering whether a third country has a full and fair asylum system); *U.T. v. Bondi*, No. 1:20-cv-116 (EGS), Dkt. 173-1 (Plaintiff's Proposed Second Amended Complaint) (Dec. 19, 2025) (challenging safe-third-country designations and regulations and guidance implementing those designations).

This change is especially harmful to the individual clients that Plaintiffs serve. The unaccompanied children represented by the Florence Project will be severely harmed both because the IFR deprives them of the forum Congress selected for their claims and because the vast majority of unaccompanied children cannot meaningfully participate in immigration court proceedings. *See* Avila-Cimpeanu Dec. ¶¶ 22, 26-29, 43. The LGBTQ+ and HIV-positive clients

---

[9] https://tinyurl.com/mc75cj6e.
[10] https://tinyurl.com/3btw4sz8.

served by Immigration Equality and Oasis likewise face unique risks. For instance, if an immigration judge decides to pretermit the claim of such a client, the applicant might well face removal to a country that treats LGBTQ+ and HIV-positive people as badly as the client's country of origin. *See, e.g.*, Refugees Int'l & Human Rights First, *Banished by Bargain: Third Country Deportation Watch*.[11] And given that the IFR provides no timeframe for referrals without interview, revoking the interview right means that no applicant will ever know precisely *when* USCIS might adjudicate their application. Because of the years-long asylum office backlog and unpredictable interview times, applicants will not know when to submit updated country conditions and other new evidence related to asylum eligibility. *See* Morris Dec. ¶ 35; Kafele Dec. ¶¶ 30-31; Brown Dec. ¶ 25; Avila-Cimpeanu Dec. ¶¶ 20-21.

Indeed, the IFR will alter the results of many affirmative asylum adjudications. Affirmative applicants who do not obviously satisfy the relevant standards based on their written applications, but whose claims an asylum officer would nevertheless grant following an interview, will now instead be referred to immigration court. The IFR itself admits that at least "some applications may be referred under this rule that USCIS could have granted." 91 Fed. Reg. at 47104. But there are far more such applications than the IFR acknowledges: after all, by Defendants' own estimation, the IFR could affect more than 440,000 pending applications on the sole ground of the one-year filing deadline. *Id.* at 47103. But applicants could previously establish "extraordinary circumstances" justifying their delay and receive asylum grants from USCIS. Indeed, 97% of the clients of Plaintiff Oasis Legal Services who filed after the one-year deadline were granted asylum after an interview with an asylum officer. Kafele Dec. ¶ 19.

---

[11] https://tinyurl.com/bdf67ypb.

Thus, far from simply "alter[ing] the manner in which the parties present themselves" to USCIS, *AFL-CIO*, 57 F.4th at 1034, the Summary Referral IFR will "dictate[] results" before USCIS for countless people, *Amica Ctr. for Immigr. Rts.*, 822 F. Supp. 3d at 157 (holding that outcome-determinative changes to EOIR appellate procedures required notice and comment). It is therefore unsurprising that the right to interview was created by notice and comment, *see* 55 Fed. Reg. 30674 (July 27, 1990)—which is itself strong evidence that "the same procedures" should be used in any attempt to rescind that right. *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 101 (2015).

Finally, the IFR alters substantive rights by allowing USCIS to refer an application on discretionary grounds before considering its merits. This seemingly minor change will have sweeping consequences, because both the facts underlying a claim and the facts established during an interview are highly relevant to the exercise of discretion. *See, e.g.*, *Matter of Pula*, 19 I&N Dec. at 474; *Discretion* 12. This change, like the IFR's broader elimination of the right to an interview, will therefore be outcome-determinative before USCIS—in this case, for people with discretionary factors intertwined with the merits of their cases. That category includes, among others, both trafficking survivors (who may have been coerced by their traffickers into entering the United States without authorization or committing crimes) and domestic violence survivors (against whom false police reports are often filed).

In short, the IFR is substantive in multiple ways. It expressly removes the longstanding regulatory right to an interview, which in turn will dictate the outcome of cases before USCIS and prevent applicants from providing the single most important type of evidence—their testimony—to USCIS. It  means that, for many asylum applicants, the statutory right to asylum never leads to consideration of their application on the merits. And it severely harms

unaccompanied children, who typically lack the ability to participate in the adversarial interview process.

Defendants' contrary arguments do not even begin to show that the IFR is a procedural rule. Defendants assert that "DHS has long believed there is no statutory right to an asylum interview," that "USCIS does not interview every" applicant for every kind of relief, and that the asylum backlog must be reduced. 91 Fed. Reg. at 47116. But if those assertions are relevant at all, it is to the merits of the IFR, not whether the IFR alters the rights and interests of asylum applicants.

