# DECLARATION OF AARON C. MORRIS
# EXECUTIVE DIRECTOR OF IMMIGRATION EQUALITY

*I, Aaron C. Morris, make the following statement on behalf of Immigration Equality. I certify under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. § 1746.*

1. I am the Executive Director at Immigration Equality, a 501(c)(3) nonprofit organization with its principal place of business in New York, NY. I make this declaration based on my personal knowledge except where I have indicated otherwise. Immigration Equality is a U.S.-based nonprofit whose mission for more than 30 years has been to promote justice for LGBTQ and HIV-positive immigrants and families through direct legal services, policy advocacy, impact litigation, and other programs.

2. To meet our mission, Immigration Equality provides a range of services to LGBTQ and HIV-positive asylum seekers. The majority of that work falls into four categories. First, our largest body of work is facilitating the representation of asylum seekers by our network of pro bono attorneys. In our asylum representation program, more than 95% of our cases are represented by pro bono counsel. Second, we provide limited in-house representation for some affirmative asylum seekers in the event they do not have a volunteer attorney. Third, we provide limited support to pro se asylum seekers who do not have an attorney. Finally, we provide direct representation and pro se support to detained individuals. The recent Interim Final Rule, *Affirmative Asylum Interviews Without Interview*, 91 Fed. Reg. 47101 (July 28, 2026), will harm each of these services in multiple ways.

**Immigration Equality's work with asylum seekers**

3. Immigration Equality provides full representation to asylum-seekers directly through its own staff and through pro bono attorney volunteers.

4. We have 19 employees, including 9 lawyers (me included). Of the lawyers on staff, three work full time in our Pro Bono Asylum Program, one works in our Detention Program, two work in our Refugee Program, and we have a part-time lawyer that does some asylum work in addition to some refugee work. We also have a director of law and policy who supervises the asylum, refugee, and detention programs. Due to the size of our legal staff, we must rely on our pro bono attorney partners to provide our clients with representation, and without those volunteers, our ability to serve clients would be massively diminished.

5. Even in the more than 95% of asylum cases where a pro bono attorney is taking on this work, Immigration Equality remains heavily involved, providing training, resources, in-depth mentorship, and review of the attorney's work. Immigration Equality also maintains a library of materials for pro bono attorneys on the state of the law and the asylum process, which we periodically update to reflect changes in policy or the law.

6. Immigration Equality's in-house legal team and its network of pro bono attorneys assist and represent LGBTQ and HIV-positive immigrants with matters before U.S. Citizenship and Immigration Services (USCIS), U.S. Immigration and Customs Enforcement (ICE), the U.S. immigration courts, the Board of Immigration Appeals (BIA), and the federal courts. Immigration Equality's legal services focus primarily on asylum, withholding of removal, and claims for relief under the Convention Against Torture (CAT), as well as related applications and benefits such as work authorization and adjustment of status. Immigration Equality has helped thousands of asylum seekers secure asylum, withholding of removal, relief under the CAT, as well as other benefits and forms of relief.

7. Currently, we have 352 cases open for clients seeking asylum, withholding of removal, or relief under the CAT. The majority of these cases (261 cases, or just over 75% of the total) are affirmative asylum cases pending before USCIS. Almost none of them have had an asylum office interview. We intend to file five cases imminently. Seventy-one cases (around 20% of the total) are defensive cases in immigration court. The remaining 15 cases (less than 5% of the total) are currently pending before the BIA. The vast majority of our asylum cases are placed with pro bono attorneys, and we are seeking pro bono attorneys to accept representation for the remaining few cases. In addition to our asylum cases, Immigration Equality attorneys are working on around 120 other domestic immigration cases via the pro-bono program or on an in-house basis.

8. Prior experience with asylum cases or immigration court is not required to volunteer with us, and many of our pro bono attorneys have little or no experience with immigration before agreeing to represent an LGBTQ or HIV-positive immigrant through our pro bono program. The majority of our pro bono attorneys do not have backgrounds in litigation; they are, for example, corporate, tax, or transactional attorneys.

