**DECLARATION OF RACHEL KAFELE**
**DIRECTOR OF PROGRAMS AND ADVOCACY, OASIS LEGAL SERVICES**

*I, Rachel Kafele make the following statement on behalf of Oasis Legal Services. I declare as follows, pursuant to 28 U.S.C. § 1746, under penalty of perjury:*

1. I am the Director of Programs and Advocacy for Oasis Legal Services **(**Oasis**)**. I make this declaration based on my personal knowledge except where I have indicated otherwise.

2. Oasis is a 501(c)(3) nonprofit organization founded in May 2017. We are based in Berkeley, California, and also have an office in Fresno, California. Oasis has 21 full-time employees, five of whom are active attorneys and five of whom are either partially accredited representatives with the Department of Justice ("DOJ") or have submitted applications to become partially accredited representatives. Partially accredited representatives are non-lawyers who can represent individuals before the Department of Homeland Security ("DHS"), including United States Citizenship and Immigration Service ("USCIS"), but cannot represent noncitizens in removal proceedings in front of the Executive Office of Immigration Review ("EOIR"). Our Social Services Program Director is a fully accredited Department of Justice representative but does not provide legal representation to clients because his focus in on supervising our social services staff and providing social services to clients.

3. As Oasis's Director of Programs and Advocacy, I manage our legal program and support in the management of our social services program. I decide legal strategy and provide counsel for the organization, supervise staff, and represent individual clients in asylum and other immigration cases. I am in constant, regular communication with my staff who provide legal representation to LGBTQ+ immigrants and consult with pro bono attorneys and law students working on our cases. I also coordinate partnerships with other non-profits who also provide legal and social services to the immigrant and LGBTQ+ communities and provide trainings on Asylum Law and other topics related to the representation of LGBTQ+ immigrants to audiences around the country. I have personally represented hundreds of asylum seekers before USCIS.

***Oasis's Mission and Clients***

4. At Oasis, our mission is to empower low-income LGBTQ+ immigrants who have survived violence and persecution due to their sexuality, gender identity, and/or HIV status by increasing access to quality, culturally responsive legal representation and social services. We provide direct representation to LGBTQ+ immigrants and asylum seekers in a variety of immigration cases, including asylum, lawful permanent residence, naturalization, protection under the Violence Against Women Act, family petitions, and applications for work authorization.

5. Oasis is almost exclusively dedicated to representing clients in front of USCIS. The large majority of the funding we receive from foundations, government grants, and private donors is tied to our affirmative asylum representation. However, we also represent a small caseload of clients in Immigration Court in front of EOIR. We currently have over 1,100 active affirmative asylum cases before USCIS, less than 300 active non-asylum cases before USCIS,

and 22 asylum cases before EOIR. We only have one attorney dedicated to representing people before EOIR; two attorneys spend the majority of their time on representation before USCIS, another splits their time between USCIS and EOIR representation, and the fifth is our pro bono coordinator and does not directly represent clients.

6. In addition to providing direct legal representation, we also provide wrap-around case management and social services to our clients, assisting with referrals to healthcare, mental health support, housing navigation, public benefits, and workforce development. Apart from legal and social services, we engage in community education and outreach, presenting trainings to community members and other legal practitioners about LGBTQ+ asylum and other forms of immigration relief. We also train service providers about how to represent LGBTQ+ immigrants in a culturally responsive way and give client and community facing trainings on Know Your Rights and other immigration topics. Oasis advocates for the inclusion of LGBTQ+ voices and experiences in immigrant spaces and for immigrant voices and experiences in LGBTQ+ spaces, acknowledging and championing the intersectional identities of our clients.

7. Oasis clients are undocumented immigrants (including asylum seekers), low-income people of color, and victims of hate crimes. Our clients have endured horrific violence because of their sexual orientation, gender identity, and/or HIV-positive status in their countries of origin. Our clients suffer from the psychological impact of trauma experienced—and the continued oppression faced—as undocumented LGBTQ+ immigrants. Many Oasis clients are also HIV-positive, making them even more vulnerable.

