**DECLARATION OF STEPHEN MARVIN BROWN**
**DIRECTOR, IMMIGRATION LEGAL SERVICES, HIAS**

I, Stephen Marvin Brown, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct.

1. I am the Director of Immigration Legal Services at HIAS, a nonprofit organization that provides vital services to refugees, asylum seekers, and other forcibly displaced and stateless persons around the world and advocates for their fundamental rights so they can rebuild their lives.

2. I am an attorney, licensed to practice law in Virginia and the District of Columbia since 2010 and 2012, respectively. I am also admitted to practice before the U.S. District Court for the Eastern District of Virginia, since 2023. In 2026, I was admitted to the Fourth Circuit Court of Appeals. I have spent my entire legal career providing immigration legal services at various nonprofits in the Washington, D.C., region.

3. I joined HIAS as Supervising Attorney in 2019 and was later promoted to Managing Attorney, and then again to my current role as Director, Immigration Legal Services, where I oversee HIAS's immigration legal services programming in HIAS's headquarters offices in Silver Spring, MD and in New York City. Throughout my time at HIAS, I have represented individuals before the Executive Office for Immigration Review (EOIR), including before the Immigration Courts and the Board of Immigration Appeals (BIA), and in affirmative asylum cases before U.S. Citizenship and Immigration Services (USCIS), as well as in other forms of family- and humanitarian-based immigration relief. I have also filed complaints in U.S. District Court for writs of mandamus under the Administrative Procedure Act for immigrant clients facing protracted delays in their immigration matters.

4. I am writing to address the harm that HIAS will experience because of a new Rule issued by U.S. Citizenship and Immigration Services, entitled Affirmative Asylum Referrals Without Interview, 91 Fed. Reg. 47101 (July 28, 2026) (hereinafter, "the Rule").

5. The facts set forth in this Declaration are based on my personal knowledge as well as the experience and work of HIAS attorneys and refugee resettlement and integration staff.

**<u>HIAS' Mission and Scope</u>**

6. HIAS is a global, faith-based nonprofit organization which, working with the organized American Jewish community, is dedicated to ensuring that the world's forcibly displaced people find welcome, safety, and freedom. Founded 140 years ago, as the Hebrew Immigrant Aid Society, HIAS is the oldest refugee protection organization in the world.

7. HIAS provides vital services to refugees, asylum seekers, and other forcibly displaced and stateless persons around the world and advocates for their fundamental rights so they can rebuild their lives. Those rights include due process, freedom from persecution, and the right to live safely just as they are. Any hindrance to those rights—especially a rule

that would eliminate due process rights of an asylum seeker—specifically the right to an affirmative asylum interview—necessarily frustrates HIAS' mission and prevents us from engaging in our core work to serve refugees, asylum seekers, and other forcibly displaced persons.

8. Today, HIAS operates offices in 11 countries, including the U.S., supporting refugees, asylum seekers, and other forcibly displaced persons with services to ensure legal protection, economic inclusion, protection from gender-based violence, and access to mental health services.

9. In the United States, HIAS is one of eight nonprofit organizations, called Resettlement Agencies, that are designated by the federal government to implement the refugee resettlement program through cooperative agreements with the U.S. Department of State and U.S. Department of Health and Human Services. We have worked with a network of 30 partner agencies, or "affiliates," who directly resettle refugees from all over the world. Over the past five years, HIAS has resettled 21,558 refugees from 64 different countries.

10. HIAS has also provided immigration legal services for more than 50 years. We have eleven legal staff members providing either direct legal services or facilitating the provision of legal services by volunteer pro bono attorneys to refugees, asylum seekers, and other forcibly displaced immigrants in the United States. We represent clients seeking various forms of legal relief, including, but not limited to, asylum, U and T visas, Special Immigrant Juvenile Status (SIJS), protection under the Violence Against Women Act (VAWA), Temporary Protected Status (TPS), adjustment of status, and citizenship. Our attorneys represent clients before the U.S. Immigration Courts, the Board of Immigration Appeals (BIA), USCIS, the Department of State (DOS), and before local family courts (for SIJS-related custody and guardianship matters). HIAS U.S. Legal Services provides all services free of charge exclusively to those who fall below 200% of the national poverty line and express fear of returning to their home countries.

