**DECLARATION OF ROXANA AVILA-CIMPEANU, ESQ**
**FLORENCE IMMIGRANT & REFUGEE RIGHTS PROJECT**

I, Roxana Avila-Cimpeanu, pursuant to 28 U.S.C. § 1746, declare as follows:

1. My name is Roxana Avila-Cimpeanu. I am a licensed attorney and a member in good standing of the State Bar of Arizona. I am currently employed as Deputy Director of the Florence Immigrant & Refugee Rights Project ("Florence Project" or "FIRRP"). I joined the Florence Project on September 6, 2016, and have served in my current role since September, 2024. I oversee our direct services programs, including both legal and social services for detained adults and unaccompanied children. Prior to my current position, I served as Children's Legal Program Manager, Managing Attorney for the Children's Pro Bono Program, Pro Bono Mentor, Staff Attorney, and Law Graduate with the Florence Project's Children's Legal Program serving unaccompanied immigrant children in Arizona. During my time at the Florence Project, I have personally provided free legal services, including direct representation, and pro bono mentorship, to at least 140 children, as well as legal orientations and Know Your Rights Presentations to hundreds more. Additionally, as Children's Legal Program Manager and Deputy Director, I have supervised attorneys, pro bono volunteer attorneys, law graduates, accredited representatives, legal assistants, intake specialists, and social workers who have provided free legal services, both direct representation and pro se services, to thousands of individuals detained in Office of Refugee Resettlement ("ORR") and Immigration and Customs Enforcement ("ICE") custody in Arizona.

2. I am writing to address the substantive harm that FIRRP will experience because of a new Interim Final Rule issued by the Department of Homeland Security, Affirmative Asylum Referrals Without Interview, 91 Fed. Reg. 47,101 (July 28, 2026) ("the Rule").

**<u>The Florence Project</u>**

3. Founded in 1989, FIRRP is a non-profit organization dedicated to providing free legal and social services to the thousands of adults and children in immigration custody in Arizona. Our vision is to ensure that every person facing removal proceedings has access to counsel, understands their rights, and is treated fairly and humanely.

4. The Florence Project is the sole 501(c)(3) non-profit organization dedicated to providing free legal services to unaccompanied children in Arizona and adults in immigration detention in Eloy and Florence, Arizona. Through our attorneys, accredited representatives, legal assistants, social workers, and network of pro bono attorneys, the Florence Project provides free legal education and high-quality free immigration representation to thousands of people who are detained in immigration custody and face removal in Arizona.

5. When children under the age of 18 arrive in the United States without a parent or guardian willing or able to care for them, and are encountered by immigration officials, they are

deemed to be unaccompanied children ("UC") under the Trafficking Victims Protection Reauthorization Act ("TVPRA") and, as such, must be detained in ORR custody, rather than ICE custody. If an unaccompanied child turns 18 in ORR custody, the TVPRA requires the child to be placed in the least restrictive setting available, which typically results in some form of release or, in very rare circumstances, transfer to adult ICE custody. In most circumstances, and unless de-designated by an officer authorized to do so, a child's legal designation as an unaccompanied child is retained even after a child is released from ORR custody and, often, can be retained for quite some time after the child turns 18. For asylum cases, so long as applications were filed prior to turning 18 and while the unaccompanied child retained that status, the statutory and regulatory protections that are afforded to unaccompanied children continue to apply to their cases regardless of their release from ORR custody, current age, or current UC status.

6. For decades, the Florence Project has provided high-quality immigration legal services and education to the hundreds, and sometimes thousands, of unaccompanied children who are detained in ORR custody in Arizona in any given year. This includes providing direct representation to hundreds of children annually who otherwise would be without an attorney and providing developmentally appropriate "Know Your Rights" presentations to children in ORR shelters to help them understand what is happening to them and their legal process, as required by law under the TVPRA. We also work to ensure that no unaccompanied child in ORR custody in Arizona goes to court alone, providing friend-of-the-court support and representation in hundreds of cases to children seeking humanitarian protection and other relief in immigration court or before U.S. Citizenship and Immigration Service ("USCIS").

7. The Florence Project also provides free legal services in three ICE detention centers currently in operation in Arizona: the Eloy Detention Center, the Florence Detention Center, and the Central Arizona Florence Correctional Complex. In those facilities, we provide detailed legal orientation and technical support to thousands of detained pro se respondents each year, including group orientations and workshops that enable people to represent themselves in bond and removal proceedings. Florence Project attorneys also represent hundreds of adult clients before the asylum office, immigration courts, and the Board of Immigration Appeals ("BIA") each year, including many who are seeking humanitarian relief, such as asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"). Florence Project attorneys also serve as appointed counsel for individuals deemed mentally incompetent to represent themselves in removal proceedings and, working with support from our legal assistants and social workers, maintain a caseload of approximately one hundred such clients throughout Arizona under the National Qualified Representative Program and pursuant to court order in *Franco-Gonzalez v. Holder*, No. CV 10-02211 DMG DTBX, 2013 WL 8115423, at *1 (C.D. Cal. Apr. 23, 2013).

