BRETT SHUMATE
Assistant Attorney General
Civil Division
DREW C. ENSIGN
Deputy Assistant Attorney General
AUGUST FLENTJE
Deputy Director
CATHERINE M. RENO
Assistant Director
CAROLINE McGUIRE
Senior Litigation Counsel
SHELBY WADE
MIA S. BONADIES
ALINA SALGADO
Trial Attorneys
U.S. Department of Justice
Office of Immigration Litigation
General Appeals and Litigation
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Attorneys for Defendants

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IMMIGRATION EQUALITY, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>MARKWAYNE MULLIN, in his official capacity as Secretary of Homeland Security, *et al*.,<br><br>*Defendants*. | Case No. 1:26-cv-02921<br><br>Hon. Tanya S. Chutkan |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' 5 U.S.C. § 705 STAY MOTION**

# TABLE OF CONTENTS


INTRODUCTION ..... 1

BACKGROUND ..... 5

I. Statutory Framework ..... 5

II. Procedural History ..... 9

STANDARD OF REVIEW ..... 10

ARGUMENT ..... 11

I. Multiple Threshold Issues Bar Plaintiffs' Stay Request. ..... 11

A. Plaintiffs Lack Standing to Challenge the Rule. ..... 11

1. Plaintiffs Cannot Establish the Rule Caused Them Injury In Fact. ..... 11

2. Plaintiffs Cannot Demonstrate Causation. ..... 16

3. Plaintiffs Do Not Show Their Claims Are Redressable. ..... 18

4. Plaintiffs are Outside the Zone of Interests of the Relevant Statutes. ..... 19

B. Plaintiffs' Stay Request is Not Justiciable Because the Court Cannot Stay Agency Action That Has Already Gone into Effect. ..... 21

II. Plaintiffs do not Make a Clear Showing that they are Entitled to Preliminary Relief. ..... 23

A. Plaintiffs Are Not Likely to Succeed on the Merits of Any Claim. ..... 23

1. Defendants followed the Proper Procedures for the Referral IFR. ..... 23

a. The Procedural Rule Exception Applies. ..... 23

b. The Foreign Affairs Exception Applies to the Referral IFR. ..... 29

2. The Referral IFR is Neither Arbitrary nor Capricious. ..... 32

a. DHS Promulgated the Referral IFR Based on Urgent and Compelling Considerations. ..... 32

b. The Referral IFR Considered Significant Reliance Interests. ..... 33

c. The Referral IFR Considers Other Important Aspects. ..... 36

d. The Referral IFR Considered Reasonable Alternatives. ..... 40

B. Plaintiffs Will Not Suffer Irreparable Harm in the Absence of Preliminary Relief. ..... 44

C. The Balance of Equities Weigh Against Granting a Stay. ..... 49

1. If the Court Chooses to Grant Preliminary Relief, Such Relief Must be Narrowly Tailored to Plaintiffs. ..... 52

2. If The Court Chooses to Grant Preliminary Relief, It Should Require Plaintiff to Post Sufficient Bond and Should Enter a Stay. ..... 53

CONCLUSION ..... 54

## TABLE OF AUTHORITIES

**Cases**

*Adams v. Vance*,
570 F.2d 950 (D.C. Cir. 1977) ........ 52

*Allied Local & Reg'l Mfrs. Caucus v. EPA*,
215 F.3d 61 (D.C. Cir. 2000) ........ 41, 44

*Am. Soc. For the Prevention of Cruelty to Animals v. Feld Entertainment, Inc.*,
659 F.3d 13 (D.C. Cir. 2011) ........ 48

*Arizona Alliance for Retired Americans v. Mayes*,
__F.4th__, 2026 WL 2277101 (9th Cir. Aug. 7, 2026) ........ 20, 47

*Avila v. Bondi*,
170 F.4th 1128, 1132 (8th Cir. 2026) ........ 36

*Ayuda, Inc. v. Reno*,
7 F.3d 246 (D.C. Cir. 1993) ........ 20

*Buenrostro-Mendez v. Bondi*,
166 F.4th 494, 498 (5th Cir. 2026)........36

*Califano v. Yamasaki*,
442 U.S. 682 (1979) ........ 52

*Cap. Area Immigrants' Rts. Coal. v. Trump*,
471 F. Supp. 3d 25 (D.D.C. 2020) ........ 29, 30, 31

*Center for Biological Diversity v. Bernhardt*,
490 F. Supp. 3d 40 (D.D.C. 2020) ........ 13, 15, 16

*Centerline Logistics Corp., et al., v. United States Department of Labor, et al.*,
No. 26-CV-2773 (BAH), 2026 WL 2415797 (D.D.C. Aug. 18, 2026) ........ 46

*Coal. for Humane Immigrant Rts v. Mullin*,
2026 WL 2317908 (D.C. Cir. Aug. 11, 2026) ........ 18

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ........ 17

*Clarke v. Sec. Indus. Ass'n*,
479 U.S. 388 (1987) ........ 19

*Ctr. for Biological Diversity v. Regan*,
597 F. Supp. 3d 173 (D.D.C. Mar. 20, 2022) ........................................................................ 21

*Ctr. For Responsible Sci. v. Gottlieb*,
346 F. Supp. 3d 29 (D.D.C. 2018) .................................................................................... 13, 15

*East Bay Sanctuary Covenant v. Trump*,
950 F.3d 1242 (9th Cir. 2020) ............................................................................................... 20

*East Bay Sanctuary Covenant v. Biden*,
993 F.3d 640 (9th Cir. 2021) ................................................................................................. 20

*Equal Rights Ctr. v. Post Props., Inc.*,
633 F.3d 1136 (D.C. Cir. 2011) ............................................................................................. 12

*Est. of Jennions v. Commodity Futures Trading Comm'n*,
183 F.4th 858 (D.C. Cir. 2026) .............................................................................................. 37

*Fair Employment Council of Greater Washington, Inc. v. BMC Marketing Corp.*,
28 F.3d 1268 (D.C. Cir. 1994) ............................................................................................... 13

*FCC v. Prometheus Radio Project*,
592 U.S. 414 (2021) ............................................................................................................... 32

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) ........................................................................................................ *passim*

*Fed'n for Am. Immigration Reform v. Reno*,
93 F.3d 897 (D.C. Cir. 1996) ................................................................................................. 20

*Fla. EB5 Invs., L.L.C. v. Wolf*,
443 F. Supp. 3d 7 (D.D.C. 2020) ........................................................................................... 44

*Food & Water Watch, Inc. v. Vilsack*,
808 F.3d 905 (D.C. Cir. 2015) ................................................................................... 3, 10, 13

*Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*,
174 F.3d 411 (4th Cir. 1999) ................................................................................................. 54

*Info. Ctr. v. DHS*,
653 F.3d 1 (D.C. Cir. 2011) ................................................................................................... 26

*Initiative & Referendum Inst. v. Walker*,
450 F.3d 1082 (10th Cir. 2006) ............................................................................................. 13

*Innovation Law Lab v. McAleenan*,
924 F.3d 503 (9th Cir. 2019) .................................................................................... 52

*INS v. Cardoza-Fonseca*,
480 U.S. 421 (1987)........................................................................................................ 5

*INS v. Doherty*,
502 U.S. 314 (1992)........................................................................................................ 3

*INS v. Legalization Assistance Project of the L.A. Cnty. Fed'n of Labor*,
510 U.S. 1301 (1993)............................................................................................ 20, 52

*Int'l Bhd. of Teamsters v. Pena*,
17 F.3d 1478 (D.C. Cir. 1994) ...................................................................................... 29

*Inv. Co. Inst. v. Commodity Futures Trading Comm'n*,
720 F.3d 370 (D.C. Cir. 2013) ...................................................................................... 40

*Jafarzadeh v. Duke*,
270 F. Supp. 3d 296 (D.D.C. 2017) .............................................................................. 27

*James V. Hurson Assocs., Inc. v. Glickman*,
229 F.3d 277 (D.C. Cir. 2000) ...................................................................................... 24

*JEM Broad. Co. v. FCC*,
22 F.3d 320 (D.C. Cir. 1994) ............................................................................ 24, 28, 29

*Laclede Gas Co. v. Fed. Energy Regul. Com.*,
873 F.2d 1494 (D.C. Cir. 1989) .......................................................................... 41, 42, 43

*League of Women Voters of the U.S. v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) ..................................................................................... 44, 46

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
572 U.S. 118 (2014)...................................................................................................... 19

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992)...................................................................................................... 16

*Make the Rd. New York v. Mullin*,
179 F.4th 16 (D.C. Cir. 2026) ...................................................................................... 43

*Mendoza v. Perez*,
754 F.3d 1002 (D.C. Cir. 2014) ............................................................................... 23, 24

*Mexichem Specialty Resins, Inc. v. EPA*,
787 F.3d 544 (D.C. Cir. 2015) .......... 46

*Moncrieffe v. Holder*,
569 U.S. 184 (2013) .......... 6

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) .......... 31, 33, 41

*Nat'l Fair Hous. All. v. Carson*,
330 F. Supp. 3d 14 (D.D.C. 2018) .......... 49, 51

*Nat'l Sec. Counselors v. CIA*,
931 F. Supp. 2d 77 (D.D.C. 2013) .......... 24

*Nat'l Treasury Emps. Union v. United States*,
101 F.3d 1423 (D.C. Cir. 1996) .......... 44

*National Taxpayers Union v. United States*,
68 F.3d 1428 (D.C. Cir. 1995) .......... 13

*Ne. Ohio Coal. for Homeless & Serv. Emps. Int'l Union, Loc. 1199 v. Blackwell*,
467 F.3d 999 (6th Cir. 2006) .......... 22

*Neighborhood TV Co., Inc. v. FCC*,
742 F.2d 629 (D.C. Cir. 1984) .......... 24

*Nken v. Holder*,
556 U.S. 418 (2009) .......... 49, 51

*AFL-CIO v. NLRB*,
57 F.4th 1023 (D.C. Cir. 2023) .......... 23, 24

*O.A. v. Trump*,
404 F. Supp. 3d 109 (D.D.C. 2019) .......... 21

*Off. of Pers. Mgmt. v. Am. Fed'n of Gov't Emps., AFL-CIO*,
473 U.S. 1301 (1985) .......... 22

*Open Top Sightseeing USA v. Mr. Sightseeing, LLC*,
48 F. Supp. 3d 87 (D.D.C. 2014) .......... 10

*People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*,
797 F.3d 1087 (D.C. Cir. 2015) .......... 11, 12

*Rajah v. Mukasey*,
544 F.3d 427 (2d Cir. 2008)........................................................................................... 30

*Regents of the Univ. of Calif.*,
591 U.S. 1 (2020)........................................................................................................ 35

*Safety-Kleen Corp. v. EPA*,
No. 92-1629, 1996 U.S. App. LEXIS 2324 (D.C. Cir. Jan. 19, 1996) .......................... 4, 21, 22

*Sampson v. Murray*,
415 U.S. 61 (1974)................................................................................................ 10, 52

*Sorenson v. Sec'y of Treasury*,
475 U.S. 851 (1986)...................................................................................................... 21

*Spirit Airlines, Inc. v. U.S. DOT*,
997 F.3d 1247 (D.C. Cir. 2021) ................................................................................ 41, 43

*Starbucks Corp. v. McKinney*,
602 U.S. 339 (2024)...................................................................................................... 53

*Sure-Tan, Inc. v. N.L.R.B.*,
467 U.S. 883 (1984)...................................................................................................... 21

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025)...................................................................................................... 52

*U.S. Ecology, Inc. v. U.S. Dep't of Interior*,
231 F.3d 20 (D.C. Cir. 2000) .................................................................................. 14, 46

*United States v. Texas*,
599 U.S. 670 (2023)................................................................................................ 11, 21

*Winter v. NRDC*,
555 U.S. 7 (2008).............................................................................................. *passim*

*Yassini v. Crosland*,
618 F.2d 1356 (9th Cir. 1980) ................................................................................ 30, 31

*Zhang v. Slattery*,
55 F.3d 732 (2d Cir. 1995)............................................................................................ 30

**<u>Statutes</u>**

5 U.S.C. § 553.......................................................................................................... 15, 31, 37

5 U.S.C. § 553(a)(1)................................................................................................. 31, 36

5 U.S.C. § 553(b)(A) ..... 31

5 U.S.C. § 702 ..... 27

5 U.S.C. § 705 ..... *passim*

5 U.S.C. § 706(2)(D) ..... 15

8 U.S.C. §1229a ..... 27, 51

8 U.S.C. § 1101(a)(42) ..... 25, 38

8 U.S.C. § 1158(a) ..... 27

8 U.S.C. § 1158(a)(1) ..... 5, 27

8 U.S.C. § 1158(b)(1)(A) ..... 2, 7, 8, 13

8 U.S.C. § 1158(b)(3)(C) ..... 9

8 U.S.C. § 1158(d)(1) ..... 47, 59

8 U.S.C. § 1158(d)(5)(A) ..... 47

8 U.S.C. § 1225(b) ..... 44

8 U.S.C. § 1226(c) ..... 44, 45

8 U.S.C. § 1226a ..... 45

8 U.S.C. § 1231(a) ..... 44

8 U.S.C. § 1231(b)(3) ..... 10

8 U.S.C. § 1232 ..... 33

8 U.S.C. § 1252 ..... 5, 27

8 U.S.C. § 1252(a) ..... 27

8 U.S.C. § 1252(a)(2)(D) ..... 27

8 U.S.C. § 1158 ..... 9

8 U.S.C. § 1158(a)(2) ..... 33

8 U.S.C. § 1158(a)(2)(A) ........ 47

8 U.S.C. § 1158(a)(2)(B) ........ 7

8 U.S.C. § 1229 ........ 9

**Rules**

Federal Rule Of Civil Procedure 56 ........ 36

Federal Rule of Civil Procedure 65(c) ........ 61

**Regulations**

Asylum Referrals Without Interview,
91 Fed. Reg. 47,101 (Jul. 28, 2026) ........ *passim*

Rules and Procedures for Adjudication of Applications for Asylum or Withholding of Deportation and for Employment Authorization, 59 Fed. Reg. 14,779 (Mar. 30, 1994)........24

Rules and Procedures for Adjudication of Applications for Asylum or Withholding of Deportation and for Employment Authorization, 59 Fed. Reg. 62,292 (Dec. 5, 1994)..........24