Defendants also rely on *JEM Broadcasting Co. v. FCC*, 22 F.3d 320 (D.C. Cir. 1994), *see* 91 Fed. Reg. at 47116, but that opinion has no purchase here. *JEM* involved a change in policy that allowed the Federal Communications Commission (FCC) to reject substantially incomplete radio-station licenses without first offering a curative amendment period. Unlike the Summary Referral IFR, that action did not remove a key method of providing information to the agency but instead simply required an application to be complete when filed. *See id.* at 327. Unlike the Summary Referral IFR, the FCC's action did not remove the right to provide the most critical type of evidence in support of an application. *Id.* And unlike the Summary Referral IFR, the FCC's action did not apply to pending applications; to the contrary, applicants were given 30 days' notice of the change. *See id.* at 328. In short, the FCC's action did not meaningfully alter rights or interests, whereas the IFR does so in very significant ways. The APA therefore required Defendants to undertake public notice and comment before promulgating the Summary Referral IFR.

**B. The Summary Referral IFR Is Arbitrary and Capricious**

In issuing a rule, an agency must "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983) (quotation omitted). An agency action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id*.

Moreover, an agency must provide a "reasoned explanation" for departing from prior policy and must "take[] into account" any "serious reliance interests" engendered by the prior policy. *FCC v. Fox Television Stations, Inc*., 556 U.S. 502, 515 (2009); *accord DHS v. Regents of the Univ. of Calif.*, 591 U.S. 1, 30 (2020) (*Regents*). In doing so, the agency must "assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Regents*, 591 U.S. at 33. And "[t]o be regarded as rational, an agency must also consider significant alternatives to the course it ultimately chooses." *Allied Loc. & Reg'l Mfrs. Caucus v. EPA*, 215 F.3d 61, 80 (D.C. Cir. 2000).

The Summary Referral IFR satisfies none of these requirements. Defendants did not meaningfully consider the reliance interests of applicants who were guaranteed an interview at the time they applied and whose applications remain pending. Defendants also failed to consider other important aspects of the problem, including that the IFR will subject countless people to supposedly "mandatory" detention and the costs of that detention, that unaccompanied children are unable to represent themselves in immigration court, and that many people referred without

an interview will never receive *any* type of hearing on their asylum claims. Nor did Defendants consider reasonable alternatives for addressing the backlog that do not involve either removing rights from, or imposing burdens on, asylum applicants.

### 1. The Summary Referral IFR fails to consider significant reliance interests

The Summary Referral IFR implicates significant reliance interests. There were over a million pending affirmative asylum applications at the time the Summary Referral IFR went into effect. 91 Fed. Reg. at 47103. And when each of those noncitizens submitted their application, they were guaranteed an interview both by longstanding DHS regulations and by the application form they completed. *See* 8 C.F.R. § 208.10 (2025) (referring to the "right to an interview"); Form I-589 Instructions 10 (2025) ("you will be notified by the USCIS Asylum Office of the time, date, and place … of a scheduled interview"). Given that right and the years-long backlog, noncitizens and their counsel understandably did not submit applications with every possible piece of relevant information. Indeed, they would have been foolish to do so, because the timing of an interview is a lottery—many people wait for years, while a few receive interviews within weeks or months—and as a result the application would very likely need to be updated before the interview. *See* USCIS, *Affirmative Asylum Interview Scheduling*;[12] Morris Dec. ¶ 35; Kafele Dec. ¶¶ 36-38; Brown Dec. ¶ 18; Avila-Cimpeanu Dec. ¶¶ 15-16, 47. Countless noncitizens, in other words, have refrained from providing details and updates until they received an interview notice—and the Plaintiffs and other legal service providers have routinely done the same on behalf of their clients, acting in reliance on the notion that they would have been able to provide

---

12 https://tinyurl.com/3e2hpjzd.

updated information in the days or weeks before a scheduled interview. Morris Dec. ¶¶ 12-13, 35; Kafele Dec. ¶¶ 29, 35, 37-38; Brown Dec. ¶¶ 18, 25, 30; Avila-Cimpeanu Dec. ¶¶ 15-16, 47.