9. When Immigration Equality accepts a client into our pro bono program, and the client is paired with counsel, an Immigration Equality staff attorney schedules a call with the team to introduce the case and discuss next steps. The pro bono attorney then schedules a meeting with the client and begins working on their asylum case. We find pro bono counsel in several ways, including by circulating a regular case-opportunities email with trusted partners, calling individual attorneys who have expressed interest in a case, and networking with law firms with significant pro bono programs. Placing a case with counsel is a significant amount of work.

10. Immigration Equality mentors the pro bono attorneys through the completion of the case. We take a three-pronged approach to mentorship—we serve as subject matter experts to answer any questions, help strategize, and review submissions. During the course of representation, Immigration Equality answers questions on a wide range of topics, including how to properly file an application, how to create a USCIS Online Account, how to follow up with the immigration court or with USCIS, how to file a service request with USCIS, how a change in personal circumstances can affect a client's case, and how recent developments in the law or policy pertain to a client. Immigration Equality also assists with framing issues and claims before USCIS and the immigration court. And

finally, Immigration Equality provides feedback and reviews submissions made as part of the asylum case.

11. There is a statutory time limit to apply for asylum. In order to qualify for asylum, an applicant should file their application within one year of their entry into the United States. If an asylum applicant does not file their application within one year of entry, they can still show that there exist changed circumstances which materially affect their eligibility for asylum or that there were extraordinary circumstances relating to the delay in filing their application. Asylum seekers who are LGBTQ and/or living with HIV often rely on these exceptions to the filing deadline. For example, someone may have come out as gay more than one year after their entry into the United States, or they may have taken recent steps in gender transition, or they may have been recently diagnosed with HIV, all of which often constitute changed circumstances that may be exceptions to the filing deadline. Post-traumatic stress disorder or other mental health challenges, hospitalization, and severe family or community opposition or social isolation are other examples of extraordinary circumstances that often demonstrate the inability to meet the one-year filing deadline. These are all examples that USCIS has listed in their training materials for asylum officers.

12. Before USCIS, the first step in applying for asylum is filing form I-589, which, up until this IFR took effect, stated that there would be an affirmative interview for each case. Pro bono attorneys often do not submit evidence in support of the I-589 at the time of filing. Then, when a case is scheduled for an interview, pro bono attorneys would update the materials previously filed (or file all supporting evidence if not previously filed).

13. There can be years-long delays between filing the I-589 and the scheduling of the interview. Many aspects of an applicant's life may have changed during that period. For example, they may have gotten additional threats from their country of origin, country conditions in that nation may have significantly declined for them, or they may have had children or gotten married to a same-sex partner. As such, an interview notice is an important flag to us that it is time to update the information that was previously provided.

14. Supporting evidence includes a declaration from the client, and letters from witnesses or other individuals with knowledge of the asylum claim. For example, for LGBTQ people, letters from individuals who are aware of the client's sexual orientation or gender identity can be important corroboration of the asylum claim. Reports on country conditions from human rights organizations or news reports are an important part of any asylum claim. Expert reports are sometimes necessary as well, including, for example, forensic psychological evaluations to explain a client's inability to file for asylum within one year due to persecution-related trauma. Finally, a letter brief is usually filed to elaborate on the claims and assist the asylum officer in deciding the case.

15. The interview is an important part of the process not only because of the development of the evidentiary record, but also because of the nature of the interview itself. Asylum officers ask questions of clients during the interview that can help illuminate what the sticking points may be in a case. For example, many clients do not file their asylum

application within one year. As mentioned above however, there are many reasons why LGBTQ people may not be able to file within one year. That consideration almost always requires a back-and-forth question and answer engagement.

16. Occasionally, we also discover that the asylum office has information that may lead the asylum officer to question whether a client would be eligible for asylum in the exercise of discretion. In those cases, clients are given the opportunity to further develop the record about why the positive equities in their case, like community involvement, would outweigh any negative equities. The I-589 does not ask any questions designed to determine whether positive equities exist, apart from the severity of persecution feared. The interview plays an important role in developing the record and highlighting information that is relevant to the asylum officer's decision. In some instances, clients may have made a mistake early in their life, but then later demonstrate genuine regret, remorse, and atonement after the fact. Assessing that transformation in-person is essential to understanding their growth as a person.