8. Because of Oasis's small size and limited resources, Oasis dedicates our limited resources to individuals who have suffered the most egregious persecution in their home countries due to their LGBTQ+ identities and who are well-placed for success in their affirmative proceedings before USCIS. Oasis invests considerable time and resources in carefully identifying clients to ensure every case we represent has a very high chance of winning asylum before USCIS and to mitigate any risk of referral to Immigration Court, where we would be unable to assist the client. This entails a lengthy and in-depth intake process, and considerable staff time and effort. And it has resulted in a 97% success rate in helping our clients win asylum in affirmative proceedings before USCIS's asylum offices.

9. Oasis regularly hosts Continuing Legal Education ("CLE") trainings for the legal community on asylum law, the nuances of LGBTQ+ asylum cases, culturally sensitive representation, and working with traumatized populations. We also host trainings for other professionals supporting LGBTQ+ asylum seekers, including psychologists providing client evaluations. Through our online resource portal, we distribute country condition research, case materials, and guides about asylum law which we make available to lawyers around the country who are representing LGBTQ+ asylum seekers.

10. In our office, Oasis staff attorneys and DOJ partially accredited representatives provide direct legal representation in collaboration with committed pro bono attorneys and interns. Each year, dozens of volunteer attorneys and law student interns receive training on representing LGBTQ+ asylum seekers in front of USCIS and then go on to represent clients through the

different stages of their asylum case. This allows our small staff to take on a high volume of cases.

11. Since its inception in May 2017, Oasis has filed over 1,600 affirmative asylum applications for clients and taken on the representation of around 400 other clients who had already filed for asylum but had not yet had their asylum interview. Around 73% of the asylum clients we represent do not file their asylum case within one year after their last arrival to the United States and therefore may be subject to a bar on asylum. However, we work on their cases because they meet the changed circumstances or extraordinary circumstance exceptions to the one-year filing deadline under the Immigration and Nationality Act.[1] The large majority of Oasis's clients do not meet the one-year filing deadline because the trauma and persecution they experienced in their countries of origin prevent them from applying for asylum sooner. They fear involving themselves in any immigration process where they will have to tell their stories to an authority figure because of their past harm. Many of our clients are not out as LGBTQ+ to their family or community and only talk about their sexual orientation or gender identity or HIV status for the first time with our staff, which is another barrier to applying earlier.

12. As of August 5, 2026, Oasis has over 1,100 clients whose asylum cases are still pending with no decision from the asylum office, and about 70% of these clients have been waiting more than three years to receive a decision in their case. Some of our pending asylum clients have been waiting since 2015 for their asylum interview and decision.[2]

***Impact of the Interim Final Rule's Elimination of Mandatory Asylum Interviews on Oasis***

13. The Interim Final Rule frustrates Oasis's mission—all but precluding our core business activities. It has already begun to cause us harm. We have tried to divert significant resources in an attempt to mitigate the effects of these new regulations on our organization, but the reality is that Oasis is set up to serve individuals in affirmative applications before USCIS and cannot simply convert our model to represent people in defensive cases in Immigration Court.

14. Due to this rule, Oasis has made the decision to no longer conduct intakes for potential clients who cannot file their asylum application within one year of their last entry to the United States. We made this decision because the IFR singles out applicants who file for asylum more than one year after their last arrival in the United States as a group of applicants who will be referred to EOIR without USCIS scheduling an interview. The effect of the referral is to give the applicant no opportunity to present their case in front of an asylum officer and instead place the applicant directly in deportation proceedings. Although the

[1] INA § 208(a)(2)(D), 8 U.S.C. § 1158(a)(2)(D); *see also* 8 CFR §§ 208.4(a)(4),(5).