11. Since 2016, HIAS has been working to develop and expand its Pro Bono program to build capacity, serve more clients, meet funding goals, and create new partnerships. HIAS works with pro bono attorneys in several ways, through our headquarters in Silver Spring, Maryland, our office in New York City, as well as remotely with over 3300 volunteer attorneys in our network nationwide. HIAS currently employs three full-time staff members in its pro bono program who oversee and supervise a robust network of volunteer attorneys located across the US.

12. Additionally, our Pro Bono team develops, on average, 20 trainings per year, designed to provide pro bono attorneys with the detailed knowledge and practice tips they need to be able to represent clients in a variety of legal petitions and applications. A key component of HIAS' pro bono work is our comprehensive training program, which includes a library of resources and hands-on mentoring model. These resources are vital to our pro bono attorneys, who are bound by ethical rules to competently represent their clients. As most of HIAS' pro bono attorneys are not practicing immigration attorneys, they rely on HIAS' trainings, resources, and mentoring to represent their clients, which includes staying up to date on changes to the law. We have earned an excellent reputation with

law firms, in large part because we provide comprehensive trainings (webinars as well as written materials) to ensure that pro bono attorneys feel prepared and competent to represent their clients. We provide pro bono attorneys with our comprehensive and carefully designed toolkits, which include samples and templates. Our pro bono team also provides one-on-one mentorship support to our volunteer attorneys and reviews their draft filings, answers questions, and otherwise troubleshoots issues that arise over the course of their representation of their HIAS client.

13. Between our Direct Services legal team and our Pro Bono and Partnerships team, we have served approximately 4000 forcibly displaced clients in the last five years. Currently, HIAS has 182 pending affirmative asylum cases before USCIS, and 60 defensive cases before the Immigration Court or Board of Immigration Appeals, involving fear-based claims (asylum, withholding of removal, and protection under the Convention Against Torture).

14. HIAS provides all of our legal services to clients completely pro bono. To sustain our work without charging fees to clients, our program is funded through federal, state, and local grants, as well as through institutional and small donors. At any given time, HIAS attorneys are responsible for meeting requirements under five or more grants, some of which require us to take a specific number of cases that fall under either categorical requirements (i.e., serving survivors of torture) or jurisdictional ones (i.e., representing Montgomery County, Maryland residents).

***The Rule Would Harm HIAS and Our Clients***

15. The Rule would make it impossible for HIAS to continue performing our core services. The Rule's increased emphasis on referral without interview would decimate our Pro Bono team's ability to place asylum cases, which we primarily place for asylum seekers before USCIS in the affirmative posture. It would also place a major strain on our direct services team's capacity to take new cases and would force us to take on more defensive cases, before the immigration courts, which we do not have the staffing nor the grant funding to undertake.

16. HIAS' funding and staffing strategy has always prioritized being able to serve those who are most in need, and who have the most to lose. We must carefully select which clients we can represent based on our limited capacity and often restrictive nature of our funding. As a result, HIAS primarily, though not exclusively, serves clients who are filing for immigration benefits with USCIS. Preparing an affirmative asylum case, though intensive, is significantly less complicated than representing an asylum seeker before the immigration court. By focusing our efforts on representing asylum seekers in an affirmative posture, we have been able to take on a greater number of asylum cases and ensure that more people are able to legally remain, safe from persecution, in the U.S.

17. The Rule threatens to upend this organizational structure. It strips an asylum seeker of the right to develop their claims through an interview before the asylum office and threatens the summary referral of countless individuals' cases to immigration court. The

populations affected by the Rule include cases where the noncitizen "does not merit a grant as a matter of discretion without first making an eligibility determination," 91 Fed. Reg. 47103, despite the form I-589 containing no questions about many of the factors that go to positive equities for discretion. This means that any of HIAS' affirmative cases could run the risk of receiving an unreviewable referral to immigration court, not because they do not merit an exercise of discretion, but because the record has not been fully developed on that question yet.