8. In addition to our free in-house representation, Florence Project has a robust pro bono program that receives case referrals from teams providing education and legal screenings and then connect unrepresented noncitizens, both adults and unaccompanied children, with pro bono counsel from law firms or pro bono private immigration practitioners. Each year, our pro bono program places dozens of new cases with volunteer attorneys before the immigration court, state juvenile and probate courts, USCIS, BIA, and the Ninth Circuit Court of Appeals and provides mentorship and technical support on those cases.

**Florence Project's Services to Unaccompanied Children**

9. The Florence Project's core work is providing free legal services, including legal education and information about asylum and other forms of humanitarian protection from removal, among other forms of relief, to thousands of people each year. Florence Project staff routinely provide individualized legal education and direct representation to noncitizens who are seeking asylum and/or other fear-based humanitarian protection, such as protection under the Convention Against Torture ("CAT"). Our Children's Program represents unaccompanied children in affirmative asylum applications before USCIS's asylum office under the TVPRA as well as in removal proceedings before the immigration court. We also represent and advise individuals in bond hearings before the immigration courts, and in release requests to ICE.

10. In total, the Florence Project currently has a staff of 129 people. The Florence Project operates two larger direct legal service programs, one serving unaccompanied children, and one serving primarily detained adults, as well as a smaller advocacy program, which directly serves both adults and children in federal court. All of the 52 staff members, including attorneys, accredited representatives, legal assistants, and social workers, who work on our Children's Program are affected by the Rule, which substantially inhibits our ability to represent unaccompanied children in their asylum proceedings. Likewise, to the extent the Rule is likely to result in increased re-detention of individuals who are referred to the immigration court for removal proceedings, the majority of our adult program staff will also likely be impacted.

11. FIRRP currently represents approximately 600 unaccompanied children in their immigration proceedings and related matters. Nearly 300 of those children have asylum applications pending before USCIS. Around 50 of those children have asylum applications pending before immigration courts. Under the TVPRA, USCIS has initial jurisdiction over unaccompanied children's asylum applications. Thus, more than 80% of FIRRP's current work in children's asylum cases is before USCIS, preparing our clients for non-adversarial interviews in an office setting, as opposed to an adversarial courtroom. Currently, approximately 8% of our child clients, nearly 50 children, are 12-years-old or younger. FIRRP is currently representing at least one unaccompanied child who is only 1-year-old and is in ORR custody in Arizona.

Access to a USCIS interview in a non-adversarial setting allows young children to more meaningfully participate in their asylum proceedings than formal, adversarial proceedings in immigration court.

12. FIRRP also assists unaccompanied children who are pursuing Special Immigrant Juvenile Status ("SIJS"), which allows immigrant children under the age of 21 who cannot reunify with a parent due to abuse, abandonment, or neglect to obtain lawful permanent immigration status. To obtain SIJS, the child needs an order from a state court in which a judge finds that (1) the child is dependent; (2) the child cannot reunify with one or both parents because of abuse, abandonment, or neglect; and (3) return to the country of origin or last habitual residence would not be in the best interests of the child. SIJS has two additional steps after the state court issues the predicate order. First, the submission and adjudication of the form I-360, Petition for Special Immigrant, which must be adjudicated by USCIS. Immigration judges cannot adjudicate an I-360 petition for Special Immigrant Juvenile Status. Once the I-360 form is adjudicated, the child may apply for a green card either before USCIS or before the immigration court, depending on jurisdiction, once a visa is available. However, due to backlogs in overall visa availability, this process can take years—often up to 5 or 6 years, from start to finish. FIRRP currently has more than 250 clients seeking SIJS with applications at various stages of the multi-step, multi-adjudicatory process. Of those clients, nearly 130 have both asylum and SIJS as potential relief that they are or may be pursuing as unaccompanied children.

13. FIRRP routinely represents children even after they have been released from ORR custody through reunification or release on recognizance upon aging out where we filed initial relief for them while they are still designated as unaccompanied children. ORR custody is intended to be temporary, with the goal of reuniting children with responsible parents or guardians. FIRRP represents approximately 450 clients who were previously detained in ORR facilities and are now living in our communities with vetted sponsors. Many of these children have pending asylum applications with USCIS.

## **How the Rule Impedes the Florence Project's Ability to Serve Its Clients, Especially Unaccompanied Children**

14. The Rule will disrupt FIRRP's core business activities, force our projects to divert limited resources, and frustrate our ability to carry out our duties as legal counsel for unaccompanied children and detained adults in many ways. Specifically, by allowing the asylum office to refer an unaccompanied child's asylum application to immigration court through removal proceedings, without the opportunity for an interview to develop the record in a non-adversarial setting will substantially impair FIRRP's ability to carry out our duties and obligations as counsel to advocate for our clients.

15. To start, FIRRP must now expend resources to review its cases involving affirmative asylum applications to determine which cases could be at risk of referral to removal proceedings based on the limited documents an asylum office would have before the interview. Specifically, to initiate a case before the asylum office, all that is required is the Form I-589 Application for Asylum and Withholding of Removal. Form I-589 requires applicants to summarize in a few sentences their often-complex asylum claims. Applicants are also expected to explain other facts that could implicate one of the bars to asylum in a short summary in the application form. With the exception of questions about persecution faced by the applicant, the form does not ask for any positive equities for the asylum officer ("AO") to consider in determining whether to grant asylum in the exercise of discretion. Given the right to an interview with an AO, and the often years-long delay between the filing of the application and the interview, FIRRP attorneys are accustomed to supplementing these brief responses by building a record and presenting evidence upon notice of an interview. The additional evidence used to be filed with the appropriate asylum office 7-10 days before the interview date. USCIS just announced the deadline is now 14 days before the interview date.