8 C.F.R. § 208.10 (2025) ........ 11, 14

8 C.F.R. § 208.13 ........ 25

8 C.F.R. § 208.14(b) ........ 8

8 C.F.R. § 208.14(c) ........ 8, 11, 14

8 C.F.R. § 208.14(c)(1) ........ 8, 35

8 C.F.R. § 208.2(a)(1)(i) ........ 8

8 C.F.R. § 208.2(b) ........ 9

8 C.F.R. § 208.3(a)(1) ........ 23

8 C.F.R. § 208.30(b) ........ 51

8 C.F.R. § 208.4(a) ........ 13

8 C.F.R. § 208.4(b)(1) ........ *passim*

8 C.F.R. § 208.9(a)(2) ........ 14

8 C.F.R. § 208.9(b) .......... 11

8 C.F.R. § 245.6 .......... 33

8 C.F.R. § 1003.14(a) .......... 9

8 C.F.R. § 1003.16(b) .......... 42

8 C.F.R. § 1208.14(c) .......... 26, 53

8 C.F.R. § 1208.14(c)(1) .......... 22

8 C.F.R. § 1208.3(c)(3) .......... 55

8 C.F.R. § 1240.11(c) .......... 9

8 C.F.R. §§ 208.1-208.35 .......... 13

8 C.F.R. §§ 208.16-.18 .......... 10

**Other Authorities**

A. SCALIA & B. GARNER, READING LAW 116 (2012) .......... 25

*Postpone*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/postpone (last visited Sep. 2, 2026) .......... 22

*Postpone*, BLACK'S LAW DICTIONARY (12th ed. 2024) .......... 22

## INTRODUCTION

The United States Citizenship and Immigration Services ("USCIS") published an interim final rule with request for comments on July 28, 2026, to help address the backlog of pending affirmative asylum applications and the public safety and national security plight it has wreaked on this country. Asylum Referrals Without Interview, 91 Fed. Reg. 47,101 (Jul. 28, 2026) (hereinafter "the Referral IFR" or "the Rule"). By Fiscal Year 2025's end, USCIS had over 1.4 million pending affirmative asylum cases, with an average processing time of 7.3 years. *Id.* at 47,108, 47,122 tbl. 5. This immense backlog severely harms the nation's immigration system because it undermines the agency's ability to timely adjudicate asylum applications. This extraordinary delay enables ineligible aliens with no viable claims, who will ultimately be referred to immigration court and may present public safety or national security concerns, to remain at large within the country for years. The backlog also severely delays relief for aliens with meritorious claims. Promptly resolving non-meritorious claims—instead of them pending for an average of 7.3 years—is critical to immigration enforcement, and ultimately benefits aliens with a good faith basis to seek asylum. *Id.* at 47,123. The Rule means asylum applicants will no longer languish in legal limbo that may produce psychological hardship. And prompt resolution of meritorious claims ensures faster access to protection, stability, potential work authorization, and family reunification. *Id.* Additionally, speedy case processing frees up interview spots for meritorious claims. *Id.*

The Rule aims to address these problems by reducing the affirmative asylum backlog and improving USCIS's operational efficiency. It now allows (but does not require) asylum officers ("AOs") to refer certain asylum applications to immigration court without conducting interviews. The Rule applies to cases where an alien is: (1) barred from applying for or being granted asylum, (2) does not merit a grant as a matter of discretion, or (3) is not eligible on the merits of the claim. *Id.* at 47,117. This Rule is then further limited to cases where: (1) the alien does not maintain a

lawful basis to remain in the United States, and (2) where the application would be referred to an immigration judge ("IJ"), not in situations where Department of Homeland Security ("DHS") would grant or deny the application. *Id*. To decide if an interview is warranted, USCIS conducts a "preliminary review of the record and evidence" to determine an applicant's eligibility for asylum, and/or whether they merit or do not merit a grant of asylum as a matter of discretion. *Id*. at 47,111. AOs review the record, as well as other evidence including the application itself, supporting documents, other information in the file, and background checks, to determine if an interview is necessary. *Id*. These changes only affect USCIS's review process—something that is wholly within the Secretary of Homeland Security's authority, 8 U.S.C. § 1158(b)(1)(A). And they do not impact EOIR's procedures under the Immigration and Nationality Act ("INA") for consideration of the application by an immigration judge, which includes procedural safeguards, like the right to counsel at the applicants' expense. Further, aliens can apply for relief before an immigration judge, including relief USCIS does not have the authority to grant. 91 Fed. Reg. 47,104. These changes also do not impact an alien's ability to obtain judicial review through the petition for review process.

The Referral IFR is supported by adequate rationale and is tailored to address the specific issues at hand. DHS has carefully considered the problems created by meritless affirmative asylum claims pending for years, as well as alternative solutions. Likewise, DHS has considered the impact of the Referral IFR on aliens in removal proceedings. DHS concluded that the Rule is the best way to solve its backlog. The Rule still allows AOs to interview aliens who have submitted thorough applications that show the potential for a viable claim. After all, it is the alien's burden to demonstrate asylum eligibility. Indeed, the Rule still permits AOs to interview any asylum applicant—it simply removes the *requirement* that an interview be conducted in every case, which

was a major source of the immense, years-long backlog. And the Rule is a net positive for the asylum system: it will accelerate adjudications while also preventing aliens with meritless asylum claims from exploiting the multi-year waiting period for an interview, eliminating a perverse incentive in the affirmative asylum process. *See INS v. Doherty*, 502 U.S. 314, 323 (1992) ("[A]s a general matter, every delay works to the advantage of the deportable alien who wishes merely to remain in the United States."). The Rule allows USCIS to more quickly identify and place aliens in removal proceedings that pose a danger to public safety or national security. 91 Fed. Reg. 47,102-03. Moving these dangerous aliens to immigration court, where their claims can be appropriately heard in an adversarial setting with government interests properly represented, will decrease the overall exposure risk to the public by reducing the time they remain at large within the country while awaiting their adjudications. *Id.* at 47,103-04.

Plaintiffs seek a stay under 5 U.S.C. § 705 to indefinitely halt these reforms. But this Court should deny Plaintiffs' motion. Multiple threshold issues bar their stay request. First, Plaintiffs' standing theory rests on a mischaracterization of the Rule: they assert that the Rule categorically eliminates interviews from the affirmative asylum process, but it does not. Plaintiffs have offered nothing more than speculation as to the Rule's impact on asylum interview preparation. Second, Plaintiffs—immigrant advocacy organizations—lack organizational standing under *FDA v. All. for Hippocratic Med.*, 602 U.S. 367 (2024) ("*Alliance*"). Absorbing the Rule into their business model cannot form the basis of their purported injury. Further, even crediting their improper standing theory, because USCIS still retains discretion to interview applicants, they cannot show "more than a frustration" of the organizations' purposes. *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015). Plaintiffs also cannot show that applicants who are independently ineligible for asylum would have had a different outcome if USCIS interviewed

them. Third, Plaintiffs' claims are outside the INA's zone of interests as they are not within the class of plaintiffs Congress authorized to sue. The theory of this suit does violence to the review limitations in the INA, whereby asylum claims are resolved as part of the removal process subject to review only in the court of appeals. *See* 8 U.S.C. § 1252. Finally, Plaintiffs' stay request is not justiciable, because 5 U.S.C. § 705—by its own terms—does not allow the Court to stay a currently effective rule. *See Safety-Kleen Corp. v. EPA*, No. 92-1629, 1996 U.S. App. LEXIS 2324, at *2-3 (D.C. Cir. Jan. 19, 1996) (per curiam).

Even if this Court found that Plaintiffs' claims were justiciable, Plaintiffs cannot show they are entitled to preliminary relief. First, Defendants were not required to provide notice and an opportunity for public comment before the Rule took effect because it is a procedural rule and involves foreign affairs function of the United States. Second, the Rule is not arbitrary or capricious as it was promulgated based on urgent and compelling considerations, and the agency considered significant reliance interests, other issues that may result from the Rule, and alternative solutions. Third, Plaintiffs have not established irreparable harm because the harm they allege is speculative and is not the sort of harm that causes a cognizable Article III injury. Finally, the significant government interest in reducing the asylum backlog, protecting the public and national security, and improving the operational efficiency outweighs the relatively weak interest of aliens who have not demonstrated a meritorious asylum claim at the time of their application, and whose cases will ultimately be referred to Immigration Court. Therefore, the Court should not stay the Rule. Should the Court grant Plaintiffs any preliminary relief, it must be cabined to the parties presently before the Court.

## BACKGROUND

### I. Statutory Framework

***Asylum.*** Asylum is a form of discretionary relief for which an alien who is physically present in or who arrives in the United States may apply unless an exception applies. 8 U.S.C. § 1158(a)(1), (a)(2); *see INS v. Cardoza-Fonseca*, 480 U.S. 421, 444 (1987). "The Secretary of Homeland Security or the Attorney General may grant asylum to an alien who has applied for asylum in accordance with the requirements and procedures established by the Secretary of Homeland Security or the Attorney General . . . if the Secretary of Homeland Security or the Attorney General determines that such alien is a refugee within the meaning of section 1101(a)(42)(A) of this title." 8 U.S.C. § 1158(b)(1)(A). An eligible alien must show that they: (1) meet the definition of "refugee"—that they are unable or unwilling to return to their home country "because of persecution or a well-founded fear of persecution on account of" one of five enumerated protected grounds, 8 U.S.C. § 1158(b)(1)(A); (2) are not subject to an exception, mandatory condition, or bar that precludes applying for or receiving asylum, *id*. § 1158(a)(2), (b)(2); and (3) merit a favorable exercise of discretion. *Id*. § 1158(b)(1)(A). Section 1158(a)(2)(B) bars an alien from applying for asylum unless he demonstrates by clear and convincing evidence that he filed the asylum application within one year after the date of his arrival in the United States. Under section 1158(b)(2)(A), the Attorney General must deny an asylum application when an alien: (1) participated in the persecution of others because of a protected ground; (2) has a conviction for a serious crime; (3) committed a serious nonpolitical crime outside of the United States; (4) is a danger to the security of the United States; (5) has engaged in terrorist activity; or (6) was firmly resettled in another country prior to arriving in the United States.

***Affirmative Asylum Applications.*** USCIS generally has initial jurisdiction over an

affirmative asylum application filed by an alien physically present in the United States or seeking admission at a port of entry. *See* 8 C.F.R. § 208.2(a)(1)(i). When USCIS adjudicates an asylum application, it "shall deny, refer, or dismiss the application." 8 C.F.R. § 208.14(c). USCIS's decision to grant asylum is discretionary. 8 U.S.C. § 1158(b)(1)(A); 8 C.F.R. § 208.14(b). If USCIS does not grant the application, USCIS refers asylum applications from inadmissible or deportable aliens to an immigration judge. 8 C.F.R. § 208.14(c)(1). USCIS generally cannot adjudicate an affirmative asylum application once an alien is placed in removal proceedings because the IJ retains exclusive jurisdiction. *See* 8 U.S.C. § 1158(b)(3)(C); 8 C.F.R. § 208.2(b).

***Defensive Asylum Applications.*** Once DHS serves an alien with a Notice to Appear, the alien is placed in removal proceedings before an Immigration Judge. 8 U.S.C. §§ 1229, 1229a; 8 C.F.R. § 1003.14(a). Exclusive jurisdiction then generally vests with the IJ. 8 C.F.R. § 208.2(b). Aliens may file defensive asylum applications in immigration court to seek relief from removal. 8 U.S.C. §§ 1158, 1229a(c)(4); 8 C.F.R. § 1240.11(c). In addition to asylum, aliens may pursue other forms of relief from removal such as withholding of removal under 8 U.S.C. § 1231(b)(3) and protection under the regulations implementing Article III of the Convention Against Torture ("CAT").[1] 8 C.F.R. §§ 208.16-.18, 1208.16-.18. USCIS cannot adjudicate these specific alternative forms of relief from removal because they are outside the agency's jurisdiction. 91 Fed. Reg. 47,102. Both withholding of removal and CAT protection are mandatory (not discretionary), and they prohibit an alien's removal to a country where he or she would be persecuted or tortured. *Moncrieffe v. Holder*, 569 U.S. 184, 187 n.1 (2013).

***Asylum Interviews Before the Referral IFR.*** USCIS's prior practice mandated interviews

[1] Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, S. Treaty Doc. No. 100-20, 1465 U.N.T.S. 85 (entered into force for United States Nov. 20, 1994).

for all affirmative asylum applicants before AOs could adjudicate their applications, unless an alien withdrew the application, waived the interview, the application was dismissed, or the applicant was forwarded to EOIR for jurisdictional reasons. *See* 8 C.F.R. § 208.10 (2025); 8 C.F.R. § 208.14(c) (2025). During that interview, the AO "elicit[ed] all relevant and useful information bearing on the applicant's eligibility for asylum." 8 C.F.R. § 208.9(b).

***The Referral IFR.*** USCIS published *Asylum Referrals Without Interview*, 91 Fed. Reg. 47,101 (Jul. 28, 2026), to address USCIS's massive backlog of pending asylum cases and the cavalcade of problems the backlog creates. The Referral IFR permits (but does not require) an AO to refer certain affirmative asylum applications to an IJ without offering an interview to the alien. 91 Fed. Reg. at 47,102 & n.1. These circumstances include, but are not limited to, when an alien is subject to the one-year asylum filing deadline ("OYFD"), is barred from a grant of asylum, does not merit a grant of asylum as a matter of discretion, or is not eligible on the merits of the claim. *Id*. at 47,103. USCIS will continue to offer interviews if it will grant or deny the case, as well as for aliens who are "not barred from asylum or ineligible on the merits of the claim, and may merit a grant as a matter of discretion." USCIS still interviews an alien "where an asylum interview with USCIS complies with other legislation or settlement agreements." *Id*. at 47,102. The Rule also "does not impact USCIS interviews where the alien maintains a lawful basis to remain in the United States." *Id.* An AO determines "if an interview is necessary" based on their review of the record, and other relevant evidence, which includes the Form I-589, supporting documents, other information in the file, and background checks. *Id*.

Lastly, the Rule modifies USCIS's processes so that an AO may determine that an alien does not merit a grant of asylum as a matter of discretion "without first making an eligibility determination." *Id*. This means that USCIS may now deny or refer an asylum application as a

matter of discretion without also determining that the alien is otherwise eligible for the benefit, for example, if an alien might be eligible per the statutory and regulatory criteria, but negative factors such as criminal history significantly outweigh any potential positive factors in making the ultimately discretionary decision on whether to grant asylum. *Id*. at 47,114.