The IFR acknowledges none of this. While it purports to include a section on the "consideration of reliance interests," that section cites as the only relevant reliance interest the "personal interest in sharing sensitive elements of an asylum claim face-to-face with an asylum officer." 91 Fed. Reg. at 47116. But as discussed above, that interest does not begin to cover the scope of reliance interests engendered by prior policy.[13] And the IFR erroneously minimizes even what little it acknowledges. The IFR calls testifying before an asylum officer a matter of mere "comfort[]," *id.* when the most significant benefit of speaking about past trauma in an asylum interview is that asylum officers, unlike immigration judges and DHS trial attorneys, are trained in trauma-informed interviewing. *See, e.g.*, *Interviewing Survivors*; Morris Dec. ¶¶ 18, 45; Brown Dec. ¶ 26; Avila-Cimpeanu Dec. ¶¶ 22, 26-28, 43; Kafele Dec. ¶ 32.

These failings are arbitrary and capricious: An agency may not "remove first and assess later." *Doctors for Am. v. OPM*, 793 F. Supp. 3d 112, 147 (D.D.C. 2025). Rather, it "must be cognizant of the reliance interests [an action] might upset and explain its good reasons for moving forward anyway." *Affirmed Energy, LLC v. FERC*, 166 F.4th 1070, 1087-88 (D.C. Cir. 2026) (cleaned up); *see Doctors for Am.*, 793 F. Supp. 3d at 147 ("ascertain[] and weigh[] the obvious reliance interests"). The IFR does not do so, and it should accordingly be stayed. *See, e.g.*, *Pouri v. DHS*, 2026 WL 1508425, at *7 (D.D.C. May 30, 2026) (granting preliminary relief

---

13 A single clause in the "consideration of reliance interests section" says that a noncitizen may "supplement his or her application." 91 Fed. Reg. at 47117. That clause does none of the three things required by *Regents*: it does not assess whether the reliance interests above exist, determine whether they are significant, or weigh them against other considerations.

because, among other things, USCIS "fail[ed] to sufficiently grapple with the serious reliance interests at stake as a result of abandoning" a prior policy).

**2. The Summary Referral IFR fails to consider other important aspects of the problem**

The Summary Referral IFR likewise ignores several other major factors relevant to whether the right to an asylum interview should be revoked. As an initial matter, although the IFR notes that noncitizens "may come" to the "attention" of U.S. Immigration and Customs Enforcement "more quickly if referred without interview," 91 Fed. Reg. at 47110, it does not acknowledge the consequences of that fact. Defendants know that both they and EOIR have adopted sweeping new interpretations of the mandatory detention provisions of the INA. *See, e.g.*, *Interim Guidance*; *Yajure Hurtado*, 29 I&N Dec. 216. And Defendants know that, while very few people are detained while they pursue affirmative asylum applications, the immigration courts hear tens of thousands of cases involving detained noncitizens each year. *See* TRAC, *Outcomes of Immigration Court Proceedings*.[14]

A referral without interview therefore means a significant risk of detention. It also means everything that comes with detention: transfer to remote detention centers and resulting separation from family, loss of ability to work, poor medical care, unhygienic and unsafe conditions, and a lack of access to counsel, among other things. *See, e.g.*, Am. Immigration Council, *Inhumane Detention Conditions Aren't Uncommon, They're Part of the Problem* (July 15, 2026);[15] *Advocates for Human Rights v. DHS*, 825 F. Supp. 3d 858 (D. Minn. 2026) (access to counsel); *H.C.R. v. Mullin*, 825 F. Supp. 3d 1267 (M.D. Fla. 2026) (same). But the IFR does not even acknowledge that people referred under its auspices run a high risk of being quickly

[14] https://tracreports.org/phptools/immigration/closure/.
[15] https://tinyurl.com/399fj2rx.

detained. Further, although the IFR includes a cost-benefit analysis, *see* 91 Fed. Reg. at 47117-20, it nowhere acknowledges the significant extra costs U.S. taxpayers will bear to detain additional noncitizens. *See, e.g.*, ICE, *Alternatives to Detention* (estimating cost at more than $55,000 per person per year).[16] And it certainly does not consider the inability of Plaintiffs or other legal service organizations with similar representation models to serve clients in detention. *See* Morris Dec. ¶¶ 24, 44; Brown Decl. ¶¶ 21, 29; Avila-Cimpeanu Decl. ¶¶ 10, 17-18, 32-33, 48.

The IFR's failure to consider the needs of unaccompanied children is even more egregious. The IFR includes a single child-specific sentence: that because unaccompanied children "are not subject to" certain bars to asylum, they "will … not be referred without interview based on" those bars but "may still be referred under the rule" on other grounds. 91 Fed. Reg. 47113. That sentence has massive, unacknowledged implications.