17. Asylum interviews are also important to allow an asylum officer the ability to ask questions about parts of an application packet they do not understand or that may seem confusing. A common example is a perceived discrepancy between the application itself and some supporting document, which turns out to be quite consistent after a conversation. From my own practice, for example, clients from many nations use of the word "Auntie" to describe a close family friend who has no biological relationship to the applicant, but who may have played a prominent role in their life. In many cultures, older adults close to a family have familial status even if they are not legally related. Similar culture confusions abound, and are easily cleared up during an interview.

18. Asylum interviews are often also less intimidating than court proceedings. The asylum office is a non-adversarial process where the interviewer's goal is to elicit information relevant to the asylum claim. For traumatized LGBTQ people who have been subjected to persecution or torture, attending an interview in a civil servant's office can be difficult, but not as hard as litigating in immigration court where they are usually cross-examined by a government attorney. It takes much more time for attorneys to properly prepare a client for a trial than for a non-adversarial interview. The work of representing someone before EOIR is categorically different and more time-consuming than the work of representing them before the asylum office.

19. This is especially true because EOIR recently fired hundreds of experienced immigration judges, shortened the training period for new immigration judges, and increased its reliance on temporary immigration judges, who are no longer required to have an immigration background. These immigration judges also must adjudicate more than just asylum applications. All of this means that advocates must be prepared for the immigration judge to need additional education and advocacy to understand the asylum claim before them.

20. Before the asylum office, the only application is for asylum. But immigration judges may also grant withholding of removal or CAT protection. So for a client in immigration

court, even if we assess the client is eligible for asylum, we also advance their claims for withholding and CAT protection. The evidentiary requirements for withholding and CAT protection are higher than for asylum, and the arguments for eligibility, while overlapping in some ways, are distinct. Being required to prepare a withholding or CAT claim for a straightforward asylum claim that should have been granted at the asylum office is an unnecessary burden.

21. There are also different procedural requirements for immigration court than the asylum office. The immigration court practice manual is 268 pages long. While the asylum offices often have procedural requirements, none are as onerous as the immigration courts. In addition, making a procedural error in immigration court could result in a client being deported. That is not a concern before the asylum offices. Because of the adversarial process in immigration court, attorneys must also have familiarity with common objections, and individual court or judge standing rules. Learning these procedural requirements and applying them to cases takes hours more preparation time that is not required for the asylum office.

22. If a case is denied or referred to immigration court, Immigration Equality continues to provide feedback and reviews every submission made by pro bono counsel. Because many of the pro bono attorneys are not litigators and have not appeared in immigration court before, Immigration Equality must explain the differences between an affirmative case before USCIS and a defensive case in immigration court. For example, Immigration Equality must explain the additional procedural requirements, including how to obtain an EOIR ID, setting up an attorney account on the EOIR online portal, how to use ECAS (the immigration courts' electronic filing system), how to enter an appearance with the immigration court, formatting requirements for filing something with the immigration court, how to find and qualify an expert witness, the need for a criminal history chart, and how to prepare pre-hearing briefs. If a client loses a case in immigration court, or if the government appeals, Immigration Equality also provides mentorship for the appeal at the Board of Immigration Appeals. None of this work is something we contemplate at the asylum office level.

23. In some cases, pro bono attorneys decide to no longer represent a client after their case is referred to EOIR. In such cases, Immigration Equality tries to find a new pro bono attorney to represent the client. When this happens, it takes a significant amount of time and resources to find and train a new team of attorneys and bring them up to speed on the facts of that particular case.

24. Based on my observations, it appears that the current DHS policy is to expeditiously move people out of the asylum office, into detention, and through immigration court as quickly as possible regardless of the strength of their claims. Detention changes the nature of representation, and clients in immigration court are more likely to be detained by DHS. If a client is detained, their immigration case usually runs on a faster timeline. In addition, our pro bono partners have had difficulty contacting clients in detention or getting necessary documents signed, due to a lack of uniform processes to access for counsel across the various detention centers. Pro bono attorneys must also play a much

larger role in collecting evidence when clients are detained because clients cannot make phone calls without significant costs and do not have regular internet or email access. Overnight, the pro bono attorney also becomes a detained client's only advocate for necessary care, such as HIV medicine or hormone replacement therapy.