[2] In January 2018, USCIS changed its policy from "First In, First Out" ("FIFO") to "Last In, First Out" ("LIFO") with the aim of reducing the backlog by hearing all newly-filed cases within the requisite 45 days of filing. However, because USCIS did not increase the number of asylum officers available to hear cases, the "LIFO" policy has created a second backlog of cases filed between January 2018 and the present date that are still waiting for interviews.

Asylum Interview IFR contemplates that an Asylum Officer will still review the asylum application and accompanying evidence to see if the timeliness bar applies, it is our belief through our extensive experience representing asylum seekers in front of USCIS that the interview process is fundamental and crucial to an Asylum Officer's understanding of whether an exception to the one-year filing rule has been met. Without the ability to present testimony to an Asylum Officer regarding their eligibility for an exception to the one-year filing deadline, the potential clients (whom we cannot assist now) will be referred to Immigration Court, placed in deportation proceedings, and have no opportunity to build the record about their asylum eligibility in an asylum interview.

15. This reduction in the number of intakes we conduct and the resulting reduction in the number of affirmative asylum cases Oasis is able to file on behalf of clients threatens our mission and also our revenue and funding. As discussed above, the vast majority of Oasis's funding is tied to affirmative asylum representation. We receive funding from foundations, individual donors, and governmental contracts because of our successful model of providing high volume affirmative asylum representation to LGBTQ+ immigrants. Some of these grants condition funding on filing a certain number of affirmative asylum cases each year and others pay a set amount per case that we file. If we file fewer affirmative asylum cases with USCIS because of the new rule, we will not be able to meet our deliverables and our funding will decrease. Less funding means cutting our staff in the short term and having fewer clients to represent in residency and citizenship cases in the long term, which will in turn reduce our funding further.

16. For example, one of the grants Oasis receives reimburses us $2,000 for each affirmative asylum application we file. It also reimburses us $250 for representation of our clients at asylum interviews. For every case we do not file because of the risks to potential clients under the IFR, we lose $2,250. In 2025 we filed 93 affirmative asylum cases, of which around 67 were for clients who did not meet the one-year filing deadline. Under the IFR, these are 67 cases we would not file, equaling a loss of funding of at least $134,000. The loss of funding from this grant alone is a significant impact on our budget and would force us to have to lay off at least one staff member, further reducing our capacity to represent clients.

17. In addition to this grant, we receive other funding that is specifically tied to providing representation to clients in affirmative asylum proceedings. This funding is given to us to assist people who have been in the United States for many years in order to improve their life and health outcomes, of which having immigration status or work authorization forms an important piece. If we are only able to file a very small number of affirmative asylum applications, this funding will no longer be available to us.

18. For our clients whose asylum applications have already been filed with USCIS, the rule will result in a large majority of them having their affirmative asylum applications referred to Immigration Court and being placed in removal proceedings without any asylum interview and the opportunity to present testimony. We believe this because the IFR explicitly mentions the one-year filing bar multiple times and describes it as a "particularly common bar" to applying for asylum. *Affirmative Asylum Interviews Without Interview*, 91 Fed. Reg. 47101, 47015 (July 28, 2026). The IFR includes a table showing how many affirmative asylum cases in the current backlog were filed more than one year after the last entry date

and another table to show that over the past five years, approximately 77% of late filed asylum applications that were referred to EOIR after an interview with USCIS were referred due to not meeting an exception to the one-year filing deadline. 91 Fed. Reg. at 47015, 47109. The IFR also gives the example of "when the alien is barred from applying for asylum due to the one-year filing deadline" to illustrate when an interview will not be given 91 Fed. Reg. 47103. As one of the stated goals of this IFR is to "reduce the affirmative asylum backlog," the IFR is specifically focusing on the bar to asylum that is most common across cases in the USCIS backlog in order to reduce the backlog as fast and as drastically as possible. 91 Fed. Reg. 47102.