18. The Rule offers no timeline on when an asylum officer may refer a case without an interview; it states only that an officer may refer a case based on a review of the record and other relevant evidence "as applicable." 91 Fed. Reg. 47128. Thus, while the Rule reaffirms the fact noncitizens can amend or supplement their asylum application at any point, 91 Fed. Reg. 47112, the ever-present risk of referral cautions strongly against filing an incomplete application that an officer may use as a basis for referral. It also means that HIAS attorneys must ensure that their client's asylum application is comprehensive and includes supplemental corroborating evidence at the time of filing. This will put particular strain on attorneys seeking to represent clients at risk of filing their application outside of the one-year filing deadline. It will also create the need for potentially duplicative work for clients who do have an interview before the asylum office. The large backlog of pending applications at the asylum office means that the country conditions or situations of our clients will have changed in the years they await an interview. Rather than doing one filing with the most-up-to-date information at the time of the interview and adjudication, HIAS attorneys will now need to do multiple filings in cases.

***The Rule Will Result in More Clients Facing Removal Proceedings, Which Are More Time-Intensive and Will Impact HIAS Attorneys' Ability to Serve its Existing Asylum Seeking Clients***

19. The IFR will also require HIAS attorneys to represent more people in removal proceedings. Removal proceedings are more time- and resource-intensive than proceedings before the asylum office. To provide representation for asylum seekers in removal proceedings, HIAS attorneys will have to familiarize themselves with the immigration court's practice guidelines, prepare briefs in advance, prepare their client and any witnesses for direct and cross examination, and attend multiple hearings in which they may be required to appear in-person. HIAS attorneys will also be required to deepen their familiarity with the forms of relief only available in immigration court. This includes withholding of removal and relief under the Convention Against Torture, which attorneys typically seek in addition to asylum for fear-based claims.

20. Furthermore, this rule, combined with current policies in the immigration court context, will likely result in asylum seekers being ordered removed from the U.S. with no meaningful chance to present their claim to protection. Under the "Asylum Cooperative Agreements" (ACAs), immigration judges are empowered to pretermit applications for asylum and order immigrants removed without even considering the merits of the underlying claim. HIAS attorneys already prepare for asylum clients' claims to face potential pretermission at Master Calendar Hearings, but if affirmative asylum seekers'

claims are also referred to the immigration court, this work will be magnified. Attorneys must know which Asylum Cooperative Agreement (ACA) may apply in their client's case, the specific considerations and eligibility characteristics of each one, and be able to develop arguments for why the client cannot be returned there. This essentially involves an entire hearing's worth of work and an enormous amount of time spent before we can even begin to litigate an asylum application.

21. Over the past year, with the huge increase in immigrants facing detention at routine ICE check-ins and USCIS interviews, HIAS attorneys now prophylactically prepare petitions for Writs of Habeas Corpus for all clients facing ICE or ISAP check-in appointments. Only in rare circumstances do individuals who filed for asylum affirmatively have ICE check-ins, and we have never represented an affirmative asylum applicant who was detained. Once someone is placed in removal proceedings, however, they are much more likely to be scheduled for regular ICE check-ins or detained. Challenges incurred with referral to immigration court increase exponentially if ICE decides to detain our clients during the pendency of their immigration court proceedings. Attorneys have long faced barriers of access to detained clients, impacting client communication and evidence preparation. The detained docket also occurs on a significantly faster timeline than affirmative asylum cases, which would require even more effort from HIAS attorneys as they prepare their client's defensive case on a compressed timeline. Although HIAS' general practice up to now has been to take on cases that have been referred to immigration court by the asylum officer, the Rule's supercharging of the referral process will make that practice all but impossible.

***The Rule Will Cause HIAS Financial Harm***

22. The Rule will also cause HIAS financial harm by requiring the organization to invest in team members' professional licensures, and/or in hiring additional staff, to meet the needs of its existing client base. To start, most, but not all of HIAS' immigration practitioners are accredited to appear in immigration court. HIAS employs one partially accredited representative on staff. Partial accreditation allows that staff member to represent asylum seekers before USCIS but not the immigration court or BIA. HIAS' partially accredited representative will be unable to continue their representation of an affirmative asylum client if their case is suddenly referred to the immigration court because of the IFR. This means that, in order to serve our existing client base, including the clients served by its DOJ accredited representative, HIAS will have to spend substantially more resources to either obtain full DOJ accreditation for its non-attorney staff, or hire more attorneys who are licensed to appear before the immigration court.