16. Supplementing the application at the time of interview (and subsequent adjudication) is particularly important as a practice for our child clients who often require more time and effort to build trust needed for them to reveal aspects of their past traumatic experiences. In my experience working with children, particularly children who have experienced trauma as many of our clients have, it can often take months, or even years in some cases, of working with a child before they begin to trust you and truly open up to tell you fully about their experiences and the worst days of their lives. This is precisely the reason that FIRRP attorneys typically file applications with relatively brief answers that still show prima facie eligibility for asylum to the narrative questions of the application with the expectation that we will supplement the application and record at a later date nearer to the interview. This practice gives us and our clients the time needed to build trust and share information that they often would not have felt comfortable sharing early in the attorney-client relationship, particularly while they were detained, and dealing with the trauma of detention and uncertainty about their futures. It also allows our staff the time needed to develop the record through other means, such as contacting family members or getting copies of newspaper articles or police reports, or other evidence that the child may not necessarily have traveled with or even know about. Due to the Rule, there is now the risk that our child clients' asylum applications could be referred rapidly, before FIRRP attorneys have the opportunity to develop their cases following these necessary steps.

17. Detention is also another reason why conducting the asylum interviews is so important. All of Florence Project's child clients are unaccompanied children who are or were once detained in ORR custody, and the majority of those clients struggle with confinement in ways that

interfere with the ability to prepare their cases while they are detained. While perhaps less carceral in nature than ICE detention centers, ORR shelters are still locked facilities where children, who by definition are without a legal parent or guardian, often experience the stress and uncertainty of not knowing where they will end up or what will happen to them. Confinement and restriction are particularly hard on young people who have left dangerous or harmful situations. On top of the usual difficulties of being confined in that manner, our child clients routinely raise concerns with us about the conditions they face while in ORR custody. Poor conditions can range from lack of access to food that they like or can eat, mental health deteriorating from prolonged detention, to instances of physical and sexual abuse by those who work in the shelters and are supposed to be caring for them.

18. In the Florence Project's experience, children in detention are often less able to fully and meaningfully participate in their legal process compared to children who have been reunited with appropriate caregivers in the community and are able to go to public school and otherwise experience a more typical childhood than they could in confinement and away from loved ones. Many of our clients are only able to openly express what happened to them and their fears about what will happen to them after they have had time living with their sponsors, who provide loving care and culturally-appropriate environments. Other clients are much more open after they have spoken with a mental health professional, and we often work with licensed psychologists to get mental health evaluations in order to complete the record in their asylum cases. Ultimately, children, especially those who have been traumatized, are often not in a position to talk about all the facts of their lives that can lead to an asylum grant until they feel safe and secure. They are better able to be active participants in their case once they have been given the opportunity to be released to the care of loved ones. Therefore, it is necessary to allow time for children to reunite with their families so that their attorneys are given the time needed to fully develop the record prior to the TVPRA prescribed child-friendly asylum interview, in a developmentally and psychologically appropriate timeframe.

19. Many of FIRRP's child clients speak neither English nor Spanish. This means that we regularly must find volunteer or paid interpreters who speak our client's language to prepare our their cases. In recent years, we have seen increased difficulty in finding adequate interpreters, as many interpreters are themselves immigrants who have begun to fear increased immigration enforcement. We routinely work with children whose best languages are scarce indigenous languages, such as Mam or Kaqchikel, which have fewer than 500,000 speakers total. We also have struggled with interpretation for children who speak languages that are so uncommon in the U.S. that we must rely on remote interpreters from the child's country of origin to facilitate communication. Interpretation, thus, poses additional barriers to being able to adequately interview and prepare a child's asylum application on the accelerated schedules that naturally follow from this Rule.

20. In the time between filing and interviewing, FIRRP often must supplement a client's asylum application based on changing situations in our client's home country or newly acquired evidence that can support a client's asylum claim. For example, in family-based cases, there could be additional evidence that the family is being targeted in the intervening time. To carry out our obligations as counsel, FIRRP attorneys must file that evidence to support our client's claim, and this can take time to gather, translate, and file. If the case is denied based only on what was initially filed without notice of intent to deny or other opportunity to respond, our attorneys would lose out on the opportunity to prepare and submit evidence for our clients that was not available at the time of filing.