Referring an affirmative asylum applicant to immigration court without an interview is a discretionary decision. *Id.* at 47,102. Affirmative asylum applicants have no statutory right to a USCIS interview, and the INA does not mandate one. Instead, the INA designates general authority to DHS to "establish a procedure for the consideration of asylum applications" and to promulgate regulations related to consideration of an asylum application. *See* 8 U.S.C. § 1158(b)(1)(A), (d)(1), (d)(5)(B). Likewise, the INA directs the Secretary of the Department of Homeland Security to establish procedures mandating that an asylum application adjudication be completed within 180 days of its filing "in the absence of exceptional circumstances[.]" 8 U.S.C. § 1158(d)(5)(A)(iii); *see also* 8 C.F.R. §§ 208.1-208.35 (regulations establishing procedures governing asylum applications).

As relevant here, the Rule makes four regulatory changes.[2] *First,* the Rule amends 8 C.F.R. § 208.4(a) to remove the phrase "in an interview" so that the language now states: "an asylum officer or an immigration judge in a hearing, shall review the application" and give the applicant the opportunity to present any information bearing on any of the asylum bars. 91 Fed. Reg. 47,103. *Second,* the Rule amends 8 C.F.R. § 208.9(a)(2) to permit an AO to refer an affirmative asylum applicant to immigration court without first conducting an interview, based on a review of the record and other relevant evidence. *Third,* the Rule amends 8 C.F.R. §§ 208.10 and 208.14 to

[2] The Referral IFR removes the requirement that a letter communicating the basis of the asylum referral include an assessment of that alien's credibility. 91 Fed. Reg. 47,110. Plaintiffs do not challenge this part of the Rule in their stay motion. *See* Dkt. No. 4-1 ("Pls.' Mot.").

remove language referring to the "right to an" interview, to reflect that an asylum applicant has no explicit statutory right to receive an interview. *Fourth,* the Rule amends 8 C.F.R. § 208.14(c) to add language confirming that an AO may refer an asylum application without an interview and to remove language referring to the "right to an" interview. 91 Fed. Reg. 47,103. On August 31, 2026, DHS issued Affirmative Asylum Referrals Without Interview: Correction, 91 Fed. Reg. 55,735 (Aug. 31, 2026), which corrected Table 3 from the original Rule. *See id*. at 55,736.

## II. Procedural History

On August 19, 2026, Plaintiffs—four nonprofit organizations—Immigration Equality, Oasis Legal Services ("Oasis"), HIAS, and the Florence Immigrant & Refugee Rights Project ("Florence Project")—filed this lawsuit challenging the Referral IFR. ECF. 1, Complaint ("Compl.") ¶¶ 116-32. No asylum applicant actually subject to the Rule is a Plaintiff in this case. Plaintiffs allege that the Rule violates the Administrative Procedure Act ("APA") because it became effective before DHS provided public notice and the opportunity for comment, under 5 U.S.C. § 553, *id*. ¶¶ 116-20, which they claim was unlawful under 5 U.S.C. § 706(2)(D) (Count I). Plaintiffs further claim that the Referral IFR allegedly violates the Trafficking Victims Protection Reauthorization Act ("TVPRA") and the INA (Count II). *Id*. ¶¶ 121-29. Finally, Plaintiffs allege that the Rule is arbitrary and capricious. (Count III). *Id*. ¶¶ 130-32.

On August 24, 2026, Plaintiffs filed a motion to stay the effective date of the Referral IFR under 5 U.S.C. § 705, Dkt. No. 4-1 ("Pls.' Mot."). Plaintiffs argue that Defendants were required to use the APA's notice-and-comment procedures before promulgating the Rule. Pls.' Mot. 2, 10-19.[3] Plaintiffs also contend that the Rule is arbitrary and capricious because Defendants did not

[3] Citations to the Plaintiffs' briefing are denoted using the document's number as listed on the docket and reference the ECF-stamped page number.

"meaningfully consider" certain reliance rights, as well as other alleged "major factors relevant to whether the right to an asylum interview should be revoked." *Id*. at 10, 20-28. Relying on four declarations, Plaintiffs claim that they will suffer irreparable harm absent a stay, because the Rule "'will interfere with' Plaintiffs' core services by impairing their 'ability. . .to provide essential services to their clients' and to take on new clients." *Id*. at 28; (citing Dkt. Nos. 4-2, Morris Decl.; 4-3, Kafele Decl.; 4-4, Brown Decl.; 4-5, Avila-Cimpeanu Decl.). Lastly, Plaintiffs assert that "the equities and public interest favor preliminary relief." *Id*. at 35. Plaintiffs insist they have a "strong likelihood of success on the merits[,]" that the public interest will be served because USCIS will be forced to "comply with their obligations under the APA[,]" and because Plaintiffs assert Defendants will suffer "minimal harm." *Id.*

## STANDARD OF REVIEW

The standard of review for relief under 5 U.S.C. § 705 is the same as the standard for preliminary injunctions. *See Sampson v. Murray*, 415 U.S. 61, 80 (1974). "A preliminary injunction is an extraordinary remedy never awarded as of right," but only "upon a clear showing that the plaintiff is entitled to such relief." *Winter v. NRDC*, 555 U.S. 7, 22, 24 (2008). To obtain relief, the movant must show: (1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of hardships tips in their favor, and (4) that an injunction is in the public interest." *Id.* at 20. To satisfy the requirements, the movant must establish a substantial likelihood of standing which is evaluated "under the heightened standard for evaluating a motion for summary judgment" in "determining whether [] to grant the motion for preliminary injunction." *Food & Water Watch, Inc.*, 808 F.3d at 912-13. "[P]laintiffs bear the burden of persuasion on all four preliminary injunction factors." *Open Top Sightseeing USA v. Mr. Sightseeing, LLC*, 48 F. Supp. 3d 87, 90 (D.D.C. 2014).

## ARGUMENT

### I. Multiple Threshold Issues Bar Plaintiffs' Stay Request.

#### A. Plaintiffs Lack Standing to Challenge the Rule.

Plaintiffs cannot succeed in obtaining any of the relief they seek because they lack organizational standing to bring their claims. "Article III standing is a 'bedrock constitutional requirement that this Court has applied to all manner of important disputes.'" *Alliance*, 602 U.S. at 378 (2024) (quoting *United States v. Texas*, 599 U.S. 670, 675 (2023)). To demonstrate Article III standing, Plaintiffs must show (i) "it has suffered or likely will suffer an injury in fact," (ii) "the injury likely was caused or will be caused by the defendant," and (iii) "the injury likely would be redressed by the requested judicial relief." *Id.* at 380.

Here, Plaintiffs assert standing on their own behalf. *E.g.*, Pls.' Mot. 8-10. Organizational standing requires Plaintiffs, "like an individual plaintiff, to show 'actual or threatened injury in fact that is fairly traceable to the alleged illegal action and likely to be redressed by a favorable court decision.'" *People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*, 797 F.3d 1087, 1093-94 (D.C. Cir. 2015) ("*PETA*") (internal citations omitted). Plaintiffs make two claims. First, that they primarily represent clients who have asylum applications pending before USCIS, and that they are ill-equipped to represent aliens in immigration court. Pls.' Mot. 8-9. Second, they claim that before the Rule, they "organized their practices based on the assumption that . . . applicants would receive an interview before the asylum office." *Id.* at 10. Plaintiffs complain that the Rule eliminates the certainty that their clients and representatives will receive notice and an opportunity to update their concededly insufficient applications. These grounds do not satisfy any of the three organizational standing requirements.

##### 1. Plaintiffs Cannot Establish the Rule Caused Them Injury In Fact.

In determining whether a plaintiff has established an injury in fact, "[t]he key issue is

whether the plaintiffs have suffered a 'concrete and demonstrable injury to [their] activities,' mindful that, under our precedent, 'a mere setback to [their] abstract social interests is not sufficient.'" *PETA*, 797 F.3d at 1093-94 (quoting *Equal Rights Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1138 (D.C. Cir. 2011)). However, "[l]ike an individual, an organization may not establish standing simply based on the intensity of the litigant's interest, no matter how longstanding the interest and no matter how qualified the organization." *Alliance*, 602 U.S. at 394 (citation modified). As *Alliance* made clear, it is not enough that "an organization diverts its resources in response to defendant's actions" even if it will "expend considerable time, energy, and resources" in response to a policy change. *Id*. at 394-95. An organization must allege sufficient facts to show that the challenged action "perceptibly impair[s]" or "interferes with" its activities by imposing an affirmative "impediment" to performing these activities. *Id*.

Plaintiffs' standing theory does not work under *Alliance*—Plaintiff advocacy organizations cannot establish standing simply because the Rule changes *if* USCIS will interview certain aliens in consideration of their affirmative asylum application. If that were true, any interest group would have standing to challenge any rule change. In *Alliance*, the Supreme Court held that a group of doctors could not assert standing to challenge agency actions affecting third parties—and in their view, removing protections and "public safety requirements" that might otherwise apply to those third parties—simply because the doctors might later be called upon to provide medical services to those individuals . . . ." 602 U.S. at 391-92. Such an "attenuated" standing theory, the Court reasoned, would improperly allow doctors to challenge virtually any policy change that might indirectly affect the health or safety of potential patients because it might affect the number of patients they serve, or the time involved in helping those patients. *Id*. There "would be no principled way to cabin such a sweeping doctrinal change" that would allow various groups to

challenge policies affecting their potential clients, such as "[t]eachers in border states" "su[ing] to challenge" changes to "immigration policies" that would affect the number of students in their classrooms. *Id*. at 392. The "Court has consistently rejected" such an "approach to standing" "as flatly inconsistent with Article III." *Id*.

*Alliance* teaches that organizations generally cannot manufacture standing by arguing a policy has "impaired" their "ability to provide services and achieve their organizational missions." *Id.* at 394. Instead, "something about the challenged action itself—rather than the organization's response to it—must make the organization's task more difficult." *Ctr. For Responsible Sci. v. Gottlieb*, 346 F. Supp. 3d 29, 41 (D.D.C. 2018) (citation modified). An organization must show that the Defendants harmed its interests and that it expended resources to address or mitigate that harm. *See Center for Biological Diversity v. Bernhardt*, 490 F. Supp. 3d 40, 46 (D.D.C. 2020) (quoting *Food & Water Watch, Inc*., 808 F.3d at 919). This standard requires evidence of a concrete impact on the organization's mission and a direct connection between the agency's conduct and the diversion of organizational resources. But, other than speculative assertions of a future increase of representation in removal proceedings (a function Plaintiffs already have in place, *see, e.g.*, Morris Decl. ¶¶ 22-23, Kafele Decl. ¶ 27), Plaintiffs offer no such evidence of injury here.

First, Plaintiffs do not suffer a cognizable injury simply because it must spend time understanding or responding to a new government rule. *See National Taxpayers Union v. United States*, 68 F.3d 1428 (D.C. Cir. 1995) (holding self-inflicted programming costs in response to new legislation do not create organizational standing); *Fair Employment Council of Greater Washington, Inc. v. BMC Marketing Corp.*, 28 F.3d 1268 (D.C. Cir. 1994) (same); *see also Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1093 (10th Cir. 2006). And if spending

time reviewing a new rule could give rise to standing, then a litigant could establish standing in every such case. *See U.S. Ecology, Inc. v. U.S. Dep't of Interior*, 231 F.3d 20, 25 (D.C. Cir. 2000) (finding that when appellants invested and then lost time and convenience in a project, "such injury, without more, is not enough" to establish standing). Second, Plaintiffs' standing theory rests on a fundamental mischaracterization of the Rule. Plaintiffs suggest that the Rule categorically eliminates interviews from the affirmative asylum process. Pls.' Mot. 17. It does not. It just permits (but does not require) USCIS to refer an application to immigration court without conducting an interview in certain circumstances, such as when the alien is not eligible for or does not merit a grant of asylum. The INA does not confer a statutory right to an interview or require USCIS to conduct an interview in every case. 91 Fed. Reg. 47,102.

Notably, the Rule only applies to aliens who do not maintain a lawful basis to remain in the United States. 91 Fed. Reg. at 41,107. But even before the Rule, the regulations already recognized that an AO "shall" refer inadmissible or deportable aliens to immigration court. 8 C.F.R. § 1208.14(c)(1). And the Rule explicitly states that it "does not impact USCIS interviews for cases where the alien is not barred from applying for or receiving asylum, not ineligible on the merits of the claim, and may merit a grant as a matter of discretion." 91 Fed. Reg. at 47,102. It also does not impact USCIS interviews where the alien maintains a lawful basis to remain in the United States, or where an asylum interview with USCIS complies with other legislation or settlement agreements. *Id.*

This distinction is fatal to the Plaintiffs' faulty organizational standing theory. Without showing the Rule categorically eliminates asylum interviews in the affirmative process, they cannot show it requires them to reshape their practices. Under the Rule, an AO first reviews the applicant's Form I-589 and then determines whether the application should be referred to

immigration court without an interview. *Id.* at 47,104. Simultaneously, USCIS retains its existing interview procedures for cases in which it conducts an interview. *Id.* Given the many circumstances where the Rule does *not* apply, Plaintiffs cannot show that the Rule requires them to pivot their business model. Pls.' Mot. 28-29. And since there are over one million cases in the backlog, it is highly speculative that Plaintiffs will entirely forego their representation of clients in affirmative asylum interviews. Plaintiffs cite no case where a court in this Circuit has held that a legal service nonprofit established a cognizable injury based on a change of law affecting only their clients, that allegedly made client representation more time-consuming or difficult.

Their second claim fares no better. Plaintiffs concede that their longstanding practice has been for their clients to submit threadbare asylum applications and to wait until a USCIS interview is scheduled before submitting meaningful supporting evidence. *Id*. at 10. Plaintiffs claim that the Rule now harms them by forcing them to expend resources to update the barebones applications "on a significantly truncated timeline." *Id*. at 30-31. Yet, statutes dealing with asylum applications instruct applicants to submit additional supporting evidence with their application, not at a later point *after* their application was submitted. *See* 8 C.F.R. § 208.3(a)(1) (stating that an asylum applicant must file a Form I-589, "together with any additional supporting evidence in accordance with the instructions on the form."); *see also id*. § 103.2(b)(1) ("An applicant or petitioner must establish that he or she is eligible for the requested benefit *at the time of filing the benefit request* and must continue to be eligible through adjudication. Each benefit request must be properly completed and filed *with all initial evidence required* by applicable regulations and other USCIS instructions.") (emphasis added)). Plaintiffs cannot establish standing based on a new rule that alters the procedures for exercising an organization's existing advocacy goals. And Plaintiffs never provide a reasonable explanation for their own failure to effectively advocate on their clients'

behalf, by ensuring that they meet their burden to demonstrate asylum eligibility at the outset. Indeed, it appears that Plaintiffs are abusing gaps in the system to take on clients with meritless claims. They also neglect to cite any legal authority that requires the government to provide Plaintiffs "notice" before adjudicating asylum applications. Put simply, Plaintiffs cannot establish standing by blaming the government for their own shortcomings.