In the TVPRA, Congress expressly selected the USCIS asylum office as the initial forum for hearing claims of unaccompanied children. *See* 8 U.S.C. § 1158(b)(3)(C). Moreover, while unaccompanied children have no more of a statutory right to counsel in immigration court than anyone else, they also have no conceivable way of representing themselves in adversarial legal proceedings. *See, e.g.*, *J.E.F.M. v. Lynch*, 837 F.3d 1026, 1039-41 (9th Cir. 2016) (McKeown, J., specially concurring). The IFR will thus shunt countless children out of the forum selected by Congress into proceedings in which they cannot meaningfully participate—but far from providing a reasoned justification for that outcome, the IFR simply ignores it.

As if that were not enough, the Summary Referral IFR fails to consider what will happen to many asylum applications that are referred without interview. The BIA now, for the first time,

---

[16] https://tinyurl.com/mr78h46b.

allows—in fact, strongly encourages—immigration judges to "pretermit" asylum applications without a hearing. *See Matter of H-A-A-V-*, 29 I&N Dec. 233 (BIA 2025); *Matter of C-A-R-R-*, 29 I&N Dec. 13 (BIA 2025); *Matter of E-A-R-M-*, 29 I&N Dec. 746 (BIA 2026); *Matter of N-E-R-S-*, 29 I&N Dec. 753 (BIA 2026); *Matter of T-A-G-*, 29 I&N Dec. 715 (BIA 2026); *Matter of A-C-M-*, 29 I&N Dec. 703 (BIA 2026); *Matter of C-I-G-M- & L-V-S-G-*, 29 I&N Dec. 291 (BIA 2025). Many applicants referred without an interview will therefore never be able to present testimony in support of their applications in any forum. This is despite the facts that the plain text of the INA guarantees each applicant "a hearing or interview," 8 U.S.C. § 1158(d)(5)(A)(ii), and that Defendants have long recognized the centrality of oral testimony to asylum cases, *see, e.g.*, *Eliciting Testimony* 12-13; *Training Manual* 105, 109.

Worse, the bases for "pretermission" in immigration court include supposed amenability to being removed under a so-called "Asylum Cooperative Agreement." *See Matter of C-I-G-M- & L-V-S-G-*, 29 I&N Dec. 291. Such agreements purport to allow Defendants to remove noncitizens to third countries where they have no ties and to do so without respect to the merits of a noncitizen's asylum application. Moreover, a noncitizen whom Defendants subject to such an agreement typically has no meaningful opportunity to express a fear of removal to the third country, even though several of the countries in question are unsafe or have poor human rights records. *See Matter of A-C-M-*, 29 I&N Dec. 703; Refugees Int'l & Human Rights First, *Banished By Bargain: Third Country Deportation Watch*.[17] Thus, under the Summary Referral IFR, it is entirely possible that a noncitizen with a long-pending application can suddenly and quickly find themselves not only referred to immigration court but also denied a hearing in that forum and deported to a foreign country where they may be at risk. The IFR fails to consider any

[17] https://tinyurl.com/bdf67ypb.

of those potential consequences beyond referral, and it is arbitrary and capricious for that reason as well.[18]

### 3. The Summary Referral IFR fails to consider reasonable alternatives

The Summary Referral IFR is also arbitrary and capricious because it fails to consider other options for carrying out its primary stated purpose—reduction of the affirmative asylum backlog—that do not involve curtailing protections for applicants. While the IFR includes a section on "alternative regulatory approaches," the only approaches it considers are the status quo; revoking the interview right; truncating initial interviews into short screening interviews; or requiring more information on the original application. 91 Fed. Reg. at 47125 (cleaned up). In other words, the IFR considered only (1) reducing or revoking the right to an interview, and (2) enforcing application standards that it concedes would have "led to the rejection of filings from vulnerable [noncitizens] who face literacy or language challenges[] and/or lack access to legal aid." *Id.* at 47126.

That approach ignores obvious alternatives for accomplishing the IFR's primary goal of reducing the affirmative asylum backlog. USCIS is aware of many such alternatives because DHS officials have recommended them. For example, in 2022, the USCIS Ombudsman recommended that USCIS prioritize affirmative asylum applications from people who are ineligible for other relief and would not see their applications mooted by such relief. *See*

[18] The IFR asserts, without more, that noncitizens whose applications are referred without interview may receive an adjudication and "grant of asylum" sooner. 91 Fed. Reg. at 47123. That is, of course, only one possible outcome. And the IFR never explains why it assumes that applications referred under the IFR will be granted in immigration court while also assuming that the same applications would generally have been denied after a USCIS interview, *see id.* at 47103 (estimating that more than 130,000 applications per year can be referred without interview). Nor does it explore whether the backlog of asylum cases in immigration court, *see id.* at 47103-04, would affect the speed of a decision there.