25. If a client is detained, they are frequently moved to another state. In addition, ICE and immigration judges are significantly less likely to release an asylum seeker on parole or bond than in the past. For pro bono attorneys in our program going forward, if the client has a viable claim for release from ICE custody, they must either learn the local rules of a federal district court in order to file a habeas petition or find local counsel willing to do so for free. Asking pro bono counsel with little or no experience in litigation to appear in a distant district court is a heavy lift. Finding local counsel to do that same work for free is also an enormous burden.

26. Given the barriers created and the resources required when a client becomes detained, some pro bono attorneys have decided to no longer represent people should they become detained. If that happens, Immigration Equality strives to find a new pro bono attorney to take on a case, or in rare circumstances, take the case ourselves.

**Organizational Harms to Immigration Equality's Core Business and Diversion of Resources**

27. The IFR will dramatically increase the resources each case requires and inevitably lead to Immigration Equality being forced to serve fewer people than we could before the IFR. Immigration Equality will be forced to use significantly more resources to represent our current clients, especially if dozens or scores of cases are all referred in rapid succession. If that should happen, we will immediately have to stop accepting new cases or drastically limit the new clients we assist. If USCIS referred all of our pending cases to immigration court, we would be unable to provide our law firm partners with the hands-on support that has made our pro bono model a success.

28. At the same time, if we can no longer provide hands-on mentorship to pro bono partners, they will likely stop taking case referrals from us. If so, it will substantially endanger our business model overall. We set the gold standard in responsiveness, training, and collaboration between a non-profit and pro-bono counsel for LGBTQ asylum cases, which is one of the reasons that the 100+ most prestigious law firms in the United States partner with us. Immigration Equality relies on donations from these law firms who participate in our Pro Bono Asylum Program for about twenty percent of our annual budget. As I described above, many of our pro bono volunteers are not comfortable in immigration court, for the most part, and we can anticipate that fewer affirmative asylum cases will mean fewer pro bono volunteers. And absent a direct connection with our work, it is our experience that law firms will stop donating or donate much less financially to Immigration Equality. In addition to countless hours of donated legal services (in 2025 alone it was worth $37 million dollars), Immigration Equality's pro bono law firm partners donate between $500,000 - $600,000 each year to support our Pro Bono Asylum Program. They do so because we prepare them to represent our collective

clients in largely affirmative cases. If we cannot continue to support these attorneys because of the rule, it would be devastating for our budget. For a non-profit that hovers between $2,200,000 and $2,500,000 a year, law firm donations constitute a significant source of our revenue.

29. The key change for the IFR is the elimination of the interview for individuals that USCIS decides should not get an interview. For the more than 250 cases pending before the asylum office that do not have an interview planned, Immigration Equality can no longer expect that those clients will have the opportunity to develop the record and explain their eligibility for asylum at an interview.

30. The IFR will change every step of our work. For example, one of the reasons the IFR lists as reasons for deferring a case is the one-year filing deadline, which will affect many of our clients. As a result, when conducting an intake, we will have to explain the very real possibility of the case being referred to immigration court without an interview at the asylum office and what that would mean for the client's case. It is our experience that many potential clients are much more hesitant to file an application voluntarily if they are told they are likely to end up in immigration court. Understandably, they often want to take more time to consider whether that is the right path for them. Because we give every potential client as much time and counsel as they need to make such a decision, this often results in several meetings and additional legal advice. What used to be one to two meetings with a client may likely turn into three to four meetings to ensure they make an informed choice.

31. Separately, some law firm attorneys who feel competent to represent an asylum seeker before a non-adversarial proceeding before USCIS do not feel comfortable representing a client in immigration court. Part of the reason that our caseload skews so heavily towards affirmative asylum is because those are the kinds of cases most pro bono counsel will accept. While only a handful of law firms have overtly indicated that they will not represent clients in removal proceedings, it is likely that the possibility or the probability that a case will be referred directly to immigration court with no affirmative interview will significantly reduce attorney participation in our pro bono program.