19. As explained above, we have 1,100 clients with pending asylum cases before USCIS and 73% of them did not meet the one-year filing deadline; but based on prior Asylum Office adjudications, we believe they qualify for an exception. Since May 2017, 82% of our clients who have been granted asylum by USCIS—a total of 510 people—applied for asylum beyond their first year in the United States and were found to have proven an exception to the one-year filing deadline. Oasis has a grant rate of 97% for this specific category of clients (those who filed outside of the one-year filing deadline). This IFR, therefore, will cause an unexpectedly large number of our clients who had the strong possibility of being granted asylum by USCIS to be bypassed for an asylum interview and placed in deportation proceedings because of the IFR's specific focus in finding large categories of cases subject to asylum bars which will allow USCIS to refer as many affirmative cases to EOIR as possible under the parameters of this new rule.

20. Almost half of our legal staff who currently work on asylum cases are partially DOJ accredited representatives or have submitted applications to become partially accredited.[3] We have three partially accredited representatives, two of whom exclusively represent clients in affirmative asylum cases. We have another two staff members whose applications for partial accreditation are in process, both of whom will represent clients in affirmative asylum cases once their applications are approved. This rule will limit the effectiveness and capacity of these five staff members to be able to respond to legal needs of our clients, forcing Oasis in the long term to pivot and choose between laying off these staff members so we can afford to hire more attorneys or spend organizational time and resources to train these staff so they can apply for full accreditation. We believe it will be difficult for these staff members to achieve full accreditation as they have no experience working with clients who are in front of EOIR

[3] *See* "Recognition and Accreditation Program Frequently Asked Questions," Executive Office for Immigration Review, Department of Justice, available at: https://www.justice.gov/eoir/recognition-and-accreditation-program-frequently-asked-questions, last accessed August 5, 2026 ("A representative is 'accredited' when DOJ authorizes a specially qualified non-lawyer to represent individuals in immigration legal matters . . . There are two kinds of accreditation: 'partial' and 'full.' A partially Accredited Representative may represent individuals before USCIS only. A fully Accredited Representative may represent individuals before both USCIS and EOIR, which includes the immigration courts and the BIA.").

and did not graduate from law school.[4] Furthermore, neither option will increase our removal defense capacity soon enough or in a sufficient way to be able to represent all our affirmative asylum clients who will be referred to EOIR due to this rule. In the short term, once our clients begin to be referred to Immigration Court under the IFR, these five staff members can no longer provide substantive legal assistance to these referred clients, hamstringing our ability to provide legal representation to LGBTQ+ asylum seekers which is at the core of our mission and organizational model.

21. The IFR represents a profound change to existing law and procedure and, as a result, a significant amount of Oasis staff time and resources will also have to be devoted to changing how our organization conducts client intakes, makes case acceptance decisions, counsels clients about the merits of their asylum case, and trains our pro bono volunteers and the wider legal community. We will have to make fundamental changes—which will take more time and resources—in how we present our clients' asylum cases and how we advocate for them in front of the asylum office. As a result, we will be able to serve fewer clients.

22. Since the interim final rule went into effect, Oasis staff have spent a considerable amount of time counseling and advising our clients who express fear about how the new rule will affect their eligibility for asylum and how and when their asylum case will be heard.

23. Our legal staff have been forced to spend time distilling the new rule into easily understandable talking points and have begun the herculean task of communicating this information to our more than 1,100 pending asylum clients. We have already spent dozens of hours simply communicating with and responding to client questions and concerns in an attempt to keep our clients apprised of the new rule. This represents significant strain on a small organization whose staff are already overtaxed, and the need for increased communications is certain to increase significantly. Our clients applied for asylum expecting to have an asylum interview conducted by a trained asylum officer in a non-adversarial environment. Due to this rule, we will have to counsel each one of them about the strong possibility that they will be referred to Immigration Court and what that process will look like and how it will differ from the affirmative process. The staff time taken to do this will further divert from our ability to file new cases.