23. Transitioning to a primarily defensive asylum docket will not only strain HIAS' staffing, it will also harm the organization financially. HIAS currently has grant funding that exclusively supports work on affirmative cases, but not defensive cases. As a result, HIAS often must draw from our pool of general funding to ensure we can continue representing clients who end up before the immigration court. Limited availability of unrestricted funding may result in HIAS having to withdraw representation from clients who are referred from the asylum office to the immigration court. It would also

negatively impact our compliance on grants, which support affirmative but not defensive representation, and have requirements on the numbers of clients to be served. Put another way, because of the need to put more resources toward cases, we are not likely going to be able to serve as many clients with the same amount of funding and staff capacity.

***The Rule Will Harm HIAS' Reputation and Threaten Attorneys' Ethical Responsibilities***

24. If HIAS attorneys had to withdraw representation from clients, simply because we do not have the capacity or funding to support representation before the immigration court, it would not only prejudice our clients, but it would severely damage our reputation. Most of our new clients come to us because of our reputation for excellent representation, because we prioritize linguistic support and cultural competency, and because we are steadfast and committed to those that we serve. For those same reasons, we are also a trusted referral partner from other non-profit and community-based organizations in the DC and NYC metro areas. As a pro bono provider, if we were forced to withdraw from large numbers of clients at once, we would be putting those clients at risk of moving forward without representation because they cannot afford it. Withdrawing from a client's case when they are even closer to the possibility of a removal order or detention would be especially grievous. This is also antithetical to the legal ethics of our individual attorneys and to the broader mission of HIAS itself.

25. The Rule would also impose substantially more work on HIAS attorneys in the way they prepare client matters; to avoid a client matter being referred from USCIS to the immigration court HIAS attorneys will have to invest more time and energy on initial filings before USCIS. As the Rule notes, an asylum officer's discretionary decision is a fact-specific totality-of-the-circumstances test. 91 Fed. Reg. 47107. And while the fact that a noncitizen is a refugee generally outweighs negative factors, the Rule also notes that "there is no statutory or regulatory requirement that an adjudicator find the [noncitizen] is a refugee prior to making a negative discretionary decision." *Id.* In other words, even if one of HIAS' clients is a refugee within the meaning of the INA, our attorneys still need to prove that status *and* account for any possible negative factors that may lead an asylum officer to refer the case out of hand. And because the IFR does not contemplate providing notice about the timing of adjudication of the asylum application, even when it has been pending for years, the attorneys will need to continuously monitor and update cases for the asylum office as events occur. For example, if a client is arrested, but ultimately not charged with a crime, an attorney would need to quickly update the asylum office to ensure that arrest does not cause the asylum office to make a negative discretionary decision.

***The Rule Will Harm HIAS Clients***

26. Under the Rule, many of our affirmative cases could end up transferred to the immigration court. This shift would mean that instead of our clients being interviewed by an asylum officer with subject-matter expertise and trauma-informed interviewing

training, they will instead face an immigration judge who may lack any experience in immigration law whatsoever. HIAS volunteers have seen this firsthand in our court accompaniment program, where trained volunteers accompany immigrants who have not yet secured legal counsel, to their Master Calendar Hearings. Volunteers have noted how immigration judges often ask ICE attorneys for help understanding some of the underlying legal issues. This shift means that clients will be forced to tell their story in a hostile environment to adjudicators who may not even understand the law or intricacies of their claim. For clients who get referred for proceedings which get expedited, we may have trouble securing pro bono health or psychological evaluations, which are especially helpful for immigration court because ICE attorneys and judges are not trained in trauma-informed interviewing and are, in fact, often hostile towards asylum seekers. Without those evaluations, it will be harder for clients to corroborate their claims.

27. Referring HIAS' affirmative caseload to immigration court would place a significant burden on our clients. Our clients, who are overwhelmingly composed of survivors of acute traumatic experiences, benefit from the asylum interview's non-adversarial format and the special training that asylum officers undergo, including training in country conditions, asylum law, and interviewing survivors of extreme trauma. Many immigrants, especially children, rely on this supportive environment to explain their fear of return to their country of origin.

***<u>The Rule Would Compromise HIAS' Pro Bono Program by Funneling Affirmative Cases into Immigration Court</u>***

28. As already explained, HIAS relies on partnerships with pro bono attorneys to serve more clients, meet funding goals, and build its capacity. The attorneys in HIAS' pro bono network are not traditionally immigration attorneys. They are largely attorneys employed at large law firms, solo practitioners, and retired lawyers. HIAS' Pro Bono Program provides our pro bono attorneys with hands-on support, which includes trainings, comprehensive toolkits, templates and samples, and heavy hands-on mentorship. The work that pro bono attorneys submit to U.S. immigration agencies on behalf of HIAS clients undergoes multiple levels of review by our team.