21. Given that the Rule allows AOs to deny asylum applications without an interview, and without notice that it intends to deny the application, Florence Project attorneys have begun to consider the need to immediately supplement the nearly 300 I-589 children's asylum applications we have pending before USCIS. This includes the possible need to gather and submit evidence to the AO before any interview date is scheduled, along with potentially a need to prepare and submit briefing on eligibility given the broad latitude to refer cases that the Rule allows. Since the Rule allows for referral without any prior notice or opportunity to respond, implementation of this Rule creates an immediate and substantial burden on Florence Project attorneys, legal assistants, and social workers to meet with clients and prepare those supplemental materials on a rapid timeframe. In my experience, preparing to supplement an asylum application with a child vary greatly based on the complexity of the case and factors such as the age of the child. It can take anywhere from 15 to 30 hours of attorney time, not to mention additional time from legal assistants, social workers, and others who support the case preparation and translation. As such, given the nearly 300 children FIRRP currently represents who have pending asylum applications before USCIS, this represents a significant outlay of immediate resources that will strain staff as we try to balance representational needs with other work flows around Know Your Rights, Friend of Court, and other critical legal services for detained children.

22. The need to rapidly supplement asylum applications that are pending, as well as the need to submit future applications with the expectation that USCIS may elect to adjudicate them on the papers only, will frustrate FIRRP's ability to represent our most vulnerable child clients. This group includes our tender-aged child clients who often are unable to remember or fully understand the circumstances that required them to flee their homes or our child clients who experienced serious and significant trauma such that they are psychologically unable to share the full extent of their experiences shortly after meeting with our staff and while still detained. The TVPRA envisioned that attorneys could represent these children in a non-adversarial interview with a trained USCIS asylum officer precisely because it protects such vulnerable children, is more child-friendly, and trauma-informed. This Rule, by eliminating that interview procedure and allowing AOs to deny a child's application and refer them to

immigration court without an interview runs directly contrary to the intent and purpose of the protective procedures established in the TVPRA.

23. This Rule will also allow AOs to deny based on their belief of apparent ineligibility without advance notice or an opportunity to respond – this is something that often requires briefing and a detailed analysis of case law. Since many of our cases before USCIS have been pending for several years, it is essential for our attorneys and our child clients to have a meaningful opportunity to brief eligibility based on current case law. For new cases, even if we briefed eligibility at the time of initial filing, new case law will almost inevitably come out between the time of filing and an AO's review of the case under the Rule, given the BIA has been issuing multiple precedential decisions per week. An opportunity to provide an up-to-date brief explaining why the case is still eligible prior to a decision by an AO is essential. The Rule, however, will lead to referrals before FIRRP attorneys have the opportunity to carry out their duties as counsel and make this showing.

24. It is especially concerning that the Rule allows AOs to deny asylum applications without an interview on the ground that the AO believes the applicant does not merit a granting of asylum as a matter of discretion. In an interview, our clients have the opportunity to present their case with the assistance of counsel and can tell their stories in a way that shows their humanity and why they are deserving of asylum. Florence Project attorneys are trained and skilled in preparing clients for these interviews to make that showing that our clients merit asylum as a matter of discretion. The Form I-589 however, does not give asylum applicants the opportunity to address why they merit a granting of asylum as a matter of discretion outside of the persecution that they will experience; there is no question that addresses discretionary factors and no clear way to submit such evidence with the application itself. By removing the right to an interview, which FIRRP has relied on, the Rule frustrates FIRRP's ability to make that showing to an AO that a client merits asylum for discretionary reasons.

25. The inevitable result of the Rule is that many unaccompanied children with affirmative asylum applications—including many who would prevail before USCIS after an interview—will be referred to removal proceedings in immigration court without an interview. The shift from representing unaccompanied children in an interview with an AO to representing them in adversarial removal proceedings in immigration court will place a substantial burden on FIRRP and disrupt our ability to successfully represent our clients in many ways.

26. The differences between the immigration court and interviews with an AO are stark. AOs receive special training in how to conduct an interview in a trauma-informed way. Immigration judges and DHS attorneys, both of whom conduct questioning in immigration court, have no such training and, indeed, the structure of an adversarial court system leaning on direct and cross-examination is not well-suited to a trauma-informed or child-centered

approach to questioning. AOs specialize in adjudication of asylum applications, but immigration judges adjudicate a variety of application types. Recent changes to the immigration court bench have made it much more likely that the immigration judge will have less than a year of experience adjudicating asylum applications. Already, FIRRP attorneys must regularly explain or brief to immigration court judges regarding special legal protections that apply to children, for example service rules, or prohibitions against taking pleadings from unrepresented minors. And, given that children's asylum applications have primarily been decided by AOs in the past, immigration judges will have very little experience conducting a child's hearing.

27. In the asylum office, interviews are often conducted in an office setting, with an interpreter that is familiar to the child. The immigration court is a formal courtroom setting, and interpretation will be, at best, an unfamiliar individual contracted with the court or a faceless telephonic interpreter. Immigration court interpretation is often inadequate; our staff have even seen the use of AI interpretation in immigration court proceedings, which, aside from being questionable in terms of sufficiency or accuracy, was both disconcerting and confusing to the children in the courtroom. Instead of speaking to someone at a regular desk or table, immigration judges sit behind a bench, typically an elevated space with a seal. Immigration judges typically wear judicial robes, which can be intimidating to young people. They also often have computer screens in front of their faces, making it harder to have normal eye-contact and interaction. Witnesses must, at best, sit at the table with counsel to testify, or at worst are asked to sit in the witness booth alone on the other side of the courtroom to testify. In an asylum interview, the officer mainly speaks to the applicant, and often says very little to the attorney unless there is a need for clarification. In immigration court, hearings often begin with various preliminary announcements and procedures that can be confusing and intimidating to a child. Moreover, the attorneys and judges are often speaking to each other in English, using technical language to address procedures that are confusing and unfamiliar to children. These portions of the proceedings may not always be interpreted for the child and, even if interpreted, are somewhat unintelligible to the child, leaving children feeling confused, uncertain, and afraid.