Moreover, as Plaintiffs acknowledge, Pls.' Mot. at 26 n.18, the Rule may benefit, rather than injure, Plaintiffs' clients with meritorious asylum claims. As explained in the Rule, allowing USCIS to refer aliens (who are clearly ineligible for asylum) to immigration court without an interview may result in more timely application adjudications for those who are actually eligible for asylum. 91 Fed. Reg. 47,103. And applicants referred to removal proceedings can apply for other forms of relief from removal that USCIS does not have authority to grant. *Id*. at 47,104. These improvements to the affirmative asylum system undermine Plaintiffs' claimed harm. If it is true that Plaintiffs' clients have meritorious asylum claims, Pls.' Mot. at 26 n.18, making the process more efficient should allow those clients to receive grants of relief more expeditiously. And given the massive backlog size, it is highly speculative and unlikely Plaintiffs would run out of clients with asylum interviews at USCIS. Because Plaintiffs fail to show concrete and demonstrable injury to their activities, they fail to meet the first requirement of organizational standing.

**2. Plaintiffs Cannot Demonstrate Causation.**

Plaintiffs fail to demonstrate a non-speculative injury that is traceable to the Rule. The causation prong "is ordinarily substantially more difficult to establish" standing when "a Plaintiff challenges the government's unlawful regulation of *someone else*." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992) (emphasis in original). Causation can neither be premised on "speculation

about the unfettered choices made by independent actors not before the courts," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 415 (2013), nor on "distant (even if predictable) ripple effects," *Alliance*, 602 U.S. at 383. Like the injury-in-fact requirement, the causation requirement "screens out Plaintiffs who were not injured by the Defendant's action," keeping courts from becoming "virtually continuing monitors of the wisdom and soundness of government action." *Id.* at 384.

Plaintiffs cannot establish that the Rule causes the injury they allege. Plaintiffs apparently assume that in all cases, an asylum applicant will be categorically referred to immigration court without an interview, and that Plaintiffs will consequently be required to expend resources assisting that applicant in removal proceedings, rather than in proceedings before USCIS. Pls.' Mot. 32. Fatally, Plaintiffs do not address the reality that their clients who this Rule would impact (in that they will not receive a USCIS interview), likely would have ended up in removal proceedings anyway, due to their ineligibility for asylum. Thus, even if Plaintiffs obtained an order requiring USCIS to offer an interview, an applicant who is independently subject to removal could still be referred to immigration court. 91 Fed. Reg. 47,105. For example, an applicant who files an asylum application after the OYFD would likely be referred to immigration court, regardless of whether USCIS conducts an interview. The same is true for applicants who are independently barred from applying for or from receiving asylum. Finally, before and after the Rule, an alien may supplement their application with additional information to demonstrate asylum eligibility. *See* 8 C.F.R. § 208.4(b)(1). In those circumstances, the absence of an interview does not cause USCIS to refer the applicant to immigration court; rather, the applicant's own ineligibility does, as it is the applicant's burden to demonstrate their asylum eligibility. *See* 8 U.S.C. § 1101(a)(42); 8 C.F.R. § 208.13. Either Plaintiffs are better equipped to represent their clients in removal proceedings than they have stated, or they were never in the business of representing them in immigration court

in the first place. Either way, their core business interests—ensuring accessibility to the affirmative asylum system—remains unaffected by the Rule. Finally, while Plaintiffs claim that the Rule will force their clients to pursue asylum defensively in removal proceedings rather than affirmatively before USCIS, Pls.' Mot. 29-30, an affirmative filing with the USCIS does not create a right to have the application adjudicated by USCIS. 91 Fed. Reg. 47,102. Plaintiffs therefore cannot establish that the resources they dedicate assisting asylum applicants in removal proceedings, if any of that resource reallocation is even significant, are fairly traceable to the Rule.

**3. Plaintiffs Do Not Show Their Claims Are Redressable.**

Plaintiffs also fail to demonstrate that their requested stay would redress the injuries they claim. That is because Plaintiffs cannot establish that eliminating the challenged aspect of the Rule would likely redress their alleged organizational injury. The D.C. Circuit Court's recent decision in *Coal. for Humane Immigrant Rts v. Mullin*, reinforces this point, and further demonstrates why Plaintiffs cannot establish redressability. No. 25-5289, 2026 WL 2317908, at *5 (D.C. Cir. Aug. 11, 2026). There, the organizational plaintiffs challenged agency directives that they claimed increased their members' risk of expedited removal. *Id.* But a long-standing, existing regulation already authorized the Government to expeditiously remove those individuals, independent of the challenged agency directives. *Id*. at **2-3. Because the Plaintiffs had not challenged that regulation, the court held that they could not show that the relief they sought would likely prevent the alleged injury. *Id.* at *3. As the court explained, where an unchallenged legal authority independently permits the alleged harm to continue, plaintiffs cannot establish that their requested relief is likely to redress their injury. *Id*. at **4-6.

Here, the regulations have long contemplated that USCIS may refer an applicant to immigration court as one of three permissible adjudicatory actions on an affirmative asylum

application. 8 C.F.R. § 1208.14(c). Even before the Rule, the regulations mandated AOs to refer asylum applications to immigration court when they involved certain inadmissible or deportable aliens, or certain aliens with expired or terminated parole. *Id.* §§ 1208.14(c)(1), (c)(4). For these aliens, an interview would not change whether USCIS referred them to immigration court because the regulations make a referral mandatory in these instances. And of course, the regulations contemplate that USCIS could refer aliens to immigration court after an interview. Thus, even without the new rule, it is speculative to claim that these cases will not result in a referral to removal proceedings in immigration court. If anything, the increased efficiency in resolving flimsy cases will facilitate Plaintiffs' organizational efforts. Accordingly, this Court should dismiss this case based on Plaintiffs' failure to establish organizational standing alone.

**4. Plaintiffs are Outside the Zone of Interests of the Relevant Statutes.**

As Plaintiffs bring suit under the APA, they must show they are "aggrieved . . . within the meaning of a relevant statute." 5 U.S.C. § 702. This means that the interest they seek to protect must "be arguably within the zone of interests to be protected or regulated by the statute . . . in question." *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 396 (1987). Plaintiffs lack a valid cause of action because they are not "within the class of plaintiffs Congress has authorized to sue." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 (2014). Here, "using traditional principles of statutory interpretation," it is clear Plaintiffs are not within that class.

The INA supplies a cause of action to challenge issues arising from removal proceedings under 8 U.S.C. §1229a, *only to individuals subject to removal proceedings*, and only through judicial review in the courts of appeals following administrative proceedings, 8 U.S.C. § 1252(a), (a)(5), (b)(9). Nothing in the asylum statute (8 U.S.C. § 1158(a)) suggests nonprofit organizations like Plaintiffs have any cognizable interests of their own in connection with an individual alien's

asylum eligibility. Section 1158 neither regulates Plaintiffs' conduct nor creates any benefits for which it is eligible. An alien seeking asylum could not bring a suit like this one, given Congress's clear mandate. 8 U.S.C. § 1252. This suit is an obvious attempt to circumvent to those channeling provisions that were designed to ensure claims were heard in a petition for review process on behalf of aliens subject to removal. 8 U.S.C. § 1252(a)(2)(D), (5).

The Organizational Plaintiffs therefore cannot be within the INA's zone of interests. When confronted with a similar challenge brought by "organizations that provide legal help to immigrants," Justice O'Connor concluded that the relevant INA provisions were "clearly meant to protect the interests of undocumented aliens, not the interests of [such] organizations," and the fact that a "regulation may affect the way an organization allocates its resources…does not give standing to an entity which is not within the zone of interests the statute meant to protect." *INS v. Legalization Assistance Project of the L.A. Cnty. Fed'n of Labor*, 510 U.S. 1301, 1302, 1305 (1993) ("*Legalization Assistance*") (O'Connor, J., in chambers). The D.C. Circuit has thus held that immigrant advocacy organizations are outside the immigration statutes' zone of interests. *See, e.g.*, *Fed'n for Am. Immigration Reform (FAIR) v. Reno*, 93 F.3d 897, 900-04 (D.C. Cir. 1996); *accord Ayuda, Inc. v. Reno*, 7 F.3d 246, 250 (D.C. Cir. 1993) (explaining that if the statute explicitly provides only for aliens to challenge removal proceedings, then "organizational plaintiffs" may not raise such claims).[4]

Defendants acknowledge that some courts in this District have sometimes held that the

[4] While the Ninth Circuit held otherwise in *East Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242, 1270 (9th Cir. 2020), it did not consider *FAIR*, 93 F.3d at 903, which is controlling in this Circuit. In any event, that analysis in the *E. Bay* opinion was superseded, *see East Bay Sanctuary Covenant v. Biden*, 993 F.3d 640 (9th Cir. 2021), and then reversed. *See Arizona Alliance for Retired Americans v. Mayes*, __F.4th__, 2026 WL 2277101 (9th Cir. Aug. 7, 2026) (en banc) (reversing "organizational standing analyses in these cases").

zone-of-interests test should be applied permissively and have found organizations that satisfy it, even in the context of the INA. *See, e.g.*, *O.A. v. Trump*, 404 F. Supp. 3d 109, 144 (D.D.C. 2019). However, this relaxed standard does not—and cannot—survive the Supreme Court's *United States v. Texas* decision. 599 U.S. 670 (2023). The Court clarified—relying on principles that inform the scope of Article III and the APA's cause of action—that third parties like Plaintiffs have no cognizable interest in the way the Executive enforces the immigration laws against others. 599 U.S. at 674, 677; *Sure-Tan, Inc. v. N.L.R.B.*, 467 U.S. 883, 897 (1984) ("[P]rivate persons such as petitioners have no judicially cognizable interest in procuring enforcement of the immigration laws[.]"). Therefore, the Court should find that the organizational Plaintiffs have not illustrated that they fall within the zone of interests of the statutes Defendants have allegedly violated.

**B. Plaintiffs' Stay Request is Not Justiciable Because the Court Cannot Stay Agency Action That Has Already Gone into Effect.**

The terms of 5 U.S.C. § 705 do not authorize a postponement of the Referral IFR. Courts construing § 705 have concluded that the phrase "postpone the effective date" of an agency action authorizes the "postpone[ment of] the effective date of *a not yet effective rule*, pending judicial review," but not suspension of a rule that is already in effect. *Ctr. for Biological Diversity v. Regan*, 597 F. Supp. 3d 173, 204 (D.D.C. Mar. 20, 2022) (emphasis added) (citing *Safety-Kleen Corp. v. EPA*, Nos. 92-1629, 92-1639, 1996 U.S. App. LEXIS 2324, at *2-3 (D.C. Cir. Jan. 19, 1996)). While these cases address an agency decision to "postpone the effective date," § 705 uses identical language when referring to "the reviewing court . . . postpon[ing] the effective date of an agency action." The use of an identical phrase in the first and second sentences of § 705 must be presumed to be intentional. *Sorenson v. Sec'y of Treasury*, 475 U.S. 851, 860 (1986) ("The normal rule of statutory construction assumes that identical words used in different parts of the same act are intended to have the same meaning."). Given its plain meaning, the language in § 705 allowing a

court or agency to "postpone the effective date" can only be read to mean that the statute allows the court "to put off until a future time," "defer," or "delay" the "operative" date of the agency action. *Postpone*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/postpone (last visited Sep. 2, 2026) (defining "postpone" as "to put off to a later time: defer"); *see also Postpone*, BLACK'S LAW DICTIONARY (12th ed. 2024) (defining "postpone" as "[t]o put off to a later time"). One cannot "defer" or "put off" an action that has already occurred. Thus, it would be perverse to interpret the statute as permitting this Court to issue a stay after the operative date of the Referral IFR (here, July 28, 2026) has passed. Accordingly, there is no plausible basis for Plaintiffs to argue that the Referral IFR is "not yet effective." *Safety-Kleen Corp.*, 1996 U.S. App. LEXIS 2324, at **2-3.

Moreover, the fact that § 705 is disjunctive, permitting reviewing courts to "postpone the effective date of an agency action or to *preserve status or rights* pending conclusion of the review proceedings" 5 U.S.C. § 705 (emphasis added), cannot change this result. That second clause is subject to the same temporal limitation as the first clause for the simple reason that the status quo, once a rule goes into effect, is that the rule is in effect. An order staying a rule or policy after it goes into effect does not preserve, but alters, the status quo. *See Ne. Ohio Coal. for Homeless & Serv. Emps. Int'l Union, Loc. 1199 v. Blackwell*, 467 F.3d 999, 1006 (6th Cir. 2006) (explaining an order "preventing the implementation of new regulations" would "disturb[]" rather than preserve "the status quo"); *Off. of Pers. Mgmt. v. Am. Fed'n of Gov't Emps., AFL-CIO*, 473 U.S. 1301, 1305 (1985) (explaining that had the district court issued an order stopping rule from taking effect, that would alter the "status quo"). Here, the status quo is that the Referral IFR is operative. Thus, because the Referral IFR is currently effective, 5 U.S.C. § 705 does not provide the ultimate relief that Plaintiff seeks—a stay of the effective date of the Referral IFR—and their claim should

be denied for this reason.

## II. Plaintiffs do not Make a Clear Showing that they are Entitled to Preliminary Relief.

Assuming, *arguendo*, that the Court finds Plaintiffs' claims to be justiciable, a stay is not warranted because Plaintiffs fail to show they are entitled to preliminary relief. To obtain relief, the movant must show: (1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of hardships tips in their favor, and (4) that an injunction is in the public interest." *Winter*, 555 U.S. at 20. Plaintiffs satisfy none of these requirements.

### A. Plaintiffs Are Not Likely to Succeed on the Merits of Any Claim.

#### 1. Defendants followed the Proper Procedures for the Referral IFR.

The APA generally requires agencies to provide notice and an opportunity for public comment before promulgating a rule. 5 U.S.C. § 553(b)-(c). Here, the Rule is exempt from that general rule because it involves a foreign-affairs function of the United States (5 U.S.C. § 553(a)(1)) and governs agency procedure (*id.* § 553(b)(A)). Thus, it was lawfully promulgated.