Citizenship & Immigration Services Ombudsman, *Annual Report 2022*, at 43 (June 30, 2022).[19] The Ombudsman further recommended, among other things, focused interview guidance for specific caseloads so that asylum officers can specialize in particular types of asylum claims—specialization that would facilitate more efficient adjudications. *Id.*

The Ombudsman has also repeatedly told USCIS that diverting asylum officers to duties at the border significantly increases the backlog. *See, e.g.*, *Annual Report 2022*, at 52; Citizenship & Immigration Services Ombudsman, *Annual Report 2017*, at 37 (June 29, 2017).[20] And in July 2024, the DHS Office of the Inspector General urged USCIS to create "a multi-year operational plan" aimed at reducing the backlog that included "clear priorities and goals, appropriate staffing levels, an analysis of funding, and how that funding will be generated." DHS OIG, *USCIS Faces Challenges Meeting Statutory Timelines and Reducing Its Backlog of Affirmative Asylum Claims* 11 (July 3, 2024).[21] But USCIS has never acted on these suggestions—and it did not consider them before deciding to revoke noncitizens' longstanding interview right instead. Nor has it used the funding windfall caused by the creation of fees for filing and maintaining asylum applications, *see* 91 Fed. Reg. 22952 (Apr. 29, 2026), to hire additional, well-qualified asylum officers.

Failure to consider these alternatives was arbitrary and capricious. To be sure, an agency need not consider "every alternative device and thought conceivable." *Vt. Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 551 (1978). But the alternatives above are "neither uncommon nor unknown." *Pub. Citizen v. Steed*, 733 F.2d 93, 105 (D.C. Cir. 1984). To the contrary, all of them are well-known to Defendants, and most were proposed by others within DHS with intimate

---

19 https://tinyurl.com/yaha327h.
20 https://tinyurl.com/mr328u73.
21 https://tinyurl.com/3ksduzrf.

knowledge of USCIS. The Summary Referral IFR simply exhibits no curiosity whatsoever about how the backlog can best be reduced; it rather assumes that curtailing interview rights or otherwise demanding more from noncitizens is the answer. It is therefore arbitrary and capricious.

## II. Plaintiffs Will Suffer Irreparable Harm Absent a Stay

A plaintiff shows irreparable harm by showing injury that is both "certain and great, actual and not theoretical, and … imminent" and "beyond remediation." *League of Women Voters v. Newby*, 838 F.3d 1, 8 (D.C. Cir. 2016) (quotations omitted). "An organization is harmed if the actions taken by the defendant have perceptibly impaired the organization's programs" and those actions "directly conflict with the organization's mission." *Id.* (cleaned up). The same type of injury that shows irreparable harm also suffices to show organizational standing. *See FDA v. All. for Hippocratic Med.,* 602 U.S. 367, 395 (2024); *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). Plaintiffs easily clear both bars, because the IFR "'will interfere with'" Plaintiffs' core services by impairing their "'ability … to provide essential services to their clients'" and to take on new clients. *CLINIC v. EOIR*, 513 F. Supp. 3d 154, 175 (D.D.C. 2021) (quoting *Nw. Immigrant Rts. Project v. USCIS*, 496 F. Supp. 3d 31, 79 (D.D.C. 2020)).

All four Plaintiffs have made clear that the Summary Referral IFR will, unless it is stayed, all but preclude them from carrying out their vital work of providing legal representation and pro se support to people seeking asylum before the USCIS asylum office. The IFR "will substantially endanger" the overall "business model" of Immigration Equality. Morris Dec. ¶ 28. It completely undercuts Oasis's business model, which "relies on the assumption that each of our clients will have an interview," to the extent that it threatens Oasis's very existence. Kafele Dec. ¶ 29. The IFR will "make it impossible for HIAS to continue performing [its] core services."

Brown Dec. ¶ 15. And it "will disrupt FIRRP's core business activities" and "significantly curtail[] FIRRP's ability to achieve its mission of serving all unaccompanied children in Arizona." Avila-Cimpeanu Dec. ¶¶ 14, 44.

The IFR will inflict very significant harm on the Plaintiffs for a simple reason: it moves more asylum cases from the USCIS asylum office to the immigration courts more quickly, 91 Fed. Reg. at 47117-18, and the Plaintiffs base either their overall business model—or, in the case of FIRRP, the business model of a major program—around representing applicants before USCIS. Over 75% of Immigration Equality's current asylum cases are before USCIS. Morris Dec. ¶ 7. Oasis has over 1,100 asylum cases before USCIS and only 22 asylum cases in immigration court. Kafele Dec. ¶ 5. HIAS "primarily ... serves clients who are filing for immigration benefits with USCIS." Brown Dec. ¶ 16. And about half (nearly 300) of the unaccompanied children represented by FIRRP "have asylum applications pending before USCIS," while only about 50 of FIRRP's child clients have asylum applications before the immigration court. Avila-Cimpeanu Dec. ¶ 11.