32. The increased burden continues after placing a case with a pro bono attorney. Especially if the attorney has never done an asylum or immigration case before, we explain the USCIS process and what to expect. That inaugural advice will necessarily become more complex since the chances that the case will be referred to immigration court will be high. We will, for example, have to explain how to fill out the asylum application with remarkable nitpicky specificity in an attempt to establish that USCIS has no reason to deem it to be incomplete or lacking in detail and thus issue a referral without interview, or at least as far as we can do to the everchanging rules. This will be especially time-consuming if the client's one-year filing deadline is fast approaching (because the IFR states that is a reason to refer a case to immigration court) and the pro bono attorneys have only recently taken on the case. Given the tight timelines and the amount of detail needed on an initial asylum application, Immigration Equality will have to spend more time and resources in reviewing the application.

33. The IFR will require an asylum seeker to provide all current evidence of asylum eligibility with the initial asylum application. Previously, we could focus on an affirmative application piecemeal; we could focus on the asylum application first and, once that was filed, move on to the supporting evidence. However, this IFR will require us to focus on all elements of the application at the same time, especially given that USCIS issued a contemporaneous new policy stating that officers no longer need to issue Requests for Evidence where applications are missing evidence. *See* USCIS, *Policy Alert: Evidence, Requests for Evidence, and Notices of Intent to Deny* (Aug. 5, 2026), https://www.uscis.gov/sites/default/files/document/policy-manual-updates/20260805-EvidentiaryStandards.pdf. Thus, in addition to explaining how to fill out an asylum application, Immigration Equality attorneys will have to explain all the evidentiary requirements, and the pro bono attorneys will have to work on this evidence immediately. The development of such evidentiary material is quite time-consuming, especially when the evidence is located abroad or must be obtained from people who are accustomed to hiding their sexual orientation, gender identity or HIV-positive status. Immigration Equality will have to then spend much more time in the beginning of the case preparing a pro bono lawyer with what to expect when starting a case and reviewing the asylum application along with all evidentiary materials to be submitted with the application.

34. The additional detail necessary up front in an application means that the pro bono attorneys will also have to meet with the client more frequently. This is typically difficult to do in a short timeline, because attorneys need to build trust with clients before clients are willing to disclose intimate details of their lives—and it is especially true for asylum seekers who underwent severe trauma, which often inhibits a person's ability to discuss traumatic events. In addition, many LGBTQ asylum seekers struggle to meet basic needs. The time or energy they have to support their claims, even with counsel, can be limited if they have unstable housing, health crises, or unemployment. Requiring meticulous detail in order to be eligible for an asylum interview is a significant burden on both the applicants, and their attorneys.

35. Complicating things further, many Immigration Equality clients are in a backlog at the asylum offices. Some filed for asylum ten years ago when a simple application was all that was necessary in order to start the process. As different administrations have changed what is required for an initial application, it is unclear whether application rules will be applied retroactively, or when it is appropriate to update a case file. For years, the notice of an interview was the sign that a case needed evidentiary updating and completion. And because every case had an interview with at least three-weeks' notice, we could structure our practice accordingly. This was both efficient for our program, and I think enormously helpful to the asylum office in making its adjudications. If we must assume that some, most, or all applicants will have no interview scheduled, and that an adjudication could happen at any time, it puts us in a position where we must constantly update a case each time a relevant fact or issue arises or changes. Because some cases last for years, this would be an enormous burden on our attorneys, and presumably not great for the asylum offices either.

36. Because more cases will be referred to immigration court under the IFR than previously, Immigration Equality will also have to spend more time reviewing materials submitted to the immigration court. For us, reviewing materials for immigration court takes, on average, more than twice as long as reviewing materials in USCIS filings. There are three reasons for this.