24. Due to the new rule, we will have to significantly retrain our staff on how to determine whether someone is eligible for an asylum interview with USCIS and how to advise potential clients about the risks of applying affirmatively for asylum. We have already spent many hours developing and training staff and creating new workflows for intake scheduling, and we anticipate significantly more hours once USCIS releases more guidance on their implementation of this rule and we see the real-time effects on our clients' cases.

25. We work with over 60 pro bono attorneys and law students each year. These volunteers work with clients to prepare their asylum applications and represent clients at their asylum interviews. We also present certified CLE trainings to the wider legal community on asylum

[4] Our Social Services Program Director worked for more than five years with clients in removal proceedings before EOIR before applying for and receiving full accreditation. Our former staff member who received full accreditation had graduated from law school.

law and representing LGBTQ+ asylum seekers. Due to the new rule, our Special Projects Director, staff attorneys, and I will have to devote time and organizational resources to retraining our volunteers and revising our CLE trainings, including reapplying for certification from the California Bar. Within one week of the rule being published, Oasis spent multiple hours responding to volunteers' questions and concerns about this rule and how it affects their representation of our existing clients.

26. Through our online resource portal, we distribute country conditions research, case materials, and guides about asylum law and procedure which we make available to lawyers around the country who are representing LGBTQ+ asylum seekers. The new rule will force us to spend a significant amount of time and resources on revising and updating these materials to align with the new rule.

27. We currently do not have the capacity to represent hundreds of clients in deportation proceedings in Immigration Court. Our removal defense program is less than two years old and our current caseload of clients with active cases in front of EOIR is 22. We only have one attorney whose work is solely dedicated to representing clients in front of EOIR. We have three other attorneys on staff who work on asylum cases but their casework is split between affirmative asylum and defensive asylum cases. Furthermore, the focus of our removal defense program is divided between fully representing clients in deportation proceedings and assisting pro se asylum applicants to submit applications and maneuver their cases with limited assistance from us so that we can assist more people in applying and getting to the hearing stage. Each of our attorney's removal defense caseload of clients where a notice of appearance of counsel has been submitted is intentionally smaller than average so we can assist more pro se applicants.

28. Being forced to change from a primarily affirmative asylum-based model to representing a significant number of clients in Immigration Court would be extremely resource intensive. Oasis would have to grow our new removal defense program rapidly, staff it with trained and experienced removal defense attorneys, develop new case materials, and recruit new pro bono attorneys who have the background, experience, and interest in defending clients in Immigration Court. Shifting to primarily defensive asylum work would severely limit our ability to use our current trained volunteer attorneys and law students to represent clients in these proceedings because of the nature of the representation and the need for increased supervision. For example, unlike in affirmative asylum proceedings where a law student can appear by themselves with the client, in removal proceedings the attorney supervisor must physically appear with the law student. Our current pro bono attorneys, while trained and experienced in how to represent asylum applicants in front of USCIS, have no experience in representing clients in front of EOIR and would not be able to increase the capacity of our small team like they do for the affirmative asylum program.

***Impact of the Interim Final Rule's Retroactivity on Oasis***

29. The IFR's application to already filed and pending affirmative asylum applications will be an additional and extreme onus on our organization and will cause us additional harm. Oasis's business model relies on the assumption that each of our clients will have an interview. Because we have a core organizational interest in serving as many LGBTQ+ immigrants who have

faced extreme persecution in their country as possible, at the time of filing our clients' asylum applications we often only submit what is required by USCIS to ensure receipt and begin processing of the application—i.e., only Form I-589 and our clients' identity documents. Although we prepare the supporting evidence, including declarations, witness affidavits, medical and psychological reports, police records, and country conditions evidence, we do not finalize and submit this evidence at the time of filing. This is because we want to avoid having to make lengthy additions and updates if the interview isn't scheduled until years after the date of filing as has been the case for many years due to USCIS backlogs. For example, we have clients who applied for asylum in 2015 and 2016: if we had submitted all the supporting evidence at the time of filing, the evidence would be stale and dated and would require extensive updates to make it probative of the client's asylum claim at the time of adjudication. This is to say that, in many cases, Oasis would have to prepare and submit clients' evidentiary packages twice—a huge additional burden on a small organization.