29. The Rule's summary referral provision would undermine HIAS' Pro Bono Program by making it prohibitively difficult for volunteer attorneys without substantive immigration law experience to represent asylum seekers. Most of the pro bono attorneys in HIAS' network (especially those at large law firms, which make up the bulk of our engaged attorneys) are loath to take on defensive asylum matters for various reasons: 1) immigration court proceedings could take years to complete. While that perception remains, we are currently facing the opposite problem, of immigration courts scheduling cases on a timeframe so accelerated, as to be difficult for pro bono volunteers, particularly at a time when the law and procedures are changing daily;; 2) defensive asylum cases are extraordinarily complex, and require a significant investment of staff time, which is not ideal for a pro bono (unpaid) matter; 3) in defensive cases, the amount of work and effort required to represent a client frequently balloons to more than

expected, requiring attorneys to represent clients in additional collateral matters like check-in appointments with ICE, bond motions, and habeas petitions, in the event of detention, or increasingly, working on appeals; 4) many pro bono attorneys focus their practice on transactional work, and are inexperienced in and uninterested in taking on litigation/court matters; 5) between new administrative precedents, policy memoranda, and an influx of inexperienced immigration judges, defensive asylum cases have become extraordinarily difficult to win, resulting in attorneys' frustration and disillusionment with pro bono immigration work. This Rule will most likely result in the referral of more asylum clients to immigration court, which will chill participation by many of HIAS current pro bono volunteers, frustrate the ability of the Pro Bono team to serve our existing client population, and threaten the partnerships our organization has spent years cultivating.

30. Additionally, as noted above, it has become cost-prohibitive to take on and mentor defensive asylum matters with HIAS' pro bono attorney network; defensive asylum cases have become so complex that it takes much more of our team's capacity to keep our training materials current, and to mentor attorneys on them. Additionally, this IFR applies to pending cases, which could upend the expectations of existing pro bono counsel as to what they have signed up for. The need to continuously update the record, created by this IFR, means that law firms can't just have staff monitoring for a decision, but will need to keep up to date any changes to the law or changed country conditions or circumstances for the client.

31. The Rule would also stretch HIAS' three-person pro bono team well beyond its limits. The Rule's risk of discretionary referral will make our work of training and mentoring volunteer attorneys much harder. First, our volunteer attorneys and their HIAS mentors will be pressed to prepare a much more complete and comprehensive affirmative asylum filing so as to avoid referral. Second, the cases that are referred to immigration court will require significantly more work, and demand exponentially more time and effort of our team to serve our existing clients. We would struggle to be able to serve our existing client base, would be completely incapable of serving any additional clients, and would fail to meet the parameters expected by our grantors. Adding removal proceedings to the Pro Bono Program's asylum docket would all but upend the program's entire model of hands-on mentorship combined with high-volume representation. As a result, HIAS would need to overhaul its Pro Bono Program, or volunteer attorneys will likely have to terminate representation upon referral.

***Conclusion***

32. The proposed changes in the Rule will cause severe harm to HIAS, its clients, and our pro bono attorneys. It will also impact the many asylum seekers that will come to us seeking desperately needed pro bono support for their asylum application, who we will have to turn away because of lack of capacity. The Rule's constant risk of referral for affirmative asylum applicants means that our attorneys and volunteers will need to dedicate even more of their capacity to producing a single, written filing, just in case the officer decides to summarily decide on the application. And the anticipated increase in referrals will take

our organization away from our principally affirmative caseload into a more defensive caseload. That will place additional strain on our attorneys to obtain the competencies to work in removal proceedings and to take on quantitatively more hours of work than they would have needed to do for the same caseload before USCIS. The Rule also threatens grant funding tied to affirmative cases and force HIAS to take on work for which they might not have specific grant funding. And should HIAS decide to terminate representation for cases that are referred to immigration court, the decision would not only harm our mission but also our reputation within the immigrant communities we represent as well as with our partner organizations.

I, Stephen Marvin Brown, declare under penalty of perjury that the information contained in this declaration is true and correct to the best of my knowledge.

Executed in Sarasota, Florida on August 17, 2026

Stephen Marvin Brown
Director, Immigration Legal Services