28. Finally, while an asylum interview and a final immigration court hearing are both ultimately conducted in private, preliminary court proceedings leading up to the final merits hearing in immigration court are often open to the public and there are routinely other individuals – other respondents and their families or members of the public – who are present in the courtroom. This can create an atmosphere of being stared at or watched that many children find deeply uncomfortable and frightening, and this is an association that children can easily attach to the whole court experience even if their final hearing is ultimately private.

29. For all of these reasons, it is much more feasible, in my experience as an attorney, to develop the record and obtain a child's honest, forthright testimony in an asylum interview, than in an immigration courtroom.

30. Given the statutory structure that gives USCIS initial jurisdiction over asylum applications for unaccompanied children, FIRRP has built its practice and developed expertise in representing unaccompanied children in this forum. For example, many attorneys with vast experience and success in representing children in asylum applications at the asylum office have very limited experience litigating asylum cases in immigration court. Thus, FIRRP will need to expend resources to train these attorneys to handle these cases in immigration court.

31. Additionally, at this time the children's docket in Arizona EOIR is being run as a 'rocket docket,' meaning immigration judges are routinely denying children continuances necessary to adequately prepare their cases or granting only very brief continuances to allow children to consult with lawyers, enter pleadings, and prepare applications for relief. The hearings have recently been converted to virtual hearings, which will make it even harder for children to engage and fully participate in an asylum hearing, and will take additional practice and preparation from our staff to get our child clients as comfortable as possible with how a virtual hearing works. The combination of increased referrals of asylum claims previously pending before USCIS and the current 'rocket docket' for children severely undermines FIRRP attorneys' ability to adequately prepare these cases and represent the number of child clients we currently have. Given the increased work needed for these already-open cases, such a shift will also undermine FIRRP's ability to continue to offer representation to new children who are placed in ORR custody in Arizona or who are released to family members in Arizona after being in ORR custody elsewhere.

32. Once a child is in removal proceedings, there is a serious risk that the DHS will re-detain or transfer our unaccompanied child clients while their cases are pending. At the Florence Project, we have already seen an increase in our non-detained unaccompanied child clients being re-detained for no good reason. We have also had to respond—filing petitions in federal court—to prevent our currently detained child clients from being transferred away from their attorneys and legal teams in Arizona, or being unlawfully repatriated in the middle of the night. This risk of re-detention and possible transfer away from counsel forces Florence Project attorneys to make additional legal arguments to protect our clients' interests, whether through filings seeking release from custody or through lawsuits attempting to prevent a clients' transfer where such transfer would interfere with an established attorney-client relationship in a way that undermines key statutory and constitutional rights.

33. Additionally, to the extent that we are unable to prevent the re-detention or transfer of our clients, the reality is that more of our unaccompanied child clients could well be detained

and/or moved to detention centers far away from their FIRRP attorneys. This interferes with FIRRP's ability to carry out our duties as counsel to these clients for several reasons. First, because FIRRP's mission is to provide free legal and social services to unaccompanied children in Arizona, any expansion to continuing representation to unaccompanied children outside of Arizona would require additional organizational steps and restructuring. Second, because FIRRP is an Arizona-based organization, our Children's Program attorneys must work toward being licensed to practice law in Arizona to be able to represent our child clients in the portions of their SIJS process that take place in state court. Our team is likely unable to quickly pivot to providing full legal services, particularly state court dependency support for SIJS, in any other state. Third, Arizona is in the Ninth Circuit, so our staff are more well versed in Ninth Circuit law, including asylum rulings, and a transfer to other jurisdiction would require additional training, research, and preparation.

34. Litigating our unaccompanied child clients' asylum claims in immigration court as opposed to the asylum office also frustrates FIRRP's ability to assist our clients who are pursuing both asylum and SIJS before USCIS. SIJS is a two-step process: first the applicant must file a form I-360 before USCIS. USCIS's current processing time for SIJS I-360 applications is set at 180 days per the regulations, but in reality often takes longer, anywhere from 7 to 9 months. If granted, that form then makes them eligible to obtain a green card, or adjust status, before USCIS or the immigration court, once an immigrant visa becomes available to them, which can take 4-5 years. Only once an immigrant visa is available, can a child apply for a green card. Traditionally, when children had asylum and SIJS applications before USCIS, the immigration court proceedings were put on hold or terminated and FIRRP attorneys were able to pursue both forms of relief for eligible clients without the risk of the child being deported prior to adjudication of their applications. However, recent changes in law and policy have undermined that system, resulting in a danger that children will be ordered deported before they can receive a green card for which they are eligible.