##### a. The Procedural Rule Exception Applies.

The Rule is subject to the procedural rule exception, which applies "to interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice." 5 U.S.C. § 553(b)(A). Rules are "procedural if they are '*primarily* directed toward improving the efficient and effective operations of an agency.'" *AFL-CIO v. NLRB*, 57 F.4th 1023, 1034 (D.C. Cir. 2023) (quoting *Mendoza v. Perez*, 754 F.3d 1002, 1023 (D.C. Cir. 2014)) (emphasis added). To determine if a rule is substantive, a court looks at the rule's effect on the "interests ultimately at stake in the agency proceeding." *Neighborhood TV Co., Inc. v. FCC*, 742 F.2d 629, 637 (D.C. Cir. 1984). An agency rule that imposes "derivative," "incidental," or "mechanical" burdens upon those

that fall under the regulation are considered to be procedural, rather than substantive. *Nat'l Sec. Counselors v. CIA*, 931 F. Supp. 2d 77, 107 (D.D.C. 2013). The critical feature of the procedural rule exception is that it covers actions of the agency that "do not themselves alter the rights or interests of parties," even if it "may alter the manner in which the parties present themselves or their viewpoints to the agency." *JEM Broad. Co. v. FCC*, 22 F.3d 320, 326-27 (D.C. Cir. 1994) (citation modified). As such, an otherwise-procedural rule does not become a substantive one, for the purpose of notice-and-comment, just because it imposes a burden on regulated parties. *James V. Hurson Assocs., Inc. v. Glickman*, 229 F.3d 277, 281 (D.C. Cir. 2000). The purpose of the exception is to "ensure that agencies retain latitude in organizing their internal operations." *AFL-CIO*, 57 F.4th at 1034 (quoting *Mendoza*, 754 F.3d at 1023).

First, the Rule falls under the procedural rule exception because there is no substantive *right* to an asylum interview before USCIS. *See* 91 Fed. Reg. 47,102 (stating that although USCIS's asylum division had a long-standing practice of offering interviews to all aliens that file Forms I-589, there was "no statutory right to an interview or requirement to conduct one.").[5] The INA plainly does not contain any such right. Plaintiffs' attempts to show otherwise are unavailing. Pls.' Mot. 2-3. They repeatedly cite 8 U.S.C. § 1158(d)(5)(A)(ii) for the assertion that "the

[5] This understanding is not new. In 1994, DHS proposed to make asylum interviews discretionary. Rules and Procedures for Adjudication of Applications for Asylum or Withholding of Deportation and for Employment Authorization, 59 Fed. Reg. 14,779 (Mar. 30, 1994) ("As currently constituted, INS regulations mandate the interview of all applicants . . . [AOs] no longer will be required to conduct personal interviews, but will have discretion to conduct such interview in any case they deem appropriate."). DHS did not finalize the change because it determined "the goal of streamlining asylum adjudications [could] be met without changing the present rule." Rules and Procedures for Adjudication of Applications for Asylum or Withholding of Deportation and for Employment Authorization, 59 Fed. Reg. 62,292 (Dec. 5, 1994) ("Accordingly, the present rule is retained and there is no provision for immediate referral of cases, without an interview, to an immigration judge."). However, over 30 years have passed, and streamlining asylum adjudications is no longer possible while maintaining interviews for every asylum applicant.

INA . . . guarantees an 'initial interview or hearing' on every asylum application." *Id*. at 4, 8, 25. But the plain text easily rebuts this claim. Section 1158(d)(5)(A)(ii) states that "in the absence of exceptional circumstances, the initial interview *or* hearing on the asylum application shall commence not later than 45 days after the date an application is filed." (emphasis added). "Under the conjunctive/disjunctive canon, *and* combines items while *or* creates alternatives. Competent users of the language rarely hesitate over their meaning." A. SCALIA & B. GARNER, READING LAW 116 (2012). In other words, an applicant may be afforded an interview or alternatively, a hearing. Under the Rule, when USCIS refers an applicant to immigration court, the application is considered by EOIR under EOIR's immigration court procedures.[6] Plaintiffs' argument that the Rule "expressly and repeatedly concedes it is removing the regulatory right to an interview" is wrong. Instead, the Rule explains that it removes *language* from existing regulations referring to a "right" to an interview. *See* 91 Fed. Reg. at 47,102, 47,103, 47,105, 47,108, 47,110 & n.40, 47,111. The Rule repeatedly emphasizes that no statutory right to an interview has ever existed, and the USCIS interview is a creature of agency practice, rather than a freestanding, substantive right. *See* 91 Fed. Reg. at 47,116.[7]

[6] Plaintiffs' contention that unaccompanied children "will be severely harmed" because the Rule "deprives them of the forum Congress selected for their claims" (Pls.' Mot. 16) is groundless. Despite a carefully reticulated statutory scheme governing unaccompanied alien children, *see, e.g.*, 8 U.S.C. § 1232, no statute requires USCIS to conduct an asylum interview for unaccompanied children (or anyone else).

[7] USCIS does not *always* interview every petitioner, applicant, or beneficiary, relating to all submitted benefit requests. Doing so would place a massive and unnecessary burden on agency resources and the public. For example, USCIS waives adjustment of status interviews in many cases, including when the "applicant is clearly ineligible." 8 C.F.R. § 245.6 Interviews are also generally waived or not mandated for Special Immigrant Juvenile petitions and Petitions to Remove Conditions on Residence. *See* USCIS, Policy Manual, Vol. 6 Part J, Chapter 4—Adjudication, https://www.uscis.gov/policy-manual/volume-6-part-j-chapter-4#footnote-5 (last updated May 8, 2026); USCIS, Policy Manual, Vol. 6 Part I, Chapter 3—Petition to Remove Conditions on Residence, https://www.uscis.gov/policy-manual/volume-6-part-i-chapter-3 (last

Similarly, Plaintiffs cannot establish aliens have a statutory right to an interview when they are statutorily ineligible to receive asylum, and thus have no substantive rights in the relief they seek. An alien's ability to apply for asylum is subject to exceptions under 8 U.S.C. §§ 1158(a)(2), (a)(2)(B), one prominent and particularly relevant exception being that the ability to apply for asylum "shall not apply to an alien unless the alien demonstrates by clear and convincing evidence that the application has been filed within 1 year after the date of the alien's arrival in the United States." Plaintiffs claim affirmative asylum applicants have the right to, via an interview, supplement their applications to establish exceptions to the OYFD apply. Plaintiffs are correct that they may provide an explanation for why the one-year bar does not apply, and in fact the Form I-589 application specifically instructs the applicant to, if relevant, "explain why [they] did not file within the first year after [they] arrived." *I-589, Application for Asylum and for Withholding of Removal*, U.S. CITIZENSHIP AND IMMIGRATION SERVICES (last updated Aug. 28, 2026), https://www.uscis.gov/i-589. However, affirmative asylum applicants are not entitled to yearslong delay in which their asylum application remains pending, unsupported by evidence establishing eligibility for the OYFD exception, while they wait for an interview with an AO. Plaintiffs themselves concede the delays inherent in the affirmative asylum process. Pls.' Mot. 31 (describing their practices based on "the long waits for, and unpredictable timing of, asylum interviews").

Plaintiffs additionally assert that the Rule is substantive because it "impinges on the underlying right to seek asylum under 8 U.S.C. § 1158(a)(1)." *Id.* at 14-15. However, the Rule

---

updated May 8, 2026). Thus, USCIS removing an interview procedure created by regulation does not constitute a change with "sufficiently grave" substantive effects that would trigger notice and comment rulemaking. Pls.' Mot. 15 (citing *Elec. Priv. Info. Ctr. v. DHS*, 653 F.3d 1, 5-6 (D.C. Cir. 2011)).

does not inhibit an alien's ability to seek asylum nor does it alter asylum standards in any way. And nothing in the Rule prevents aliens from submitting affirmative asylum applications to USCIS, 91 Fed. Reg. 47,116, or affects an aliens' ability to amend or supplement their asylum applications at any point before a decision from USCIS or in immigration court. *See* 91 Fed. Reg. at 47,112 (citing 8 C.F.R. 208.4(b)(1)). Because USCIS retains discretion as to whether to offer interviews, USCIS may exercise that discretion based on whether an alien satisfied their burden to demonstrate their eligibility for asylum at the time of their application. The Rule will lead to aliens' improved understanding of the asylum process and improved application quality and completeness. 91 Fed. Reg. at 47,109.

The Rule also does not prevent applicants from continuing to seek asylum in immigration court. In fact, by regulation, the asylum application of an inadmissible or deportable alien that is referred to EOIR is specifically referred "for adjudication in removal proceedings. . . ." 8 CFR §§ 208.14(c)(1), 1208.14(c)(1). Plaintiffs argue that asylum applicants do not receive a hearing before an IJ due to DHS and the Executive Office for Immigration Review ("EOIR") policy of pretermitting asylum applications in violation of 8 U.S.C. § 1158(d)(5)(A)(ii). Pls.' Mot. 8, 25. However, Plaintiffs' claims are speculative given that once an alien is placed in removal proceedings, they retain the right to present their asylum claim *de novo* before an IJ, which means they can file evidence or an updated application. 91 Fed. Reg. at 47,113; 8 C.F.R. § 208.4(b)(1). Aliens also have a right to appeal an IJ's decision to the Board of Immigration Appeals as well as in federal court via a petition for review. *Jafarzadeh v. Duke*, 270 F. Supp. 3d 296, 306 (D.D.C. 2017).

Plaintiffs further assert that "revoking the interview right means that no applicant will ever know precisely *when* USCIS might adjudicate their application[,]" which contributes to the Rule

"dictat[ing] results" before USCIS for "countless people." Pls.' Mot. 17-18 (emphasis in original). Yet, upon the filing of an affirmative asylum application, aliens have never known precisely when USCIS would adjudicate their application. Moreover, Plaintiffs concede their members were previously encumbered by "the long waits for, and unpredictable timing of, asylum interviews." *Id.* at 31. Accordingly, Plaintiffs' argument that applicants referred without interviews "will not know when to submit updated country conditions and other new evidence related to asylum eligibility" is not grounded in any right contemplated by the procedural exception to the requirement for notice and comment. *Id.* at 17 (citations omitted). In any event, these arguments miss the point and only confirm the Rule is quintessentially procedural, akin to the rules regarding the timing of briefs or evidentiary submissions in the federal courts. *See, e.g.*, FED. R. CIV. P. 56.

The D.C. Circuit addressed a comparable challenge when the Federal Communications Commission ("FCC") promulgated a procedural rule by limiting an applicant's ability to amend their applications. *See JEM Broad. Co.*, 22 F.3d at 323. The Court concluded that an applicant's "right to a free shot at amending its application is not so significant" as to trigger notice and comment rulemaking, "particularly in light of the Commission's weighty efficiency interests." *Id.* at 327. The Court explained that the procedural exception embraces cases where there are considerations such as "effectiveness, efficiency, expedition and reduction in expense." *Id.* Critically, the Court found that the FCC "did not change the *substantive standards* by which the FCC evaluates license applications." *Id.* (emphasis in original). Here, Plaintiffs claim that the Rule "remove[s] the right to provide the most critical type of evidence in support of an application," unlike the FCC in *JEM Broad. Co.* Pls.' Mot. 19. However, the Rule leaves USCIS's substantive evaluation standards for affirmative asylum applications unchanged. Plaintiffs mischaracterize the interview as critical to an affirmative asylum application, especially in cases, as contemplated by

the Rule, where applicants submit a threadbare application. USCIS's efficiency interests to reduce the immense asylum backlog weighs against Plaintiffs' interests in an interview despite asylum ineligibility. *See JEM Broad. Co.*, 22 F.3d at 327.

**b. The Foreign Affairs Exception Applies to the Referral IFR.**

The Rule is also subject to the Foreign Affairs Exception. Rules that involve "a military or foreign affairs function of the United States" are exempt from APA notice-and-comment requirements, 5 U.S.C. § 553(a)(1); *See Int'l Bhd. of Teamsters v. Pena*, 17 F.3d 1478, 1486 (D.C. Cir. 1994) (finding that the foreign affairs exception applied when a rule implemented an international agreement). Thus, "the foreign affairs function exception plainly covers heartland cases in which a rule itself directly involves the conduct of foreign affairs." *Cap. Area Immigrants' Rts. Coal. v. Trump*, 471 F. Supp. 3d 25, 54 (D.D.C. 2020) ("*CAIR*"). This exception applies here. On February 21, 2025, the Secretary of State determined:

> all efforts conducted by any agency of the federal government to control the status, entry and exit of people, and the transfer of goods, services, data, technology, and other items across the borders of the United States, constitutes a foreign affairs function of the United States under the Administrative Procedure Act, 5 U.S.C. §§ 553, 554.

91 Fed. Reg. at 47,116 (quoting 90 Fed. Reg. 12,200 (Mar. 14, 2025)). The Rule observes that the Secretary's determination "references and implements numerous Presidential actions reflecting the President's top foreign policy priorities, including E.O. 14161." *Id.* Accordingly, DHS explained that this Rule "is directly connected to controlling the status and entry and exit of people across the borders of the United States, such that it constitutes a foreign affairs exception." *Id*. Removing the requirement that USCIS interview every affirmative asylum applicant allows USCIS to move aliens with non-meritorious claims, including those who have committed serious crimes or acts of terrorism, more quickly through the removal process. 91 Fed. Reg. at 47,116. Promptly moving

these aliens to the removal process also reduces the period during which dangerous aliens may remain in the United States while their asylum applications are pending, thereby decreasing "the overall exposure risk to the public." *Id*. at 47,104.

Courts have found that the foreign affairs exception applies in immigration matters. In *Rajah v. Mukasey*, the Second Circuit considered an APA challenge to an immigration program requiring certain nonimmigrant aliens from designated countries to register with immigration authorities. 544 F.3d 427, 432 (2d Cir. 2008).[8] The court held that the regulations fell within the APA's foreign affairs exception, notwithstanding that the program operated domestically. *Id.* at 437. The court explained that notice-and-comment could result in "definitely undesirable international consequences," including disclosure of sensitive foreign intelligence, impairment of relations with other countries, and delays that could diminish the Government's ability to collect intelligence and defend against potential attacks by foreign terrorists. *Id.* at 437 (citing *Zhang v. Slattery*, 55 F.3d 732, 744 (2d Cir. 1995)), *superseded by* 8 U.S.C. § 1101(a)(42).[9] The Second Circuit's decision is consistent with *Yassini v. Crosland*, 618 F.2d 1356, 1358 (9th Cir. 1980). There, the INS Commissioner revoked deferred departure dates previously granted to Iranian nationals in the United States. *Id.* The Ninth Circuit held the foreign affairs exception applied because the Government was acting in response to the Iranian hostage crisis, and pursuant to Presidential foreign policy directives. *Id.* at 1361.