For some Plaintiffs, the shift in cases from USCIS to the immigration courts means they are in imminent danger of being unable to continue representing existing clients. HIAS "do[es] not have the staffing nor the grant funding to undertake" more immigration court representation. Brown Dec. ¶ 15. Oasis is in the same situation: of its 1,100 asylum cases pending at the asylum office, more than 70% involve applications filed more than one year after the applicant entered the United States, Kafele Dec. ¶¶ 18-19—a fact the IFR repeatedly treats as sufficient grounds for referral without an interview, *see* 91 Fed. Reg. at 47103, 47112-13, 47116-17, 47122, 47125. But Oasis lacks the resources to represent even a fraction of its 1,100 affirmative asylum clients in immigration court. Oasis has only one attorney who works primarily in that forum, and many

of Oasis's staff members are not authorized to practice in immigration court. Kafele Dec. ¶¶ 20, 27.

Immigration Equality—which, like Oasis, primarily represents LGBTQ+ people and those who are HIV-positive—also has a significant number of clients who filed after the one-year deadline. Morris Dec. ¶ 30. There are good reasons for the people that Immigration Equality and Oasis serve to file after the deadline, including the inability to "come out or begin the transition to affirm their gender" within a year of their arrival in the United States, Kafele Dec. ¶ 34, and the timing of an HIV diagnosis, Morris Dec. ¶ 11. Indeed, Oasis has won 97% of its cases at the USCIS asylum office for clients who missed the one-year deadline. Kafele Dec. ¶ 19. But because the IFR does not distinguish among bases for filing after the deadline, Oasis has stopped conducting intakes for people who are applying for asylum outside the one-year period. Kafele Dec. ¶ 14; *see also* Morris Dec. ¶ 30 (Immigration Equality expects fewer clients with a one-year deadline issue will want to apply affirmatively due to increased risk of referral to immigration court).

Use of the Summary Referral IFR will also immediately reduce the number of clients each Plaintiff can represent. In cases where Plaintiffs *are* able to represent clients referred under the IFR, doing so will be more costly and time consuming for the Plaintiffs. The Plaintiffs will have to prepare clients for direct and cross examination, identify and prepare expert witnesses for the same, and simultaneously prepare claims for withholding of removal and protection under the Convention Against Torture. *See, e.g.*, Morris Dec. ¶ 43; Kafele Dec. ¶ 28; Brown Dec. ¶ 19; Avila-Cimpeanu Dec. ¶ 46. And unlike a grant of asylum by the USCIS asylum office, DHS may appeal a victory in immigration court to the BIA—a step DHS has been taking more often in the

past year. *See* Morris Dec. ¶ 40. The amount of work required for one client in immigration court is therefore far higher than the amount of work for one client with an application before USCIS.

The increased complexity of immigration-court representation will have particularly severe consequences for Immigration Equality. Like the other Plaintiffs, Immigration Equality can represent fewer clients in immigration court than before the asylum office: the review by staff of documents prepared by pro bono attorneys "takes, on average, more than twice as long" in immigration-court cases as it does in cases before USCIS. Morris Dec. ¶ 36. But Immigration Equality uses a model of partnering with pro bono attorneys in almost all of its cases. Morris Dec. ¶ 5. The majority of these pro bono attorneys "are, for example, corporate, tax, or transactional attorneys" and "do not feel comfortable representing a client in immigration court"; many attorneys "will accept" only affirmative cases. *Id.* ¶¶ 8, 31. Indeed, that is "[p]art of the reason that" Immigration Equality's "caseload skews so heavily towards affirmative asylum." *Id.* ¶ 31. And although the other Plaintiffs rely less heavily on pro bono partners, the effect on those partnerships is the same. As HIAS puts it, the IFR will "decimate" the "ability to place asylum cases" with pro bono lawyers. Brown Dec. ¶ 15.