37. First, even though there is often case law to the contrary, many immigration judges cherry-pick minor inconsistencies in a noncitizen's statements to make an adverse credibility finding. Accordingly, if a case is in court, we and our pro bono partners must comb through the submission looking for even the most insignificant inconsistencies and work with our clients to account for immigration judges' potentially incorrect interpretations of prior statements. To avoid this, Immigration Equality attorneys comb through the materials, including the asylum application, credible fear interview transcripts, statements the client may have made to DHS at the border, and any prior submissions to the immigration court, to check for inconsistencies and to try to explain potentially perceived inconsistencies.

38. Second, immigration judges have increasingly focused on country conditions regarding one element of asylum in particular. As part of an argument that our client has experienced or is likely to experience persecution by a private actor (as opposed to a member of the government), we must demonstrate that the government of their country of origin is either unable or unwilling to control the private persecutors. Since January 2025, immigration judges have increasingly fixated on this element and cherry-picked evidence to find that this element has not been met. As such, we go through country conditions materials and review country conditions sections of briefs in great detail. We also recommend that pro bono attorneys hire an expert to provide a report on conditions in that country for people who are similarly situated to the client. For example, sometimes our clients will report the harm they experienced at the hands of a private persecutor to the police in their country of origin. In our experience, immigration judges are often likely to erroneously conclude that reporting a crime is evidence that the government is not unable or unwilling to protect our client. So we will need to obtain an expert to explain the country conditions that indicate that receipt of a police report is not evidence that the government will do anything with the police report or be otherwise able to control the persecutor.

39. Third, due to the procedural requirements of an adversarial hearing, more documents need to be filed with an immigration court and served on opposing counsel that do not need to be filed with the asylum office—*e.g.*, witness lists, criminal history chart, motions, and pre-hearing briefs.

40. In addition, given recent, politically motivated terminations of competent immigration judges, we have seen many more LGBTQ people with strong claims who have their claims for protection denied. And even when clients receive some form of relief, the government has filed a larger number of appeals. As a result, if we accept a case for representation before the immigration court, we have to prepare for that case to end up on appeal at the BIA.

41. Cases at the BIA involve another level of careful review and research. Immigration Equality attorneys help pro bono attorneys strategize on the grounds for appealing an immigration judge's decision. We instruct attorneys on how to obtain the digital audio recording of the 2-4+-hours long merits hearing in immigration court, review the immigration judge's decision, and instruct the pro bono attorneys on possible issues to bring up on appeal. We provide instructions on the procedure to file the appeal and request a fee waiver. And after a briefing schedule is issued, we also review the appeal brief—something that, after another recent interim final rule, must be done on an exceptionally short schedule—20 days with no opportunity for extension if the attorney needs it.

42. Moreover, because some pro bono attorneys cannot or decide not to represent clients in immigration court or if they are detained, an increase in cases at the immigration court will mean more defensive cases to place with a smaller pool of attorneys. Due to our small staff, we will be unable to represent people whose cases we cannot place with pro bono attorneys.

43. Currently only 25% of our cases are in immigration court. That percentage will increase as a result of the IFR, and we will have to take fewer cases because cases in immigration court take far more time and resources than cases at USCIS.

44. We have already seen in intakes that many LGBTQ asylum-seekers with strong claims for protection are reluctant to apply for protection due to fears of arrest and detention. Because the rule further increases the risk of arrest and detention, more LGBTQ people will forfeit their rights to apply for protection. We will be unable to provide our core services to those people.

45. Moreover, in my experience, while LGBTQ asylum seekers are among the most resilient people in the world, many have experienced persecution and torture. Many are also not accustomed to being public about their sexual orientation or gender identity when they come from places that persecute LGBTQ people. As a result, the information that can be gathered in a non-adversarial interview in an office-setting by an asylum officer who has been trained in trauma-informed interview techniques is a strong reason for preserving the asylum interview. Adversarial proceedings, in a large, intimidating courtroom, are much more resource intensive for Immigration Equality, much more daunting for our clients, and a great drain on the federal government. If the U.S. government agrees that no LGBTQ person should be persecuted, a straightforward asylum claim for an LGBTQ applicant should not need the time and attention of an immigration judge in most cases. Eliminating the interview process at USCIS is a loss for all parties involved.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 31st day of August 2026, in New York, NY.

[signature]

Aaron C. Morris