30. With the elimination of mandatory asylum interviews, Oasis will have no guaranteed opportunity to provide this supporting evidence needed to show our clients' asylum eligibility before the interview determination is made. Although the IFR discusses the possibility of USCIS issuing Requests for Evidence (RFE) or issuing public alerts to give notice to asylum applicants to submit supporting evidence, this notice or opportunity is not guaranteed by the rule. In fact, within days of issuing this IFR, USCIS announced that it will rely less on RFEs for applications. "USCIS to Reduce Frivolous Immigration Benefits Requests by Reinforcing Evidence Standards," August 5, 2026, available at: https://www.uscis.gov/newsroom/alerts/uscis-to-reduce-frivolous-immigration-benefits-requests-by-reinforcing-evidence-standards. Therefore, it is very probable that hundreds of our clients will be unable to get a full evidentiary opportunity to present their claim in a non-adversarial environment because the only evidence of their claim currently in front of USCIS is their skeletal Form I-589. We can therefore expect many of our clients to be referred to immigration court with no opportunity to provide evidence to the immigration office, despite their application having guaranteed that opportunity. The amount of time Oasis will have to spend counseling our over 1,100 affirmative clients on this point will be immense.

31. Furthermore, although there is a notice scheme contemplated by the rule that potentially allows for the submission of supplemental evidence before an interview determination is made, this scheme will put Oasis under intense strain and in danger of not being able to submit the necessary materials for all of our pending clients. Currently it takes our legal caseworkers approximately five hours to prepare the supporting evidence for an individual client's case that is submitted after the asylum interview is scheduled. From August 2025 to July 2026, Oasis has had 74 asylum interviews scheduled, resulting in 370 hours of staff time spent over the entire year to prepare the supporting evidence. Under the rule, if USCIS issues RFEs or a public alert, Oasis will have to devote at least 5,500 hours of staff time in order to submit all of our pending clients' supporting evidence by a certain deadline to be considered by USCIS to avoid referral to Immigration Court without an interview. The standard response time that USCIS gives to respond to an RFE is 90 days. If USCIS gives each asylum applicant the same 90 days in which to submit their additional evidence, it will take eight Oasis staff members working on the submission of supporting evidence for nearly eight hours per day, five days per week in order to meet this deadline. All of our other legal work—including filing citizenship and lawful

permanent residency applications, new asylum applications, and responding to client communication—will have to cease.

***Harm to Oasis Clients and Other Asylum Seekers***

32. In my experience representing asylum seekers for the past 13 years, the asylum interview conducted by a trained asylum officer is an extremely important part of the adjudicatory process. First, through the oral testimony of the applicant, the asylum claim can be presented to the fullest. The applicant can elaborate on important elements of their claim that they may not have understood were important to include in their initial application and supporting evidence. They can also add further detail through oral testimony that could not or has not been captured through documentary evidence. This is especially true for cases that have already been filed with USCIS and then sat as a result of huge backlogs due to USCIS not interviewing asylum applicants soon after they apply. Many people who have already filed for asylum applied under the expectation that they would be given a non-adversarial interview. This was part of the calculus that made them go forward with their case. At Oasis, this has been an important part of our explanation and orientation for new clients: the assurance that their asylum case will be decided in a non-adversarial setting and that they will have the opportunity to fully submit all the evidence in their case and present oral testimony.

33. The new rule will have an especially devasting impact on LGBTQ+ affirmative asylum seekers like our clients. LGBTQ+ asylum seekers often face severe mental health challenges,[5] which affect their ability to fully present their asylum case, especially if the trauma is recent or the asylum seeker has not received mental health treatment. Years of trauma in their home countries and the unique challenges faced by LGBTQ+ immigrants in the United States mean that Oasis clients and LGBTQ+ asylum seekers in general experience high rates of mental health disorders like Post Traumatic Stress Disorder, recurrent depression, and anxiety and panic disorders.