35. In 2024, EOIR finalized a Rule that allowed for administrative closure in immigration court, which allowed immigration judges to close removal proceedings when a noncitizen makes the requisite showing that they have a pending application or petition that they are pursuing with USCIS, like SIJS, with a showing of their likelihood to succeed in that petition or application. *See Efficient Case and Docket Management in Immigration Proceedings,* 89 Fed. Reg. 46,742 (effective July 29, 2024). Thus, in the past children with SIJS were able to get regular continuances, ask the court to put the case on the non-active "status docket", or have their cases administratively closed or terminated if they were only waiting for a visa to become available. This conserved limited judicial resources not adjudicating full asylum claims where a child was approved for relief but just had to wait for their visa to become available. DHS would often join our attorneys in a motion to dismiss cases for the same reason.

36. These options are no longer available to FIRRP attorneys and clients. Despite the 2024 regulations allowing for administrative closure, in 2025, the BIA issued a binding decision that suggests immigration judges should not grant administrative closure to children who are eligible for SIJS given the "indeterminate and likely lengthy period of time until [the applicant] would be eligible to adjust status." *Matter of Cahuec Tzalan*, 29 I&N Dec. 300, 305 (BIA 2025). More recently in *Texas v. U.S. Department of Justice*, EOIR rescinded the 2024 regulations allowing for administrative closure through a settlement agreement, which reinstated regulations from 2020 that provide that immigration judges cannot administratively close cases. No. 7:26-cv-00070 (N.D. Tex. June 22, 2026). Under these circumstances, children who have had their I-360 applications granted, and therefore been deemed worthy of protection from deportation through SIJS, but who are stuck in bureaucratic limbo waiting for a green card to become available are now being ordered removed. Once AOs begin referring affirmative asylum applications for unaccompanied children to immigration court without an interview, those children will be at an elevated risk of removal before their SIJS process is completed or a green card becomes available. SIJS is not available to children with removal orders. By referring children more quickly to the immigration court, this Rule frustrates FIRRP's ability to pursue SIJS for our clients, because our client's immigration court cases will likely be completed before the SIJS process can be finalized, and create significant additional litigation work for children who choose to appeal the removal order. Thus, the Rule will prevent our clients from obtaining the relief they're entitled to and place FIRRP attorneys in the impossible position of trying to advocate and protect our client's rights under these circumstances.

37. SIJS is often a preferable form of relief to asylum for various reasons Additionally, as noted previously, asylum is legally complex and requires the client to testify as to the harm they've experienced or fear. By contrast, while the SIJS process requires some level of findings regarding abuse, abandonment, and neglect the child has suffered, it is on the whole done in a less traumatizing setting and by state court judges with expertise in child welfare issues. While pre-Rule norms ensured that children who were seeking asylum got the benefit of a non-adversarial interview with an asylum officer trained in trauma informed interviewing, that will no longer be the presumption for children seeking asylum. It would be preferable from a child-centered viewpoint to avoid the need for children to testify about their traumatic experiences in an adversarial setting, particularly where another form of relief from removal is available. Unfortunately, the current rocket docket processing of children's cases means that lawyers are no longer able to wait to pursue asylum until after the SIJS is adjudicated. It is also otherwise inefficient to have immigration courts adjudicating asylum while SIJS, an alternative form of relief that could resolve the whole case, is also pending. In addition, the need for appeals will inevitably arise where children are forced to go through immigration court, at an accelerated pace, and without a meaningful opportunity to receive the SIJS relief

for which they have been deemed eligible, and to which they are otherwise entitled.

38. Additionally, if a child with pending SIJS is ordered removed, the appellate process requires even more staff time and resources. First, our attorneys must talk to our clients about their appellate options and rights. This requires additional FIRRP staff time spent explaining confusing concepts of appeals to a child. If the child decides to pursue an appeal, staff members must prepare a notice of appeal and necessary fee waivers (or pay exorbitant appellate filing fees), prepare full appellate briefs on behalf of our clients, and follow changes in the law and provide supplemental arguments to the BIA as necessary. And often in these cases, we also have to spend time assuaging the child's fears and devastation around hearing that they will be removed, which often leads to many tears and feelings of dread, which also cause secondary trauma to our staff.

39. Many of the attorneys on our Children's Program have limited experience with appeals before the BIA, since in prior years, children with SIJS were not getting removed and the cases would not be set for final hearing on the basis that a visa was coming eventually. FIRRP is currently taking steps to train staff on appeals, creating further strain on limited staff resources within the Children's Program as well as from our Adult and Advocacy Programs who are more familiar with appellate practice.

40. Additionally, it is possible that many of these cases will require Petitions for Review to the Ninth Circuit Court of Appeals, given the authority of courts of appeals to review questions related to asylum law, and the constitutional concerns that can arise in ordering children who are eligible for protections deported. Again, this is an area that is well-outside the regular experience and expertise of our Children's Program attorneys. An increased need to represent unaccompanied children in the Ninth Circuit will put a significant strain on our small, two-attorney appellate team and will create further need for expanded training and support for staff who are trying to navigate a new area of legal practice.

41. The Rule's expected rapid referral of cases to immigration court is also particularly pernicious because, currently, FIRRP attorneys are seeing immigration court dates rescheduled with little notice, especially for detained clients, leaving attorneys with little time to prepare for a full merits hearing and obtain necessary evidence. This means that the AO referral places a child's case on a fast-track towards a full asylum merits hearing, often with limited time to be able to prepare for such a hearing.