---

[8] After 9/11, the Attorney General implemented the National Security Entry-Exit Registration System. *Rajah*, 544 F.3d at 433. This program required non-immigrant aliens from over sixteen designated countries to register, provide fingerprints and present immigration related documents to immigration authorities. *Id.* at 433.

[9] *Rajah* also establishes that an agency need not expressly state the foreign-affairs consequences in the rule itself, particularly when those consequences are apparent from the circumstances. *Id*. at 437.

*Rajah* and *Yassini* teach that immigration regulations may fall within the foreign affairs exception, even if the Rule operates domestically. This exception is not confined to regulations directed exclusively at foreign governments or diplomatic relations, as Plaintiffs posit. Pls.' Mot. 13. These holdings also confirm that the exception applies when a Rule's operation is sufficiently connected to the Nation's foreign affairs and national security interest functions. Importantly, DHS relied on the holding in *Yassini* when promulgating the Rule, 91 Fed Reg. 47,116.

*CAIR v. Trump* is also instructive and does not compel a different result. 471 F. Supp. 3d at 25. In that matter, the court considered an interim final rule that disqualified aliens who entered the United States though the southern border from seeking asylum, unless they "unsuccessfully sought similar protection in another country on their way here." *Id*. at 31. The Government argued that the rule implicated foreign affairs because it implicated the United States' relationship with and ongoing international negotiations with certain countries. *Id.* at 52. The court rejected that argument because they were "downstream effects" of the rule and the rule itself did not "involve the mechanisms through which the United States conducts relations with foreign states." *Id*. at 55, 57. But the Rule here is materially different than the one at issue in *CAIR*. It does not change the substantive rules governing who may qualify for asylum. *See* 91 Fed. Reg. 47,106. Instead, it permits (but does not require) USCIS to refer certain applications to immigration judges without an interview. *Id*. at 47,102-03. Thus, the Rule's procedures directly concern the United States' administration of its immigration and asylum system, which necessarily implements the government's policies concerning the admission, removal, and treatment of foreign nationals.

Significant here—and dissimilar from the situation in *CAIR*—is the Secretary of State's recent determination that federal efforts to control the status, entry and exit of persons across the Nation's border are foreign affairs functions. 90 Fed. Reg. 12,200. This Rule implements that

determination by establishing a mechanism for USCIS to resolve affirmative asylum applications more efficiently and, when appropriate, transition those cases to proceedings before immigration judges. 91 Fed. Reg. at 47,102-03. The Rule, therefore, does more than produce *incidental* effects on foreign affairs. Instead, it *directly* implements the framework for administering the nation's asylum and immigration system in furtherance of its foreign affairs and national security objectives. Thus, the Rule directly involves a foreign-affairs function under § 553(a)(1).

**2. The Referral IFR is Neither Arbitrary nor Capricious.**

The Rule is neither arbitrary nor capricious. DHS promulgated it after considering significant reliance interests, reasonable alternatives to the Rule, and other major issues that may arise with the introduction of the Rule. The Court's review of whether the Rule is arbitrary and capricious is "narrow,", and this Court "should not substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983) ("*Motor Vehicle Mfrs*."). A reviewing court must determine that the agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id.* at 43. At bottom, arbitrary-and-capricious review asks only whether "the agency has acted within a zone of reasonableness." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). Agency action is "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs.*, 463 U.S. at 43.

**a. DHS Promulgated the Referral IFR Based on Urgent and Compelling Considerations.**

DHS promulgated the Rule based on urgent and compelling considerations. 91 Fed. Reg.

47,101. First, DHS explained that the purpose of the Rule is to "amend existing regulations to permit an AO to refer certain asylum applications to EOIR without conducting an interview." *Id.* at 47,102. DHS updated the affirmative asylum system for several reasons, including: (1) to reduce the enormous affirmative asylum backlog, (2) to improve the efficiency of USCIS operations, (3) to safeguard national security and public safety, and (4) to ensure consistency with agency priorities. *Id*. The Rule illustrates that this change "ensures that aliens understand what to expect throughout the affirmative asylum process . . . and that their filing of an asylum application does not guarantee an interview with USCIS." *Id*. Allowing USCIS to refer applications to EOIR without an interview also allows USCIS to "more efficiently manage its affirmative asylum backlog" by not only reducing adjudicative resources spent on processing non-meritorious asylum claims, but to also free up interview spots for actually eligible applicants. *Id*. This change allows USCIS to "focus its limited resources on applications within its jurisdiction that require eliciting testimony for adjudication." *Id*. Regarding national security, USCIS is now "able to more quickly identify [affirmative asylum applicants] that pose a danger to public safety or national security" and quickly place those aliens in removal proceedings. *Id*. at 47,102-03. Consequently, it is clear that DHS "examine[d] the relevant data" and concerns regarding the USCIS affirmative asylum process, and "articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs.*, 463 U.S. at 43. The Rule is not arbitrary and capricious.

**b. The Referral IFR Considered Significant Reliance Interests.**

Plaintiffs assert that the Rule implicates significant reliance interests because aliens can no longer refrain from submitting thorough applications at the outset, and instead wait to complete their application at the USCIS interview Pls.' Mot. 20-22. But it has always been the asylum

applicant's burden to demonstrate their asylum eligibility. *See* 8 U.S.C. § 1158(b)(1)(B)(i) ("The burden of proof is on the applicant to establish that the applicant is a refugee, within the meaning of section 1101(a)(42)(A) of this title."). Plaintiffs do not provide a reasonable explanation for why an applicant would not submit all supporting documentation at the time of the application and supplement the application as needed. Instead, they simply state that submitting less than thorough applications is something they "have routinely done[,]" acting in reliance on the "notion" that they would have a scheduled interview, and could present updated information there. Pls.' Mot. 21-22. Importantly, the Rule does not change what USCIS has always instructed asylum applicants: to submit detailed asylum applications.[10]

Further, although Plaintiffs insist that the interview served as a signal for the service providers and applicants to provide updated information regarding their asylum application, *id*. at 21, that statement disregards the fact that applicants could always, and were in fact encouraged, to update their information at any time. 8 C.F.R. § 208.4(b)(1). To this end, several of Plaintiffs' declarations highlight complications that may arise with updating an applicants' asylum application, such as the efficiency of the process or the burden on the attorneys. *See* Morris Decl. at ¶ 35; Brown Decl. at ¶ 18; Avila-Cimpeanu Decl. at ¶ 15, 47. But they do not articulate that the Rule now forces applicants to do something they were not expected to do before. Incidentally, these points all underscore that this is a procedural rule, not a substantive one.

[10] Plaintiffs' claim that the Rule did not consider applicants' general reliance interest on USCIS interviews is demonstrably false. Pls.' Mot. at 22 (citing 91 Fed. Reg. at 47,116). The Rule states: "DHS recognizes that asylum applicants have become accustomed to presenting their claims to an asylum officer at a scheduled interview." 91 Fed. Reg. at 47,116. As such, DHS also recognizes that asylum applicants had expectations about how they understood the asylum process would unfold—including that they would receive an asylum interview—and that the Rule disrupts that understanding. Although DHS recognizes this element, it also acknowledges that "USCIS cannot continue to offer everyone an asylum interview given the drastic growth in the affirmative asylum applicant landscape since this agency procedure was last evaluated." *Id*.

The Rule also clarifies that even if an individual *could* "erroneously be referred without interview, the alien will retain the opportunity to present his or her claim to an IJ *de novo*, at which point he or she could present arguments and evidence of an exception the filing deadline." 91 Fed. Reg. 47,113. Thus, immigration court provides aliens with yet another opportunity to update their application. To this end, Plaintiffs emphasize that asylum officers are "trained in trauma-informed interviewing[,]" in contrast to the adversarial setting removal proceedings provide. Pls.' Mot. 2, 5, 22. But Plaintiffs fail to acknowledge that in immigration court, they may retain an attorney. 8 C.F.R. § 1003.16(b). Their advocate's job is to elicit information that is helpful to their client and present it to the IJ in a persuasive manner.

Ultimately, Plaintiffs oversimplify all of the reliance interests that DHS considered when promulgating the Rule. Pls.' Mot. 22. DHS considered several reliance interests and discussed these interests within the Rule itself. 91 Fed. Reg. 47,116. Based on those considerations, DHS limited the Rule "to referral cases where one is barred from applying for or being granted asylum, does not merit a grant as matter of discretion, or is not eligible on the merits of the claim." *Id*. at 47,117. As such, DHS "assess[ed] whether there were reliance interests, determine[d] whether they were significant, and weigh[ed] any such interests against competing policy concerns." *DHS v. Regents of the Univ. of Calif.*, 591 U.S. 1, 33 (2020). The purpose of the Rule is to minimize and reduce the backlog plaguing the affirmative asylum process. 91 Fed. Reg. 47,102. In doing so, the Rule could positively impact some asylum applicants because it allows USCIS to reallocate its scarce resources toward the timely adjudication of meritorious cases, free up interview slots for cases where an interview is needed and accelerates the timeline and resolution of non-meritorious claims. *Id*. at 47,117. These positive outcomes, as acknowledged in the regulation, counteract Plaintiffs' accusation that DHS has not considered what the ramifications of the Rule are. Pls.'

Mot. 20-22. As such, the Rule is not arbitrary and capricious.

**c. The Referral IFR Considers Other Important Aspects.**

Plaintiffs next contend that the Rule is arbitrary and capricious because it "ignores" major factors relevant to whether the "right to an asylum interview should be revoked." *Id*. at 23.

First, Plaintiffs assert that "[a] referral without interview . . . means a significant risk of detention[,]" as well as all the issues that may come with detention, such as transfer to remote detention centers, separation from family, loss of ability to work, inadequate medical care, etc. *Id*. Plaintiffs argue that the Rule neither acknowledges this purported risk nor does it acknowledge the heightened costs U.S. taxpayers will bear "to detain additional noncitizens." *Id*. at 23-24.

Aside from the limited application of the Rule, detention is not applied to *every* alien in removal proceedings. Detention is mandatory in certain circumstances: (1) 8 U.S.C. § 1226(c), which applies to certain criminal and terrorist aliens; (2) 8 U.S.C. § 1225(b), including 8 U.S.C. § 1225(b)(2)(A)[11], which applies to individuals in the expedited removal process and applicants for admission; and (3) 8 U.S.C. § 1231(a), which applies to aliens with a final order of removal. Detention is required for those groups irrespective of an affirmative asylum application. For other aliens not in these categories who are transferred to U.S. Immigration and Customs Enforcement ("ICE") custody, the agency decides if an alien should be detained if they are deemed to be "a public safety or flight risk[.]" *Detention Management*, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, https://www.ice.gov/detain/detention-management (last visited Sept. 15, 2026). This determination is made on a case-by-case basis based on the totality of the circumstances. *Id*. In addition to these factors, ICE also takes other circumstances into consideration when deciding

[11] Two Circuit Courts have recently held that applicants for admission are subject to mandatory detention without bond under 8 U.S.C. § 1225(b)(2)(A). *See Avila v. Bondi*, 170 F.4th 1128, 1132 (8th Cir. 2026); *Buenrostro-Mendez v. Bondi*, 166 F.4th 494, 498 (5th Cir. 2026).

if an alien should be detained, such as whether an alien has a serious medical condition, is the primary caregiver of minor children, or other humanitarian considerations. *Id*. Thus, Plaintiffs' assertions about the interplay between the Rule and the risk of detention are tenuous at best.

Significantly, DHS limited the Rule "to referral cases where one is barred from applying for or being granted asylum, does not merit a grant as a matter of discretion, or is not eligible on the merits of the[ir] claim," 91 Fed. Reg. 47,116-17, and to "cases where the alien does not maintain a lawful basis to remain in the United States, and where the application would be referred to DOJ, not where DHS would deny the application." *Id*. at 47,117. Given the Rule's limited application, and the even more limited circumstances supporting detention generally, the cross-over of *both* the Rule *and* detention to be applied to one individual applicant is a small risk. "Speculation" is not enough to "overcome the 'highly deferential' arbitrary and capricious standard, which 'presumes agency action to be valid.'" *Est. of Jennions v. Commodity Futures Trading Comm'n*, 183 F.4th 858, 866 (D.C. Cir. 2026) (citation omitted).

Importantly, detention in these limited circumstances furthers one of the Rule's main goals: to enhance "national security and public safety." 91 Fed. Reg. 47,104. Detention of potentially dangerous aliens before they can be promptly removed furthers both objectives. *Id*. Indeed, the Rule instructs AOs to swiftly identify applicants who threaten either public safety or national security for removal, who would likely be in immigration detention anyway. *See* 8 U.S.C. § 1226a (describing mandatory detention of suspected terrorists); *see* 8 U.S.C. § 1226(c) (describing mandatory detention for certain criminal aliens). In doing so, the Rule "decrease[s] the overall exposure risk to the public because it will reduce the amount of time during which dangerous aliens can remain at large within the United States[.]" *Id*.

Next, Plaintiffs contend that the Rule fails to "consider the needs of unaccompanied

children" and only includes "a single child-specific sentence: that because unaccompanied children 'are not subject to' certain bars to asylum, they 'will . . . not be referred without interview based on' those bars but 'may still be referred under the rule' on other grounds." Pls.' Mot. 24 (citing 91 Fed. Reg. 47,113). Plaintiffs' theory regarding unaccompanied children is similarly affected by their misunderstanding of what the Rule actually does. Indeed, the text of the Rule plainly refutes Plaintiffs' argument. As the Rule itself states, it only applies to certain applications where an applicant is "barred from applying for or being granted asylum, does not merit a grant as a matter of discretion," or is ineligible on the merits of the applicant's claim. 91 Fed. Reg. 47,116-17. The Rule explains that the OYFD is the most common bar that prevents aliens from being able to apply for asylum. *Id*. at 47,112. However, because unaccompanied children "are not subject to the filing deadline and will therefore *not* be referred without interview" based on this metric, it is unlikely that the Rule will apply to unaccompanied children. *Id*. at 47,113 (emphasis added). In fact, the Rule clarifies this point, explaining that the Rule may not afford a child an interview "if an AO determines that the [unaccompanied child] is ineligible for asylum." *Id.* For instance, an asylum application "asks if the alien, spouse or child(ren), ever ordered, incited, assisted or otherwise participated in causing harm or suffering to any person because of his or her race, religion, nationality, membership in a particular social group or belief in a particular political opinion." *Id.* at 47,114. The Rule explains that "[a]n affirmative response to this question may indicate that the alien, spouse and/or child(ren), may be barred due to the persecution of others." *Id.* And in any event, USCIS is not yet even deploying the Rule to minor applicants. *See* Declaration of Brett H. Lassen (hereinafter, Lassen Decl.) ¶ 9, attached hereto as Exhibit A.