By its very existence, meanwhile, the Summary Referral IFR greatly complicates Plaintiffs' task of representing existing asylum clients before USCIS. Before the IFR, Plaintiffs routinely updated affirmative asylum applications after an interview was scheduled—a practice made necessary by the long waits for, and unpredictable timing of, asylum interviews. *See* Morris Dec. ¶¶ 12, 33; Kafele Dec. ¶¶ 29-30; Brown Dec. ¶ 18; Avila-Cimpeanu Dec. ¶ 15**.** But the moment Defendants issued the IFR, which allows any case to be referred without an interview at any time, *every* affirmative asylum case became at imminent risk of referral to immigration court without notice. *See* Morris Dec. ¶ 27; Kafele Dec. ¶ 30; Brown Dec. ¶¶ 17-18;

Avila-Cimpeanu Dec. ¶¶ 15, 21; 91 Fed. Reg. at 47112 (stating that USCIS is "not required" to send an individualized request for evidence in each case before referral under the IFR). As a result, Plaintiffs must expend considerable time and resources—on a significantly truncated timeline—supplementing pending asylum applications. Morris Dec. ¶¶ 33-34; Kafele Dec. ¶ 31; Brown Dec. ¶ 18; Avila-Cimpeanu Dec. ¶ 21**.**

For all the Plaintiffs, this task demands that attorneys expend significant resources to "race against the clock, meeting with hundreds of [clients] with pending asylum claims before USCIS and work through their most traumatic experiences to supplement the record." Avila-Cimpeanu Dec. ¶ 45; *see* Morris Dec. ¶ 35; Brown Dec. ¶ 18. And for Oasis, which has over 1,100 pending affirmative asylum applications and fewer than ten employees authorized to represent clients before USCIS, updating affirmative cases on a truncated timeline is impossible. *See* Kafele Dec. ¶¶ 2, 5, 30-31. Moreover, Plaintiffs will have to continue these updates throughout the life of a pending case. Kafele Dec. ¶ 31; Brown Dec. ¶ 25; Avila-Cimpeanu ¶¶ 20-24; Morris Dec. ¶ 35**.**

The Rule imposes especially severe harm on FIRRP's work with unaccompanied children. For a child trying to recount the details of their past persecution, "it is much more feasible … to develop the record and obtain a child's honest, forthright testimony in an asylum interview, than in an immigration courtroom." Avila-Cimpeanu Dec. ¶ 29. Even more work is required for children's cases in immigration court than for cases involving adults, and some children who are referred without an interview will never get the opportunity to tell their stories because of the difficulty of testifying before an immigration court. *Id*. ¶¶ 42-43.

Furthermore, some of FIRRP's child clients are also eligible for Special Immigrant Juvenile Status (SIJS)—relief that only USCIS can provide—because they have been abandoned,

abused, or neglected by one or both parents. Avila-Cimpeanu Dec. ¶ 12. The IFR requires FIRRP to continually update the asylum applications for these clients in the hope that the children are not referred to immigration court without an interview—and potentially removed—before USCIS completes the two adjudications necessary for full SIJS relief. *See id*. ¶¶ 33, 39. For all of these reasons, the IFR will "have an immediate effect on Plaintiffs' ability to serve their existing clients and take on new clients," and "such harm is irreparable." *CLINIC*, 513 F. Supp. 3d at 175 (cleaned up); *see Nw. Immigrant Rts. Project*, 496 F. Supp. 3d at 79-80.

By reducing the number of clients Plaintiffs can serve, the Summary Referral IFR will also cause irreparable financial harm to Oasis and HIAS. Oasis receives funding tied to the number of individuals they serve and will lose $2,250 per client it cannot serve because of the IFR. Kafele Dec. ¶ 16. HIAS, which receives funding tied to work on asylum cases only before USCIS, will also suffer financial harm as the IFR shifts cases to immigration court. Brown Dec. ¶ 23; *see also* Morris Dec. ¶ 28 (IFR will endanger sources of Immigration Equality's funding).

In addition, the IFR will force Plaintiffs to divert significant resources from other tasks. Plaintiffs must now, to the extent possible, use funding and staff time to train in-house and pro bono attorneys on immigration-court filings and procedures. *See, e.g.*, Kafele Dec. ¶¶ 20, 24, 28; Brown Dec. ¶ 31; Avila-Cimpeanu Dec. ¶ 30. Oasis may need to lay off staff that cannot represent people before the immigration court in order to hire staff who can. Kafele Dec. ¶ 20. Regardless, Oasis has no way to increase it "removal defense capacity soon enough or in a sufficient way to be able to represent all [the] affirmative asylum clients who will be referred to EOIR due to this rule." *Id*. Plaintiffs must also funnel additional resources to train attorneys on BIA appeals—and petitions for review in the federal courts of appeals—that will inevitably result from denials of relief in immigration court. *See* Avila-Cimpeanu Dec. ¶¶ 39-40. And for

clients who are at risk of being detained because of the IFR, Plaintiffs will need to work on habeas petitions in federal district court or recruit volunteer attorneys to provide habeas representation. Morris Dec. ¶ 25; Brown Dec. ¶¶ 21, 29; Avila-Cimpeanu ¶ 32.