34. Most of our clients and other LGBTQ+ asylum seekers arrive in the United States deep in the closet and afraid to be open about their gender identity and sexual orientation because of the danger that exists in their home countries to be LGBTQ+. Due to a lifetime of persecution, the majority of our clients are unable to come out or begin the transition to affirm their gender within one year after their arrival to the United States or even for many years after that.

35. For example, in the past two years alone, we have had three clients granted asylum whose initial reason for applying for asylum had changed by the time they were interviewed. All are transgender women who, at the time they filed for asylum, were not yet open about their gender identity and identified as gay men in their Form I-589s. As is our usual practice, we

---

[5] *See* Ariel Shidlo and Joanne Ahola, "Mental health challenges of LGBT forced migrants," *Forced Migration Review* (April 2013), available at: http://www.fmreview.org/sogi/shidlo-ahola.html; *see also* Victoria Neilson & Aaron Morris, "The Gay Bar: The Effect of the One Year Filing Deadline on Lesbian, Gay, Bisexual, Transgender, and HIV-Positive Foreign Nationals Seeking Asylum or Withholding of Removal," 8 N.Y. CITY L. REV. 233, 264 (2005).

only submitted the asylum application and no additional evidence because we did not know when their interviews were going to be scheduled and did not want to spend organizational resources on extensive updates if they were not interviewed soon after applying.

36. Two of these clients received interviews seven years after applying, and the third received her interview nine years after applying. By the time their asylum interviews were scheduled, all three clients had come out as transgender women, and this material change to their asylum application could be presented to the asylum officer through the supporting evidence provided in advance of the interview and through testimony at the interview. All three were granted asylum, and as all three had applied for asylum after their first year of arrival in the United States and were granted an exception to the one-year filing deadline. The fact that they had the opportunity to have an asylum interview made it possible for them to fully present their asylum claim and be granted asylum.

37. We have many other clients who are not able to disclose all incidents of persecution they experienced in their countries of origin at the time they submitted their asylum application. Due to receiving therapy and other mental health support, these clients were eventually able to talk fully about the harm they experienced so they could testify about what had happened to them at their asylum interviews. For example, one of our clients had been raped multiple times as a child by his uncle. When he first applied for asylum, he did not feel comfortable enough to talk about this experience, so it was not included in his application. USCIS did not schedule his asylum interview until seven years after he filed. In preparation for the interview, we filed an updated declaration and psychological evaluation with this new information, and he was able to testify about this harm at the interview. He was granted asylum.

38. We have other clients where conditions in their country substantially worsened in the time between when they filed for asylum and the scheduling of their asylum interview. Because of the opportunity to have an interview and the opportunity to submit updated evidence until the interview, these clients were able to fully present their asylum claims and corroborate their fear of return.

***Conclusion***

39. The changes in the Rule will cause severe harm to Oasis, our clients, and our pro bono partners. If this Rule goes into effect, Oasis will be unable to carry out its mission of serving as many LGBTQ+ asylum seekers as possible. Our business model relies on representing LGBTQ+ asylum seekers before USCIS in affirmative asylum proceedings and this Rule will severely reduce our capacity and ability to do this because of its aim to refer large categories of affirmative asylum seekers to Immigration Court. Oasis will not be able to pivot its business model to adequately respond to the significant changes entailed by the IFR because we do not have the funding, experience, or capacity to represent large numbers of our clients and other LGBTQ+ immigrants in Immigration Court. This IFR will hurt LGBTQ+ asylum seekers, like our clients, by eliminating the opportunity to provide additional evidence to support their asylum cases before referral to EOIR and denying them the opportunity to receive a non-adversarial asylum interview before an Asylum Officer where they can fully present their asylum claim.

I declare under penalty of perjury that the information contained in this declaration is true and correct to the best of my knowledge.

Executed on this 21 day of August 2026, in Berkeley, CA.

Rachel Kafele