42. Shifting our representation of unaccompanied children with asylum applications to immigration court also interferes with FIRRP's ability to represent these clients given the risk of pretermission. Over the past year and a half DHS and sometimes immigration judges *sua*

*sponte* have denied asylum applications prematurely, without a hearing, which is referred to as pretermission. Sometimes this occurs with little to no notice to counsel and a limited opportunity to respond and defend or amend a client's asylum application. FIRRP has already seen this happen to a child client and is concerned that the Rule will increase this practice, leading to a situation where a child not only does not get a child-friendly interview at the Asylum office as required by the TVPRA, but they *never* get the chance to provide any evidence, including testimony, in support of their asylum application before they are deported.

43. By forcing FIRRP to litigate our unaccompanied child client's asylum claims in adversarial immigration court removal proceedings, the Rule frustrates FIRRP's ability to represent its clients. The amount of time it will take to represent a child before immigration court is much greater, given the challenges of preparing a young child for formal, adversarial court proceedings. Many of FIRRP's clients are teenagers and 8% of FIRRP's unaccompanied children clients are 12 years old or younger. FIRRP has vast expertise and experience in preparing this age group to present their testimony in front of an AO in a non-adversarial interview. But it is extremely difficult and time-consuming for an attorney to attempt to prepare a young child for court proceedings. For example, the attorney must explain to the child what will happen during immigration court proceedings and who the various actors present in the courtroom are, which are concepts a young child, especially those from more rural areas, will likely struggle to understand. These children often do not understand the various parties present in the courtroom, and need help, for example, distinguishing between the immigration judge and opposing counsel. Our teams often rely on visual aids such as dolls in order to explain what might happen during the hearing. Further, the intimidating nature of court proceedings severely limits a child's ability to provide testimony regarding their asylum claim. Young children, especially those who have suffered from traumatic events like our unaccompanied child clients, struggle to provide testimony if faced with hostile questioning by opposing counsel on cross examination, which does not happen in an interview with an AO. In my experience, even a facially simple question such as "is Spanish your best language" can be difficult for a child to answer, and I have regularly seen indigenous children who don't speak Spanish very well agree to Spanish interpretation in immigration court due to the pressure of the environment in EOIR.

44. This Rule will ultimately limit FIRRP's ability to take on more cases and may force FIRRP to reduce the number of clients we serve. Thus, the Rule significantly curtails FIRRP's ability to achieve its mission of serving all unaccompanied children in Arizona. For all the reasons discussed above, in the immediate term, responding to the Rule will require a significant outlay of staff resources on all of our cases that are pending before the asylum office at a time where our staff are also experiencing capacity strains due to other government actions to speed along children's cases, including both a rocket docket denying children meaningful

continuances to prepare their cases, and where the asylum office has called more than 40 of our cases for asylum interviews in the past month.

45. Further, conducting follow up interviews and preparing supplemental materials for so many children simultaneously will contribute significantly to staff burnout. Because of this Rule, we have to ask our staff to race against the clock, meeting with hundreds of children with pending asylum claims before USCIS and work through their most traumatic experiences to supplement the record. Our team must now do this on a rapid-response timeline with no clear deadlines to help them prioritize or triage. The emotional and psychological secondary trauma our staff will be exposed to as a result of this Rule is massive. While our day-to-day work involves exposure to traumatic stories, the level of detail and repetition of the traumatic information required to finalize supplemental materials for so many asylum claims at once is of a different level and depth that exponentially increases the overall secondary trauma that our staff are likely to experience. Further, when that emotional and psychological impact of this Rule is considered further in the broader scope of the persistent attacks on immigrant children and the cuts to programming intended to protect our vulnerable clients, the moral injury that our staff will likely experience will be significant. These are factors that lead directly to burnout, which in turn leads to poor staff morale and attrition. All of this undermines FIRRP's ability to provide our core services, because experienced staff who burnout leave the organization and sometimes the field entirely, which means we must expend even more of our limited resources recruiting and training new staff. This is heightened by the fact that our positions largely require Spanish fluency, and the pool of qualified, Spanish-bilingual attorneys is already small to begin with.

46. In the long-term, putting an increased emphasis on filing robust I-589 applications to USCIS with all supporting materials early in our attorney-client relationship with a child will undermine decades of best practices in our child-centered, trauma informed representation. It will additionally increase the potential for children having their cases judged on less complete information, and it will put additional strain on Florence Project staff who must constantly consider how and when to supplement the record as law and facts may change or develop over time, because the Rule does not provide for any notice prior to denial. To the extent that the Rule also results in shifting our representation of unaccompanied children from USCIS to immigration court, it will significantly increase the amount of work needed to prepare each case and child. The Rule will force FIRRP attorneys to do their best to carry out their duties as counsel on an expedited timeline in a setting that is unworkable for young children who have suffered trauma. The increase in work per case and the impossible circumstances of preparing young children for adversarial court proceedings will further impact staff morale and could lead to significant burnout and attrition in staff at FIRRP.