Lastly, Plaintiffs argue that the Rule "fails to consider what will happen to many asylum applications that are referred without interview." Pls.' Mot. 24. Plaintiffs assert that because the

immigration judges may "pretermit" asylum applications without a hearing, applicants referred to removal proceedings without an interview "will therefore never be able to present testimony in support of their applications in any forum." *Id.* at 24-25. Plaintiffs appear primarily concerned about the interplay between pretermission and removals under Asylum Cooperative Agreements. *Id.* at 15-16, 24-25. This suit is not a challenge to those separate policies. But in any event, Defendants addressed the possibility of pretermission before the immigration judge in the Rule. *See* 91 Fed. Reg. at 47,108 n.22. Although Plaintiffs disagree with how the agency weighed the possibility of pretermission, that is a policy dispute and does not support an arbitrary and capricious challenge or support the claim that the agency failed to consider the possibility of pretermission.

Furthermore, the asylum statute does not require a hearing or interview for every alien who applies for asylum, and particularly, does not require one for aliens potentially subject to Asylum Cooperative Agreements. *See* 91 Fed. Reg. at 47,107. The statute provides that the Attorney General and the Secretary of Homeland Security shall establish procedures for consideration of asylum applications, 8 U.S.C. § 1158(d)(1), and that such procedures shall provide that "in the absence of exceptional circumstances, the initial interview or hearing on the asylum application shall commence not later than 45 days after the date an application is filed," 8 § U.S.C. 1158(d)(5)(A)(ii). This language does not guarantee a hearing or interview—it merely provides an aspirational timeframe for when an interview should be conducted.

Even if the Court were to read the statute as requiring an interview or hearing, Plaintiffs' primary concern—the application of Asylum Cooperative Agreements to aliens without a hearing—falls outside the procedural statute. Section 1158(a)(2) defines aliens who are ineligible to even *apply* for asylum, and included in that list are aliens who may be removed under an Asylum Cooperative Agreement and aliens who apply for asylum more than one year after their last entry.

8 U.S.C. §§ 1158(a)(2)(A), (B). Because the requirements for agency procedures at 8 U.S.C. § 1158(d)(5)(A) only apply to those with *filed* applications, even accepting Plaintiffs' interpretation of section 1158(d)(5)(A)(ii) would not lead to the conclusion that the aliens Plaintiffs are concerned about would benefit from an interview requirement. In any event, such agreements may also be applied by USCIS, and, contrary to Plaintiffs' claims, immigration judges cannot order an alien removed under such an agreement if the alien has demonstrated it is more likely than not that the alien would be persecuted based on a protected ground or tortured in the country of removal. *See* 8 C.F.R. § 1240.11(h)(2)(iii).

Plaintiffs' challenges to the Rule do not demonstrate that it is either arbitrary or capricious because they are nothing more than a disagreement with DHS's policy choices. *See Inv. Co. Inst. v. Commodity Futures Trading Comm'n*, 720 F.3d 370, 380 (D.C. Cir. 2013) ("This argument amounts to nothing more than another policy disagreement with CFTC, so we must reject it."). As such, this Court should deny Plaintiffs' motion.

**d. The Referral IFR Considered Reasonable Alternatives.**

Finally, Plaintiffs assert that the Rule is arbitrary and capricious because DHS failed to consider alternatives to control its affirmative asylum backlog. Pls.' Mot. 21, 26. That is false. Although Plaintiffs acknowledge that the Rule articulates the alternatives that DHS contemplated, *id.* at 26, they complain that DHS only considered approaches that "are the status quo," such as revoking the interview right, truncating initial interviews into short screening interviews, or requiring additional information on the original Form I-589. *Id.* (citing 91 Fed. Reg. at 47,125).

To be regarded as rational, an agency must "consider significant alternatives to the course it ultimately chooses." *Allied Local & Reg'l Mfrs. Caucus v. EPA*, 215 F.3d 61, 80 (D.C. Cir. 2000). In doing so, an agency must "give a reasoned explanation for its rejection of such

alternatives." *Spirit Airlines, Inc. v. U.S. DOT*, 997 F.3d 1247, 1255 (D.C. Cir. 2021); *see Laclede Gas Co. v. Fed. Energy Regul. Com.*, 873 F.2d 1494, 1498 (D.C. Cir. 1989) (requiring consideration of "facially reasonable alternatives"). However, an agency is not required to consider "every alternative device and thought conceivable by the mind of man . . . regardless of how uncommon or unknown that alternative may have been[.]" *Motor Vehicle Mfrs.*, 463 U.S. at 51.

As Plaintiffs admit, Pls.' Mot. 26, DHS *did* consider alternative regulatory approaches, 91 Fed. Reg. 47,125-26, and explained why they fail to control the backlog as well as the Rule does. First, DHS considered "an alternative that would keep the pre-existing policies in place[.]" *Id.* at 47,125. But DHS determined that the volume of annual affirmative asylum applications has ballooned "significantly," and that this approach would not "result in any long-term measurable improvements to the backlog reduction, efficiency of operations, or the affirmative asylum system as a whole[.]" *Id*. Instead, DHS anticipates that the affirmative asylum backlog "would continue to grow and strain" USCIS's adjudicatory capacity and undermine the timely protection of individuals seeking refuge. *Id*. DHS next considered implementing a short-form, targeted affirmative asylum interview, which would clarify the applicant's basic claim, any filing prohibitions, and mandatory asylum bars. *Id*. However, DHS rejected this proposal because this process would still require scheduling interviews, arranging interpreter support, and expending AO time. *Id*. This alternative would continue to use "valuable DHS resources" that could instead be allocated to improve DHS's operational efficiencies and "more meaningfully" reduce the backlog. *Id*. Lastly, DHS considered strengthening its completeness check during the Form I-589 intake and expanding authority to reject incomplete applications at filing, by deploying rejection procedures used for other immigration forms. *Id*. DHS determined that this alternative would reduce the volume of low-quality applications entering the affirmative asylum system, and ensured

that scarce resources are dedicated to cases with only a few administrative flaws. *Id*. at 47,125-26. Notwithstanding, DHS passed on this alternative, because it noted that this option could inadvertently lead to rejecting filings from aliens "who face literacy or language challenges, and/or lack access to legal aid." *Id*. at 47,126.

Plaintiffs contend that DHS should have considered "obvious alternatives" to the Rule, Pls.' Mot. 26-27, including USCIS "create[ing] 'a multi-year operational plan' aimed at reducing the backlog that [delineated] 'clear priorities and goals, appropriate staffing levels, an analysis of funding, and how that funding will be generated.'" *Id.* at 27. But an entire overhaul of the affirmative asylum system would involve extensive resources and time, while the backlog will continue to fester. This alternative, which would require massive agency restructuring, is not a "facially reasonable alternative[.]" *See Laclede Gas Co.*, 873 F.2d at 1498 ("[W]here a party raises facially reasonable alternatives . . . the agency must either consider those alternatives or give some reason, within its broad discretion . . . for declining to do so.") (internal citations omitted).

On a smaller scale, Plaintiffs suggest that "USCIS prioritize affirmative asylum applications from people who are ineligible for other relief and would not see their applications mooted by such relief." Pls.' Mot. 26. But this alternative would require the agency to sort through an already massive (and growing) backlog and require the agency to provide AOs specialized training. Those efforts would divert agency resources from adjudicating pending cases in the backlog now. And such a shift would not reduce the backlog because it would not change the number of applications an individual AO could adjudicate. Plaintiffs' recommendation also included "focused interview guidance for specific caseloads so that asylum officers can specialize in particular types of asylum claims[.]" *Id*. at 27. This alternative, too, still usurps "valuable DHS resources," 91 Fed. Reg. at 47,125, because it would still require creating and providing specialized

training, scheduling interviews, securing interpreter support, and expending AO time. *Id*. Instead, these resources could be allocated to improve DHS's operational efficiencies and more meaningfully address the backlog. Plaintiffs' suggestions may be more realistic measures once the agency lassos the backlog. But as the backlog is growing at breakneck speed, Plaintiffs' suggestions would reroute "valuable DHS resources" that could be better allocated to "meaningfully reduce its backlog of pending cases." *Id*. Finally, Plaintiffs speculate that assigning AOs to "duties at the border" is contributing to the backlog. Pls.' Mot. 27. Plaintiffs fail to acknowledge that the AO's presence at the border is necessary to ensure the Government is properly identifying aliens for expedited removal, in accordance with 8 U.S.C. § 1225(b)(1)(A)(ii). When immigration enforcement encounters an alien at the border, asylum officers are vital to screening aliens for "credible fear," to determine what removal process (8 U.S.C. § 1229a or 8 U.S.C. § 1225(b)(1)(A)(i)) is appropriate for them. *See Make the Rd. New York v. Mullin*, 179 F.4th 16, 21 (D.C. Cir. 2026) ("If an alien expresses fear of persecution or torture, or an intent to apply for asylum, the alien is referred to a non-adversarial 'credible fear' interview with an asylum officer who decides whether there is a significant possibility that the alien could establish eligibility for asylum or related protection."). By regulation, other officers cannot conduct this screening. 8 C.F.R. § 208.30(b). And of all asylum officers nationwide, only approximately 6% are assigned to performing these vital duties, and are doing so virtually. Ex. A, Lassen Decl. ¶ 10. This meager percentage is hardly the resource diversion that Plaintiffs posit.

Accordingly, DHS "demonstrate[d] that the agency grappled with an important aspect of the problem before it or considered another reasonable path forward." *Spirit Airlines, Inc.*, 997 F.3d at 1255 (citation omitted). DHS's consideration of significant alternatives to the Rule signals that this Court should deem the Rule "rational." *See Allied Local & Reg'l Mfrs. Caucus*, 215 F.3d

at 80 ("To be regarded as rational, an agency must…consider significant alternatives to the course it ultimately chooses.").

**B. Plaintiffs Will Not Suffer Irreparable Harm in the Absence of Preliminary Relief.**

Plaintiffs fail to demonstrate that they will suffer irreparable injury if the Court does not stay the Rule. As the Supreme Court has held, "plaintiffs seeking preliminary relief [must] demonstrate that irreparable injury is *likely* in the absence of" that relief. *Winter*, 555 U.S. at 22. Plaintiffs must show both that their claimed harm is "certain and great," "actual and not theoretical," so that "there is a clear and present need for equitable relief to prevent irreparable harm." *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 7-8 (D.C. Cir. 2016) ("*Women Voters*") (citation modified). If Plaintiffs fail to demonstrate irreparable harm, the Court may deny the motion without considering the other *Winter* factors. *Fla. EB5 Invs., L.L.C. v. Wolf*, 443 F. Supp. 3d 7, 11 (D.D.C. 2020). Indeed, *Winter* teaches that Plaintiffs' failure to show "that irreparable harm is *likely* in the absence of" preliminary relief is by itself dispositive of a motion for that relief. 555 U.S. at 22.

Plaintiffs claim that the Rule "will interfere with Plaintiffs' core services by impairing their ability [] to provide essential services to their clients and to take on new clients." Pls.' Mot. 28 (internal quotations omitted). Plaintiffs also claim the Rule conflicts with their mission to ensure "that as many noncitizens as possible have meaningful access to the asylum process." *Id*. at 34. But Plaintiffs' claimed harm is not sufficient to establish standing, *see* Section I.A, *supra*, and continues to rest on their blatant mischaracterization of the Rule, which does not even show that the Rule undermines their mission. *See Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1430 (D.C. Cir. 1996) ("If a defendant's conduct does not conflict directly with an organization's stated goals, it is entirely speculative whether the defendant's conduct is impeding

the organization's activities."). Indeed, the Rule makes interviews in affirmative proceedings *discretionary*—interviews are still available if applicants satisfy their burden to show asylum eligibility when they apply for it and applicants may still retain representation in those interviews. Given the massive backlog of over one million asylum cases, there is still plenty for these organizations to do. Since the Rule has been implemented, USCIS is still conducting over 1,000 asylum interviews *per week*. Ex. A, Lassen Decl. ¶ 10. The Rule also does not affect an aliens' ability to file an affirmative asylum application with USCIS, which Plaintiffs maintain is still within the scope of their advocacy. *See, e.g.*, Morris Decl. ¶¶ 7, 9, 12-14; Kafele Decl. ¶¶ 8, 11. If anything, these arguments only reveal that the organizations' true goal is to continue the endless processing delays of the massive number of flimsy asylum applications in cases where the organizations are *not* involved, underscoring the lack of standing or harm to the organizational mission.

As for applicants later placed in removal proceedings, they can still pursue asylum in immigration court, a procedure that the Rule does not change. 91 Fed. Reg. 47,113. While Plaintiffs claim they will face irreparable injury because they cannot take on more representation in immigration court or lack those resources, the Rule itself does not impact Plaintiffs' existing scope of representation with their clients. Pls.' Mot. 28-29. At most this rule will shift some of Plaintiffs' caseload from USCIS to immigration courts. But this is nothing new. Prior to this rule, Plaintiffs already had processes for handling asylum applications referred to immigration court, *see, e.g.*, Morris Decl. ¶¶ 22-23, Kafele Decl. ¶ 27, because that is a foreseeable outcome that was always contemplated by the regulations. 8 C.F.R. § 1208.14(c). Plaintiffs cannot even quantify how much of their work will shift from affirmative to defensive asylum proceedings, since USCIS still retains discretion to interview an applicant. Plaintiffs' speculation about how the Rule will

affect their operations plainly undercuts their claimed harm because they cannot demonstrate a huge resource diversion—caused by the Rule—to earn injunctive relief. *See Centerline Logistics Corp., et al., v. United States Department of Labor, et al.*, No. 26-CV-2773 (BAH), 2026 WL 2415797, at *5 (D.D.C. Aug. 18, 2026) (collecting cases that stand for the proposition that speculation cannot serve as the basis for imminent harm). The Rule's indirect downstream effects of how Plaintiffs choose to allocate their resources is not a legally cognizable injury—much less irreparable harm demonstrating that preliminary relief is warranted. *See* Section I.A, *supra*; *see also US Ecology, Inc. v. United States DOI*, 231 F.3d 20, 25 (D.C. Cir. 2000) (finding that when appellants invested and then lost time and convenience in a project, "such injury, without more, is not enough" to establish standing). Plaintiffs similarly claim that they must expend considerable time and resources supplementing pending asylum applications. Pls.' Mot. 31-32. But that is neither new, nor does it ask Plaintiffs do something outside the scope of what should already be included when representing their clients in affirmative asylum proceedings. Applicants could always—and were in fact encouraged—to update their information at any time. 8 C.F.R. § 208.4(b)(1); *see* Section II.A.2.b, *supra*.