In addition to causing these significant, imminent harms, the Summary Referral IFR conflicts directly with the Plaintiffs' missions. Plaintiffs are committed to ensuring that as many noncitizens as possible have meaningful access to the asylum process. Morris Dec. ¶¶ 1-2; Kafele Dec. ¶ 39; Brown Dec. ¶¶ 7, 24; Avila-Cimpeanu Dec. ¶ 44. The IFR's effects on Plaintiffs directly impede their abilities to fulfill their respective missions by reducing the number of clients each Plaintiff (and other legal-service organizations) can serve. The IFR also frustrates Plaintiffs' missions by creating a situation in which applicants will receive no interview or hearing even though they were, when they applied, guaranteed the opportunity for both an interview *and* a hearing before removal. Plaintiffs therefore satisfy the test for irreparable harm, and this factor strongly favors a § 705 stay. *League of Women Voters*, 838 F.3d at 9; *see CLINIC*, 513 F. Supp. 3d at 176 ("Plaintiffs will be irreparably harmed by the damage to their core missions.").

## III. The Balance of the Equities and the Public Interest Favor the Plaintiffs

The final two § 705 stay factors—the balance of the equities and the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Here, Plaintiffs' strong likelihood of success on the merits, *see supra* Part I, itself demonstrates that the equities and public interest favor preliminary relief. "It is well established that the Government cannot suffer harm from [relief] that merely ends an unlawful practice." *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 218 (D.D.C. 2020) (quotation omitted). Rather, "there is a substantial public interest in having governmental agencies abide by the federal laws . . . that govern their

existence and operations." *Open Cmtys. All. v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017) (quotation omitted). There is therefore "generally no public interest in the perpetuation of unlawful agency action." *Id.* (quotation omitted). And "[t]he public interest is served when administrative agencies comply with their obligations under the APA." *N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 21 (D.D.C. 2009).

The "only harm" Defendants would suffer from a stay involves "keep[ing] in place" longstanding regulations, *Dist. of Columbia*, 444 F. Supp. 3d at 45, which would "preserve the relative positions of the parties" as they existed prior to the IFR's July 28, 2026, effective date, *Robertson v. Cartinhour*, 429 F. App'x 1, 2 (D.C. Cir. 2011). That minimal harm "pales in comparison to the injuries" the IFR will inflict on the Plaintiffs. *Dist. of Columbia*, 444 F. Supp. 3d at 45; *see supra* Part II. It also pales in comparison with the harm the IFR inflicts on Plaintiffs' clients—and the public interest is not served either by thwarting affirmative asylum claims that otherwise would be granted or by thrusting people with long-pending applications into removal proceedings without warning. The balance of the equities and the public interest, like the other stay factors, strongly favor Plaintiffs.

**CONCLUSION**

For the foregoing reasons, the Court should issue a stay of the Summary Referral IFR's effective date under 5 U.S.C. § 705 pending a final judgment in this case.

Dated: August 24, 2026

Respectfully Submitted,

*/s/ Richard Caldarone*
Keren Zwick (D.D.C. Bar No. IL0055)
Richard Caldarone (D.C. Bar No. 989575)
Mary Georgevich*
Maria Dambriunas (D.C. Bar No. 1738154)
Gerardo Romo*
Mark Scaggs*
NATIONAL IMMIGRANT JUSTICE CENTER
111 W. Jackson Blvd., Suite 800
Chicago, IL 60604
(312) 660-1531
kzwick@immigrantjustice.org
rcaldarone@immigrantjustice.org
mgeorgevich@immigrantjustice.org
mdambriunas@immigrantjustice.org
gromo@immigrantjustice.org
mscaggs@immigrantjustice.rg
Anwen Hughes*
HUMAN RIGHTS FIRST
121 W. 36th St., PMB 520
New York, NY 10018
(212) 845-5244
HughesA@humanrightsfirst.org

Melissa Crow (D.C. Bar No. 453487)
CENTER FOR GENDER & REFUGEE STUDIES
1901 Pennsylvania Avenue, NW
Suite 900, PMB 228
Washington, DC 20006
(202) 355-4471
crowmelissa@uclawsf.edu

Robert Pauw*
CENTER FOR GENDER & REFUGEE STUDIES
c/o Gibbs Houston Pauw
1000 Second Avenue, Suite 1600
Seattle, WA 98104
(206) 682-1080
rpauw@ghp-law.net

Peter Habib*
CENTER FOR GENDER & REFUGEE STUDIES
200 McAllister Street
San Francisco, California 94102
(415) 610-5729
habibpeter@uclawsf.edu

**Application for admission or admission pro hac vice forthcoming*