47. Pro bono attorneys who have been placed on cases for unaccompanied children will face many of the same challenges in response to this Rule. Where previously filed asylum

applications are pending with USCIS, this Rule creates pressure for pro bono attorneys to rapidly supplement those applications and materials and prepare and submit updated briefs on eligibility for relief for their clients or risk a summary referral to EOIR without any reason or notice. While most of our pro bono attorneys do not handle the same sizeable caseload that FIRRP's staff attorneys do, many of FIRRP's pro bono partners are attorneys who do not primarily practice immigration law. As such, each pro bono attorney will require significant hours of mentorship support from our in-house pro bono team to be able to rapidly respond to the demands created by this Rule. Pro bonos also often rely on FIRRP connections and staff to assist with things like volunteer interpretation or psychological evaluations and, given that these already limited resources will likely be severely taxed with FIRRP's own clients, there could be significant bottlenecks for pro bonos and their clients to obtain necessary support on the timeframe that is needed to try to avoid a potential referral without interview. In these cases, we may need to spend more on hiring interpreters and translators. In recent years, it has become increasingly difficult to place cases with expedited timelines with pro bono attorneys. Indeed, this pattern of pro bono attorneys being reticent to enter on a case that they fear may move too quickly for them has long made placement of cases for detained adults difficult for our Adult Program. Further, many pro bono attorneys took on unaccompanied child clients intending to represent them in an interview with an AO. Once a case is referred to immigration court, that pro bono may withdraw their representation given the fast-time and resource-intensive work that representing a child in this high-stakes, adversarial setting would require. The Rule thus frustrates FIRRP's ability to work effectively with pro bono counsel to help achieve our mission and will result in FIRRP taking on fewer cases because we will have fewer attorneys available to assist our clients, especially under the conditions created by the rule.

**<u>Florence Project's Services to Detained Adults</u>**

48. The Rule will also detrimentally impact the Florence Project's work with detained adults. The Adult Program primarily provides free legal and social services to adults who are detained in ICE custody in the three immigration detention centers located in Florence and Eloy, Arizona—the Florence Detention Center, the Central Arizona Florence Correctional Complex, and the Eloy Detention Center. Individuals in these remote detention centers attend hearings in EOIR courts located inside the facilities or by video with Immigration Judges ("IJs") throughout the country. In 2025, the Adult Program provided free legal services to about 1,300 adults in ICE custody, including full representation to nearly 300 adults facing removal, more than 100 of whom had been deemed mentally incompetent to represent themselves due to a serious mental health condition

49. The Adult Program's work can be broadly construed to fall into one of three cohort areas:

a. Pro Se Cohort: Legal staff in the Adult Program *pro se* cohort offer immigration-related legal orientation and education services as well as other forms of pro se support to individuals who do not have counsel and are facing removal while in ICE custody. Adult Program staff services include providing group Know Your Rights Presentations ("KYRs"); one-on-one education in immigration law and procedure, including appellate procedure; pro se workshops on various forms of relief; assistance gathering, understanding, and translating documents, including assistance interpreting and understanding forms related to the removal process; and developing and distributing specialized *pro se* guides. This cohort seeks to make contact with every individual who is detained in ICE custody and provide basic legal orientation and a free consultation to any person who is not already represented by counsel.

b. Direct Representation Cohort: The direct representation cohort provides free, in-house representation to detained individuals in defensive removal proceedings. This cohort also does a limited amount of non-detained full representation in immigration proceedings, but only for adults who were previously detained where Florence Project was appointed as representative under the NQRP and/or *Franco* injunction.

c. Pro Bono Cohort: Florence Project's Adult Program also has a cohort dedicated to screening, placing, and mentoring cases with outside pro bono counsel. This includes recruiting and training local pro bonos – both attorneys from firms with limited immigration experience, and immigration-focused private attorneys. Pro bono attorneys working with Florence Project Pro Bono Mentors routinely take cases before the Immigration Court (EOIR), BIA, Ninth Circuit, and in District Court.

50. The Rule will likely impact FIRRP's core business activities in its detained Adult Program. With the ability to deny affirmative asylum claims without an interview and for any reason such as a matter of discretion or on the appearance that a bar to asylum may apply based on limited evidence and no developed record, AOs will likely deny many asylum applications and refer these individuals to immigration court removal proceedings. In that process, based on current trends and practice it is very likely that such individuals will be detained. The expected sharp increase in detained adults will put a severe strain on the Florence Project Adult Program's ability to fulfill its mission by providing legal services and representation in removal proceedings to detained noncitizen adults in Arizona.

51. An increase in the detained population as a whole requires more staff resources to provide basic education and outreach, which undermines FIRRP's capacity to provide direct representation. Additionally, while previously filed I-589 applications can be helpful in identifying the bones of a claim, having a previously denied application can also create additional credibility complications for our adult clients when they supplement their

applications with further details and information that may not have been previously included. This, in turn, requires Florence Project Adult Program staff to spend more time with individuals preparing for questions as to their credibility and creates additional pressure for our staff to try to help people obtain corroborating evidence from detention to counter-act any potential for adverse credibility inferences that may arise from the addition of supplemental information.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 21st day of August 2026, in Phoenix, Arizona.

Roxana Avila-Cimpeanu

______________________________

Roxana Avila-Cimpeanu, Esq.
Deputy Director
Florence Immigrant and Refugee Rights Project