Plaintiffs feared self-inflicted financial injuries also do not constitute irreparable harm. Plaintiffs fail to establish that they will with any "certain[ty]" experience substantial financial harm that is "beyond remediation." *Women Voters*, 838 F.3d at 7-8. "Financial injury is only irreparable where no 'adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation.'" *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015). Plaintiffs do not meet this high bar. For example, Oasis claims to receive funding from a grant that reimburses them $2,000 for each affirmative asylum application filed, and $250 for representation at interviews. Kafele Decl. ¶ 16. Oasis claims that due to the Rule, they have decided

"to no longer conduct intakes for potential clients who cannot file their asylum application within one year of their last entry to the United States." *Id.* ¶ 14. Oasis filed 93 affirmative asylum cases in 2025, 67 of which were for clients who did not meet the OYFD. *Id.* Oasis claims under the Rule, the 67 cases they would not have filed equal "a loss of funding of at least $134,000," which would force them to lay off at least one staff member. *Id.* But Oasis' alleged future monetary losses are the type of resource diversion that do not survive *Alliance* and likewise does not weigh in the balance of harms. *See Arizona Alliance*, __F.4th__, 2026 WL 2277101, at *7 (finding that after *Alliance*, it is not enough to allege that a new policy "caused it to divert resources" but the policy must "'directly affect[] and interfere[] with' the plaintiff organizations' core activities") (quoting *Alliance*, 602 U.S. at 395). Moreover, these claims are speculative and based on their continued mischaracterization of the Rule: that it categorically eliminates affirmative asylum interviews for aliens who file outside the OYFD. That is wrong. The Rule accounts for the exceptions to the OYFD, including the existence of changed or extraordinary circumstances. 91 Fed. Reg. 47,106. The Form I-589 asylum application instructs aliens to provide relevant information and evidence related to their belated filing. *See* 8 C.F.R. § 1208.3(c)(3). That evidence should be apparent at the time of filing if the changed circumstances are the *reason* for filing the asylum application. Further, Oasis's declaration does not explain why Oasis cannot continue to support affirmative asylum applicants by initiating the process and submitting a fulsome application, regardless of whether an interview is held. Kafele Decl. ¶ 16. Oasis's own decision to decrease their client intake is not traceable to the Rule. Indeed, with over a million backlogged asylum claims, and 132,167 applications filed annually, 91 Fed. Reg. at 47,103, it is hard to see how Oasis cannot pick up an additional 67 cases. Whether USCIS interviews an applicant does not hinder an alien from

applying for asylum in the first place, or impede Oasis from representing the alien in that process.

Florence Project likewise claims the Rule imposes severe harm on their work with unaccompanied children. Pls.' Mot. 29, 32; Avila-Cimpeanu Decl. ¶¶ 14-16, 43-44. This argument does not justify staying the Rule as a whole, and it too assumes that its minor clients will be categorically referred to immigration court. Avila-Cimpeanu Decl. ¶ 25. But the Rule only contemplates that USCIS would refer a child to immigration court without an interview in very limited circumstances, like if the child participated in the persecution of others. *See supra* Section IV.B.1.b. And in any event, USCIS is not yet even deploying the Rule to minor applicants. Ex. A, Lassen Decl. ¶ 9.

The other organizational Plaintiffs, HIAS and Immigration Equality, express only a general fear that the Rule will jeopardize their funding, without quantifying that the loss of funding will be actual, great, or imminent. Brown Decl. ¶ 23 (stating "because of the need to put more resources toward cases, we are not likely going to be able to serve as many clients with the same amount of funding and staff capacity"); Morris Decl. ¶ 28 (indicating that if Immigration Equality cannot continue supporting pro bono attorneys who donate legal services and $500,000-$600,000 a year "because of the rule, it would be devastating to our budget"). Plaintiffs HIAS and Immigration Equality have not demonstrated they will, without preliminary relief, likely suffer clear, great, actual, imminent financial harm that cannot be remediated. *See Alliance*, 602 U.S. at 405 (explaining that an organization that has not suffered a concrete injury caused by a defendant's action cannot "spend its way into standing" simply by expending money to gather information and advocate against the defendant's action); *see Am. Soc. For the Prevention of Cruelty to Animals v. Feld Entertainment, Inc.*, 659 F.3d 13, 25 (D.C. Cir. 2011) (finding that under D.C. Circuit case law, "an organization's diversion of resources to litigation or to investigation in anticipation of

litigation is considered a 'self-inflicted' budgetary choice that cannot qualify as an injury in fact for purposes of standing.").

In sum, Plaintiffs' articulation of "injury" amount to the consequences of their own voluntary choices, not direct results of the Rule. Because Plaintiffs do not show that they will likely suffer irreparable harm in the absence of preliminary relief, they are not entitled to that relief. *Winter*, 555 U.S. at 22.

**C. The Balance of Equities Weigh Against Granting a Stay.**

When the Government is the opposing party, the balance of equities and public interest factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Because these factors favor Defendants, a stay is not warranted. Plaintiffs claim otherwise because they assume the Rule is unlawful and argue that they have demonstrated a "strong likelihood of success on the merits." Pls.' Mot. 33-34. But these are merely Plaintiffs' legal conclusions and do not address the relevant question: "In evaluating [the balance of equities and public interest factors], courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Nat'l Fair Hous. All. v. Carson*, 330 F. Supp. 3d 14, 63 (D.D.C. 2018) (citation modified). Here, Plaintiffs—who are four legal service organizations—argue they will suffer financial hardship as a result of the Rule because they will represent fewer clients in affirmative asylum proceedings, their attorneys' work will become more complicated, and the Rule is contrary to the Plaintiffs' mission statements. *See* Pls.' Mot. 28-34; *see also supra* Section II.B. Tacitly recognizing the weak nature of this argument, they shift focus to their clients' purported harm. But since their clients are not parties to this suit, this theory fails to move the needle here.

Moreover, Plaintiffs' claimed harm depends on a fundamental mischaracterization of the Rule. Plaintiffs incorrectly contend that the Rule will "thwart[] affirmative asylum claims that

otherwise would be granted." Pls.' Mot. 34. They fail to acknowledge that the Rule would not affect meritorious claims or strong applications, *see* 91 Fed. Reg. at 47,102, and that the aliens with long-standing pending applications "thrust[]" into removal proceedings are those who do not meet these criteria. *See* 91 Fed. Reg. at 47,111 (explaining that referral case types include aliens: barred from applying for or receiving a grant of asylum; who do not merit a grant as a matter of discretion; or who are ineligible on the merits). The public is harmed by allowing the latter group to live freely within the country for many years, while forcing aliens deserving of relief to languish in legal limbo. And although some applications that USCIS could have granted may be referred to immigration court, DHS explained that "this will be a rare occurrence because an AO still reviews the record and evidence before a final adjudication and USCIS still retains the ability to offer an interview on any application, including where there is evidence of overcoming a bar." 91 Fed. Reg. at 47,104. Even if such a referral happens, an alien can still apply for relief in removal proceedings, including asylum, and for relief that USCIS could not adjudicate. *See* Section I (Statutory Framework) at p.6, *supra*.

Defendants' interests in keeping the Rule in place far outweigh these "harms." To begin, these changes permit USCIS to reduce "adjudicative resources expended on processing non-meritorious claims, free up interview slots for cases based on scheduling priorities [. . .] and focus its limited resources on applications within its jurisdiction that require eliciting testimony for adjudication." 91 Fed. Reg. at 47,102. The consequences of inaction are significant. As the Rule notes, "[t]he volume of annual affirmative asylum applications USCIS receives has grown significantly in the past five years, reaching a high of 465,810 in 2023." *Id.* at 47,108. The average processing time for Form I-589 reached 7.3 years in fiscal year 2025, and DHS estimates the annual average processing time over the past five years is 5.8 years. *Id.* at 47,121-22. Changes in

regulation are "necessary for the agency to keep up with receipts of incoming asylum applications and to efficiently process a backlog of over 1.4 million affirmative asylum cases." *Id.* at 47,109.

Scheduling an interview for a threadbare application usurps valuable agency resources. USCIS must assign an asylum officer time to prepare for the interview, conduct the interview, and evaluate the testimony and evidence gathered at the interview when making a decision; in doing so, USCIS also must expend interpreter resources and administrative resources, including scheduling, file preparation, notice generation, additional file and case tracking, and facility coordination. Ex. A, Lassen Decl. ¶ 12. Every interview slot used for an applicant that failed to meet their eligibility burden at the outset takes away an interview slot (and precious agency resources) from an applicant who followed regulatory and agency instructions. *Id.* ¶ 13.

These changes are also necessary to address public safety concerns. For example, USCIS can now issue a Notice to Appear more quickly when appropriate (instead of waiting for ICE to do so), which allows USCIS to timely identify and place dangerous aliens in removal proceedings. *See* 91 Fed. Reg. at 47,110. Under prior practice, aliens in criminal custody who were not issued a Notice to Appear could not generally be interviewed, and their applications could not generally be adjudicated, until they were released from criminal custody. *Id.* The Rule allows USCIS to refer these cases without an interview rather than wait for criminal proceedings and detention to end. *Id.* This change will address the "significant delays in processing both national security and public safety concerns due to staffing, resources, and USCIS dependency on ICE, and other law enforcement and intelligence community responsiveness." *Id.*; *see Nken*, 556 U.S. at 436 (finding a heightened public interest where "the alien is particularly dangerous, or has substantially prolonged his stay by abusing the processes provided to him.").

Finally, the DHS Secretary has broad authority to implement procedures and conditions

governing asylum applications. 8 U.S.C. §§ 1158(d)(1), (d)(5)(B). A stay of the Rule would "deeply intrude[] into the core concerns of the executive branch," *Adams v. Vance*, 570 F.2d 950, 954 (D.C. Cir. 1977), including the "efficient administration of the immigration laws," *Innovation Law Lab v. McAleenan*, 924 F.3d 503, 510 (9th Cir. 2019). *See also Legalization Assistance*, 510 U.S. at 1305-06 (O'Connor, J., in chambers) (warning against "intrusion by a federal court into the workings of a coordinate branch of the Government"). In sum, Defendants' legitimate and important interests in reducing the significant affirmative asylum backlog and safeguarding public safety significantly outweigh Plaintiffs' alleged injuries of financial harm and complication of attorneys' casework.

**1. If the Court Chooses to Grant Preliminary Relief, Such Relief Must be Narrowly Tailored to Plaintiffs.**

If the Court grants Plaintiffs preliminary relief, it should narrowly tailor it to Plaintiffs. Here, Plaintiffs seek a § 705 stay. Section 705 is subject to equitable principles, and was designed "to reflect existing law[,] . . . not to fashion new rules of intervention for District Courts." *Sampson*, 415 U.S. at 68 n.15. When a court crafts equitable relief, it is bound by "the rule that injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Trump v. CASA, Inc.*, 606 U.S. 831, 862 (2025) (Thomas, J., concurring) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)). Accordingly, "the question is not whether an injunction offers complete relief to everyone potentially affected by an allegedly unlawful act; it is whether an injunction will offer complete relief to the plaintiffs before the court." *Id.* at 852. Keeping with that longstanding principle, the House Report that accompanied the APA explained that relief under § 705 should "normally, if not always, be limited the parties complainant." H.R. Rep. No. 79-1980, at 277 (1946). More broadly, the Supreme Court has recently instructed that "[w]hen interpreting a statute that authorizes federal courts to grant" preliminary relief, courts "do

not lightly assume that Congress has intended to depart from established [equity] principles." *Starbucks Corp. v. McKinney*, 602 U.S. 339, 346 (2024) (citation omitted). Thus, section 705's plain language requires the Court to consider relief that merely "preserve[s] status or rights pending conclusion of the review proceedings" and is tailored "to the extent necessary to prevent irreparable injury." In limiting such relief "to the extent necessary to prevent irreparable injury," 5 U.S.C. § 705, the statue directs courts to apply traditional equitable principles, which include tailoring relief to be no more intrusive than necessary to prevent irreparable harm to the parties. Thus, rather than vacating altogether USCIS's ability to refer certain affirmative asylum applications to EOIR without an interview, any preliminary relief must be cabined to the parties presently before the Court.

**2. If The Court Chooses to Grant Preliminary Relief, It Should Require Plaintiff to Post Sufficient Bond and Should Enter a Stay.**

If the Court issues any injunctive relief, Defendants respectfully request the requirement of a reasonable bond, considering the financial damages and other costs that a preliminary injunction will impose on Defendants. Under Federal Rule of Civil Procedure 65(c), courts may grant preliminary relief "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained" by Defendants in the event that they are "found to have been wrongfully enjoined or restrained." FED. R. CIV. P. 65(c). To that end, the Fourth Circuit has directed that "[i]n fixing the amount of an injunction bond, the district court should be guided by the purpose underlying Rule 65(c), which is to provide a mechanism for reimbursing an enjoined party for harm it suffers as a result of an improvidently issued injunction or restraining order." *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 n.3 (4th Cir. 1999). For that reason, "[t]he amount of the bond . . . ordinarily depends on the gravity of the potential harm to the enjoined party." *Id.* Here, Plaintiffs seek to enjoin USCIS from addressing the affirmative

asylum backlog by referring certain asylum cases to immigration court. Restricting USCIS's ability to address the affirmative asylum backlog throughout the pendency of this case is precisely the harm that Rule 65(c) exists to cure. Accordingly, the Court should require Plaintiffs to post bond before obtaining a stay against Defendants for the pendency of this case.

Defendants also request that the Court stay the issuance of a stay pending appeal, stay relief as to non-parties or, at minimum, enter a fourteen-day administrative stay, to allow Defendants to determine whether to file an appeal and seek emergency appellate relief.

## CONCLUSION

For these reasons, this Court should deny the Plaintiffs' request for a stay of the Referral IFR.

DATED: September 15, 2026

Respectfully Submitted,

BRETT SHUMATE
*Assistant Attorney General*
Civil Division

DREW C. ENSIGN
*Deputy Assistant Attorney General*

AUGUST FLENTJE
*Deputy Director*

CATHERINE RENO
*Assistant Director*

SHELBY WADE
MIA S. BONADIES
ALINA SALGADO
*Trial Attorneys*

*/s/ Caroline McGuire*
CAROLINE McGUIRE
Senior Litigation Counsel
NY Bar #5854823
United States Department of Justice
Office of Immigration Litigation
P.O. Box 868, Benjamin Franklin Station
Washington. D.C. 20044