**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IMMIGRATION EQUALITY, *et al*.,<br><br>*Plaintiffs*,<br><br>v.<br><br>MARKWAYNE MULLIN, *et al.*,<br><br>*Defendants*. | Case No.: 1:26-cv-2921-TSC |

**PLAINTIFFS' REPLY MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR STAY OF EFFECTIVE DATE OF ADMINISTRATIVE ACTION**

## INTRODUCTION

The interim final rule titled *Affirmative Asylum Referrals Without Interview*, 91 Fed. Reg. 47101 (July 28, 2026) (Summary Referral IFR or IFR), fails the most basic requirements of the Administrative Procedure Act (APA). Even though the Summary Referral IFR expressly revokes a regulatory right, Defendants issued it without notice and comment. And the IFR, which applies to both pending and future applications, completely ignores numerous significant aspects of the problem before the agency—including long-settled reliance interests and severe effects on unaccompanied children and other applicants. While the IFR masquerades as a backlog-reduction measure, it also ignores every method of reducing the affirmative asylum backlog that does not involve attacking the rights and interests of noncitizens.

Defendants' opposition to a stay of the Summary Referral IFR under 5 U.S.C. § 705 is little more than a smokescreen. Defendants attack Plaintiffs' standing without ever mentioning most of the relevant facts—facts that place Plaintiffs in the heartland of organizational standing under Supreme Court precedent. In attempting to vindicate the issuance of the IFR without notice and comment, Defendants ignore the law governing application of the foreign-affairs exception and seek to evade the IFR's clear revocation of the regulatory right to an interview through a convoluted word game. Given that the IFR fails to discuss the significant issues Plaintiffs identified, Defendants repeatedly try to justify the IFR's choices via impermissible, post-hoc rationalizations by counsel. Although Defendants also repeatedly attempt to downplay the IFR as "limited," it is universal: the IFR permits *any* affirmative application to be referred without an interview on *any* basis that can support a referral. And Defendants' other scattershot arguments rest on misreadings of authority and have been repeatedly rejected by the courts.

The IFR is unlawful and should be stayed pending final judgment in this case.

# ARGUMENT

## I. No Threshold Issues Bar Plaintiffs' Request for Relief

Defendants make various threshold arguments, none of which has merit. Plaintiffs, service organizations whose core work will be significantly harmed by the Summary Referral IFR, have standing to challenge the IFR under binding precedent. Plaintiffs also fall within the zone of interests of the Immigration and Nationality Act (INA), as numerous courts in this district have held. Finally, a stay under 5 U.S.C. § 705 remains appropriate after an agency action takes effect.

### A. Plaintiffs Have Standing

#### 1. Plaintiffs have shown injury-in-fact

Plaintiffs have demonstrated that they have standing because the Summary Referral IFR interferes with their core business activities. *See FDA v. All. for Hippocratic Med.,* 602 U.S. 367, 395 (2024) (*Alliance*); *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982); Mot. 27-33. Plaintiffs' representation models involve a large number of affirmative asylum cases before USCIS and relatively few defensive asylum cases in immigration court—while the Summary Referral IFR will shift many thousands of cases from USCIS to the immigration courts. Mot. 28. As Plaintiffs have explained, this fundamental shift will prevent them from continuing to represent many existing clients whose cases are referred to immigration court, Mot. 27-28; prevent them from taking on entire categories of clients, *id.* at 28; reduce the number of clients they can serve because cases in immigration court require far more time and resources than cases before USCIS, *id.* at 29-30; hamstring their ability to implement their pro bono partnership programs, *id.* at 8, 30; require the updating of all pending applications almost immediately and also on an ongoing basis, *id.* at 30-31; reduce the number of future clients they can serve, *id.* at

30-32; cause financial harm, *id.* at 32; force significant diversions of resources, *id.* at 32-33; and conflict directly with their missions, *id.* at 33.

Defendants almost entirely ignore these effects. Instead, Defendants assert that Plaintiffs fall outside the bounds set by *Alliance* and *Havens* by contending that Plaintiffs rely on the mere fact that the IFR "changes *if* USCIS will interview certain" asylum applicants. Opp'n 12. To the contrary, Plaintiffs' standing rests on the massive harm that change—and related changes in the IFR—will wreak on their operations and their ability to serve current and future clients. *See, e.g.*, Dkt. 4-2, Morris Dec. ¶¶ 27-28; Dkt. 4-3, Kafele Dec. ¶ 39; Dkt. 4-4, Brown Dec. ¶ 15; Dkt. 4-5, Avila-Cimpeanu Dec. ¶¶ 14, 44-45. Plaintiffs are in the same position as the plaintiff organization in *Havens*: they are service organizations, and the IFR "directly affect[s] and interfere[s] with [their] core business activities." *Alliance,* 602 U.S. at 395. Thus, far from relying on a theory under which "any interest group would have standing to challenge any rule change," Opp'n 12, Plaintiffs' standing relies on the fact that the IFR poses a severe threat to their service models.

Unable to force Plaintiffs' theory outside the framework of *Alliance* and *Havens*, Defendants next misread *Alliance*. That case did not, as Defendants contend, hold that harm to an organization's core services is insufficient for standing. Opp'n 13. Rather, it held that an "issue-advocacy organization" that "has not suffered a concrete injury … cannot spend its way into standing simply by expending money to gather information and advocate against" a change. *Alliance*, 602 U.S. at 394-95. The Court in *Alliance* then expressly preserved standing for situations—like this one—in which an agency action "directly affect[s] and interfere[s] with" the core services provided by a service organization. *Id.* at 395. Numerous post-*Alliance* decisions from courts in this circuit, therefore, hold that organizations have standing to challenge agency

actions that make "client representation more time-consuming or difficult." Opp'n 15; *see, e.g.*, *E.Q. v. DHS*, 835 F. Supp. 3d 221, 242-46 (D.D.C. 2026); *Amica Ctr. for Immigrant Rts. v. EOIR*, 822 F. Supp. 3d 119, 140-49 (D.D.C. 2026) (*Amica*); *Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem*, 793 F. Supp. 3d 19, 66-69 (D.D.C. 2025), *aff'd*, 174 F.4th 81 (D.C. Cir. 2026), *pet'n for cert. filed* (*RAICES*).

Defendants' remaining arguments are aimed at straw men. Plaintiffs' detailed declarations demonstrate that the effects of the Summary Referral IFR go far beyond the need to undertake "educational and legislative initiatives," *Nat'l Taxpayers Union v. United States*, 68 F.3d 1428, 1434 (D.C. Cir. 1995), or to "understand[] or respond[] to a new government rule," Opp'n 13. Indeed, Plaintiffs have shown that the IFR—among many other things—"substantially endanger[s]" Immigration Equality's "business model" and threatens Oasis's existence. *See* Morris Dec. ¶ 28; Kafele Dec. ¶ 29; Mot. 27**.** Defendants' disregard of that evidence cannot make it disappear.

Defendants next mischaracterize Plaintiffs' standing theory as assuming that the Summary Referral IFR "categorically eliminates interviews." Opp'n 24. None of Plaintiffs' statements implies or rests on that premise. Rather, Plaintiffs theory is rooted in the indisputable fact that Defendants will refer *some* cases—including many cases in which the application was filed after the general one-year deadline—without interview under the IFR. For example, Oasis cannot represent even a fraction of its 1,100 affirmative asylum cases in immigration court. Mot. 28-29 (citing Kafele Dec. ¶¶ 20, 27). As another example, the referral without interview of *any* of their clients' cases will reduce the number of clients they can serve by forcing those cases into a more time-consuming, resource-intensive forum. *See* Mot. 29-30 (citing declarations). Defendants' own declaration makes clear that the IFR has already resulted in the summary

referral of more than 1,000 cases. Decl. of Brett H. Lassen (Lassen Dec.) ¶ 8. And given Plaintiffs' detailed declarations, Defendants fare no better with their conclusory assertion that Plaintiffs cannot show that the IFR "requires them to reshape their business practices" absent a "categorical[] eliminat[ion of] asylum interviews." Opp'n 14.[1]

Defendants finally engage with one of the many ways in which the IFR harms Plaintiffs—but only by mischaracterizing Plaintiffs' statements. Plaintiffs do not assert standing on the supposed basis that "their longstanding practice has been to submit threadbare asylum applications and to wait until a USCIS interview is scheduled before submitting meaningful evidence." Opp'n 15. The relevant portion of Plaintiffs' argument instead proceeds from the fact that, given the unpredictable and often years-long wait before USCIS acts on an application, they "routinely *update*[]" the evidence after an interview is finally scheduled. Mot. 30 (emphasis added) (citing declarations). Thus, far from somehow "abusing gaps in the system" or "fail[ing] to effectively advocate on their clients' behalf," Opp'n 15-16—baseless *ad hominem* accusations—Plaintiffs' practice is a response to Defendants' longstanding failure to prioritize affirmative asylum adjudications. *See e.g.*, Kafele Dec. ¶ 29. Indeed, governing regulations expressly authorize Plaintiffs' approach, requiring asylum officers to consider any evidence filed "at least 14 calendar days in advance of the interview date." 8 C.F.R. § 208.9(e); *see also, e.g.*, 91 Fed. Reg. at 47110 n.38 (acknowledging that the interview is an opportunity to submit additional evidence); USCIS, *Interviewing – Eliciting Testimony* (Feb. 5, 2025) (paper application "only outlines the minimum information required to establish eligibility").[2]

---

1 Defendants' suggestion that the IFR limits the cases it allows them to refer, and the bases for such referrals, Opp'n 14, is false. *See infra* pp. 19-20. And their attempt to rely on 8 C.F.R. § 1208.14(c)(1), *see* Opp'n 14, rests on a fundamental mischaracterization of that regulation. *See infra* p. 7.

2 https://tinyurl.com/yafy53y5.

Finally, Defendants argue that the IFR may actually benefit Plaintiffs' clients. Opp'n 26.[3] That argument amounts to nothing more than unsupported speculation that Plaintiffs' comprehensive declarations are wrong. Such handwaving deserves no weight, and Plaintiffs have satisfied the injury-in-fact requirement.

**2. Plaintiffs have shown causation and redressability**

Defendants' arguments on causation and redressability also rest on a misreading of Plaintiffs' declarations and arguments. After again wrongly contending that Plaintiffs believe the IFR will result in the summary referral of every single application, Opp'n 17; *see supra* pp. 4-5, Defendants assert that Plaintiffs' clients "likely would have ended up in removal proceedings anyway." Opp'n 17. That assertion treats one aspect of Plaintiffs' basis for standing—their inability to represent many existing affirmative-asylum clients in immigration court, *see* Mot. 28-29—as Plaintiffs' *only* argument. It would therefore not defeat Plaintiffs' standing even if correct.

Defendants' assertion is also false. Both the IFR and Defendants' brief treat a missed deadline as a clear hallmark of a lack of merit. 91 Fed. Reg. at 47103, 47112-13, 47116-17, 47122, 47125**;** Opp'n 17. But 97% of Plaintiff Oasis's clients who missed the one-year filing deadline received asylum from USCIS following an interview, Kafele Dec. ¶ 19, and all four Plaintiffs have long track records of success at USCIS—which explains why the Plaintiffs have far fewer cases in immigration court than before USCIS, *see* Opp'n 17. Defendants never engage with Plaintiffs' showing that there are good reasons for this success. *See* Mot. 29 (citing declarations). It is therefore the IFR, not any supposed systematic deficiency in the asylum

---

[3] Plaintiffs did not concede this point. *Contra* Opp'n 16. Plaintiffs instead made clear that Defendants' unexplained, unsupported assumption that some people referred to immigration court would benefit from faster grants contradicts Defendants' assumption that the same cases would *not* be granted following an interview and fails to account for the multimillion case backlog in the immigration courts. Mot. 25 n.18.

applications Plaintiffs file on behalf of their clients, that will put Plaintiffs in the untenable position of being unable to continue representing existing clients whose cases are referred to immigration court under the IFR.[4]

In their final attempt to resist Plaintiffs' standing, Defendants rely on a D.C. Circuit opinion holding that redressability is absent if a stay under 5 U.S.C. § 705 "would not affect" the government's "authority to continue" taking the same steps permitted by the challenged agency action. *Coal. for Humane Immigrant Rts. v. Mullin*, 185 F.4th 1275, 1282 (D.C. Cir. 2026). Here, Defendants contend that a Department of Justice regulation—8 C.F.R. § 1208.14(c)(1)—provides that continuing authority. *See* Opp'n 18-19.

That argument misreads the regulation in question. Section 1208.14(c)(1) states that "[i]f the asylum officer … does not grant asylum to an applicant *after an interview is conducted*," then the asylum officer "shall refer … to an immigration judge" an "applicant who appears to be inadmissible or deportable." 8 C.F.R. § 1208.14(c)(1) (emphasis added); *see id.* § 1208.14(c)(4) (same as to applicants with terminated or expired parole).[5] Put simply, § 1208.14(c) cannot be read to provide the authority to refer cases without an interview. Only the IFR does that.

---

[4] Defendants' citation to *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562 (1992), *see* Opp'n 16, likewise lacks merit. The Supreme Court there suggested that it is difficult to establish standing when causation and redressability "hinge on the response of" one or more third parties. *Lujan*, 504 U.S. at 562. Defendants do not even attempt to assert that Plaintiffs' standing theory depends on actions by non-parties to this lawsuit. It does not.

[5] The regulation also applies if "the applicant is deemed to have waived the applicant's right to an interview" by failing to appear or failing to provide biometrics. 8 C.F.R. § 1208.14(c); *see id.* § 1208.10.

### B. The INA's Zone of Interests Includes Plaintiffs

Contrary to Defendants' argument, *see* Opp'n 19-21, Plaintiffs—as nonprofits whose missions are to serve noncitizens seeking asylum—fall squarely within the zone of interests of the INA. The zone-of-interests test is "not especially demanding"; it bars only actions where "a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress authorized that plaintiff to sue." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 130 (2014) (quotation omitted). Further, the "benefit of any doubt goes to the plaintiff," meaning that the test is satisfied so long as the plaintiff "arguably" falls "within the zone of interests to be protected or regulated by the statute." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224-25 (2012) (quotation omitted).

Courts in this district have repeatedly rejected Defendants' arguments and held that nonprofit legal service providers who serve noncitizens satisfy this permissive test. *See, e.g.*, *RAICES*, 793 F. Supp. 3d at 75-76; *Nw. Immigrant Rts. Proj. v. USCIS*, 496 F. Supp. 3d 31, 52 (D.D.C. 2020); *Capital Area Immigrants' Rights Coal. v. Trump*, 471 F. Supp. 3d 25, 43-44 (D.D.C. 2020) (*CAIR Coal.*); *O.A. v. Trump*, 404 F. Supp. 3d 109, 143-45 (D.D.C. 2019). Indeed, those courts have had "no trouble" reaching that conclusion, because the "daily work" of Plaintiffs and similar nonprofits "is governed by the INA" and because "the INA contemplates an important role for [such] organizations like Plaintiffs." *Cath. Legal Immigr. Network, Inc. v. EOIR*, 513 F. Supp. 3d 154, 171 (D.D.C. 2021) (citing *Nw. Immigrant Rts. Proj.*, 496 F. Supp. 3d at 51-52). The same result follows here. The INA expressly contemplates a role for nonprofit organizations to provide legal services to people seeking asylum, *see, e.g.*, 8 U.S.C. § 1158(d)(4), and all of the Plaintiffs have shown that the IFR impedes their ability to provide those services.

Defendants' reliance on Justice O'Connor's opinion in *INS v. Legalization Assistance Project of Los Angeles County Federation of Labor*, 510 U.S. 1301, 1302 (1993) (O'Connor, J., in chambers); *see* Opp'n 20, is misplaced. That non-precedential opinion expressed the view "of only a single Justice" about "a statute other than the INA." *CAIR Coal.*, 471 F. Supp. 3d at 43. Moreover, since then, the Supreme Court has consistently made clear that the zone-of-interests test is less demanding. *See, e.g., Lexmark*, 572 U.S. at 130; *Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co.*, 522 U.S. 479, 492 (1998).[6] And *Federation for American Immigration Reform, Inc. v. Reno*, 93 F.3d 897 (D.C. Cir. 1996), which involved an anti-immigration advocacy organization, is simply inapposite.

Finally, Defendants argue that *United States v. Texas*, 599 U.S. 670 (2023), displaced the zone-of-interests standard. Opp'n 21. Not so. That decision relied on an entirely separate line of cases holding that plaintiffs may not "contest the policies of [a] prosecuting authority when [they themselves are] neither prosecuted nor threatened with prosecution." 599 U.S. at 677 (quotation omitted). This case does not involve prosecutorial decisions, and *Texas* is therefore inapposite.

### C. Section 705 Permits a Stay

Defendants' argument that 5 U.S.C. § 705 does "not authorize a postponement of" the Summary Referral IFR, Opp'n 21, contradicts the plain text of that statute. Section 705 allows the courts to "issue all necessary and appropriate process to postpone the effective date of an agency action or to *preserve status or rights* pending conclusion of the review proceedings." 5 U.S.C. § 705 (emphasis added). That language expressly allows this Court to preserve the status quo that preceded the IFR—and the status and rights of Plaintiffs and their clients—pending the

---

6 Defendants' assertion that organizations may not sue if a statute provides that only individuals may do so, Opp'n 19-20, begs the question. Defendants have identified no statute that prevents organizations from bringing this case, and none exists.

outcome of this proceeding. Courts in this district, and across the country, have therefore routinely stayed already-effective agency actions under § 705. *See, e.g.*, *Cabrera v. U.S. Dept. of Lab.*, 792 F. Supp. 3d 91, 106 (D.D.C. 2025); *Kingdom v. Trump*, 2025 WL 1568238, at *5 (D.D.C. June 3, 2025); *Afr. Communities Together v. Lyons*, 799 F. Supp. 3d 362, 383 (S.D.N.Y. 2025) (citing further cases).

Defendants' attempts to evade the plain language of § 705 fall flat. Defendants cite cases in which courts have said *an agency* may not stay already-effective action under § 705. *See, e.g.*, *Ctr. for Biological Diversity v. Regan*, 597 F. Supp. 3d 173, 204-05 (D.D.C. 2022) (emphasis added). But contrary to Defendants' assertion, Opp'n 22, the language of § 705 provides broader authority to courts than to agencies. An agency is empowered only to "postpone the effective date of action taken by it," not to "issue all necessary and appropriate process … to preserve status or rights." 5 U.S.C. § 705; *see, e.g.*, *Afr. Communities Together*, 799 F. Supp. 3d at 383. And because the latter language gives this Court authority to stay the IFR, Defendants' riff on the meaning of "postpone," Opp'n 21-22, is beside the point.

Finally, Defendants contend that the relevant status quo for purposes of a Section 705 stay is the current situation, in which the Summary Referral IFR is in effect. Opp'n 22-23. But setting aside an agency action means "re-establishing the status quo absent the unlawful agency action." *League of Women Voters v. DHS*, 835 F. Supp. 3d 79, 138 (D.D.C. 2026) (cleaned up) (discussing vacatur); *see Make the Rd. N.Y. v. Mullin*, 179 F.4th 16, 32 (D.C. Cir. 2026) ("A stay is just the preliminary form of vacatur …."). [7] Were it otherwise, an agency could ensure that

---

[7] The cases on which Defendants rely, Opp'n 22, tellingly concern the very different question of when a temporary restraining order may be immediately appealed. *See OPM v. Am. Fed'n of Gov't Emps.*, 473 U.S. 1301 (1985) (Burger, C.J., as circuit justice); *Ne. Ohio Coal. for Homeless & Serv. Emps. Int'l Union, Local 1199 v. Blackwell*, 467 F.3d 999 (6th Cir. 2006).

unlawful rules remain in place for a significant time simply by making them immediately effective, even if immediate effect is not lawful. The relevant status quo here is therefore the pre-IFR situation, in which USCIS guaranteed an interview to every affirmative asylum applicant.

## II. Plaintiffs Are Likely to Succeed on the Merits of Their Claims

The Summary Referral IFR is unlawful. Defendants issued it without undertaking the notice-and-comment procedures required by the APA. And the IFR substantively violates the APA because it fails to consider a host of significant issues and alternative approaches.

### A. The Summary Dismissal IFR Required Notice and Comment

#### 1. The foreign-affairs exception does not apply

Plaintiffs have shown that the Summary Referral IFR does not implicate a "foreign affairs function of the United States," 5 U.S.C. § 553(a)(1), and therefore does not fall under the foreign-affairs exception to the APA's notice-and-comment requirement. That exception covers only agency actions that "clearly and directly involve actions or activities characteristic to the conduct of international relations." *E.B. v. U.S. Dep't of State*, 583 F. Supp. 3d 58, 65 (D.D.C. 2022). The Summary Referral IFR, which does nothing more than alter the regulations that apply to asylum applications filed within the United States, cannot satisfy that test. *See* Mot. 11-13.

Defendants' arguments do not even begin to show otherwise. They rely on the categorical decree by the Secretary of State that *all* regulations touching on "the status, entry, and exit of people" are subject to the foreign-affairs exception. 90 Fed. Reg. 12200, 12200 (Mar. 14, 2025); *see* Opp'n 29-30. But Defendants do not argue that such a decree purporting to interpret the APA deserves deference from this Court—much less cite authority for any such proposition. It does not. *See* Mot. 12-13.

Furthermore, Defendants make no attempt to ground the Secretary's decree in the APA's text, and the decree misstates the law. "[U]nder the law of this Circuit, the foreign affairs function exemption covers heartland cases in which the rule itself directly involves the conduct of foreign affairs." *E.B.*, 583 F. Supp. 3d at 65. Courts in this circuit thus have held that many immigration regulations, including those that govern access at the U.S. border and have the direct consequence of removal from the United States, do *not* implicate the foreign-affairs exception. *See* Mot. 12 (citing cases). And the Secretary's decree also flies in the face of the rule that exceptions to notice-and-comment procedures must be "narrowly construed and reluctantly countenanced." *N.J. Dep't of Envtl. Prot. v. EPA*, 626 F.2d 1038, 1045 (D.C. Cir. 1980).

The result would not change even if the Secretary's decree had correctly stated governing law. Contrary to Defendants' unexplained assertion, the IFR is not "directly connected to controlling the status and entry and exit of people across the borders of the United States." Opp'n 29 (quotation omitted). The IFR involves one main legal shift—it removes the regulatory right to an asylum interview before USCIS—and makes collateral changes to implement that shift. That shift applies solely to people who applied for asylum from within the United States (not those physically entering or exiting the country), and the direct consequence of that change is to force applicants into immigration court (not to deny them status or remove them).

Defendants' attempt to rely on out-of-circuit cases likewise fails. Those cases read the foreign-affairs exception to apply whenever following "notice-and-comment procedures would provoke definitely undesirable international consequences." *E.B.*, 583 F. Supp. 3d at 64 (quotation omitted); *see Rajah v. Mukasey*, 544 F.3d 427, 437 (2d Cir. 2008); *Yassini v. Crosland*, 618 F.2d 1356, 1360 n.4 (9th Cir. 1980). But "the D.C. Circuit has not adopted" that test, which "is unmoored from the legislative text" and which "would render the foreign affairs exception

superfluous" by collapsing it into the separate good-cause exception to notice-and-comment procedures. *E.B.*, 583 F. Supp. 3d at 64-65; *accord, e.g.*, *Amica*, 822 F. Supp. 3d at 164-66. Furthermore, Defendants have not even attempted to identify specific "undesirable international consequences"—such as undermining a response to the Iran hostage crisis, *see Yassini*, 618 F.2d at 1360, or revealing sensitive foreign intelligence, *see Rajah*, 544 F.3d at 437—that would flow from providing public notice and comment before enacting the IFR. That some "immigration matters," Opp'n 30, might implicate foreign affairs therefore does not carry Defendants' burden of showing that the IFR does.

Defendants' attempt to find support in *CAIR Coalition*, *see* Opp'n 31, is mystifying. *CAIR Coalition* held that an IFR that "categorically disqualifies [noncitizens] arriving at the southern border from receiving asylum unless they have already unsuccessfully sought similar protection in another country" did *not* trigger the foreign-affairs exception. 471 F. Supp. 3d at 31; *see id.* at 53-56. That opinion accordingly supports Plaintiffs, who challenge an IFR that applies only to people in the United States and does not turn on whether noncitizens sought protection from a foreign government.

**2. The procedural-rule exception does not apply**

The Summary Referral IFR is also not covered by the procedural-rule exception to the APA's notice-and-comment requirement. That exception, for "internal house-keeping measures," does not apply to actions that "alter the rights or interests of parties." *AFL-CIO v. NLRB*, 57 F.4th 1023, 1034-35 (D.C. Cir. 2023) (quotations omitted). But the IFR alters rights and interests because it expressly removes the regulatory right to an asylum interview, impinges on the right to seek asylum, alters the result of many cases, and ends "nearly four decades" under which

Defendants exercised their discretion to grant or deny asylum only after adjudicating the merits of an application. *See* Mot. 14-18; *RAICES*, 174 F.4th at 108.

Defendants' contrary arguments, Opp'n 23-29, do not dispute that the IFR alters interests and rights by allowing USCIS to refer an application on discretionary grounds without considering the application's merits. *See* Mot. 17. Moreover, there can be no dispute that the right to an interview was created by notice and comment. *See* 55 Fed. Reg. 30674 (July 27, 1990); *Perez v. Mortg. Bankers' Ass'n*, 575 U.S. 92, 101 (2015); Mot. 17. These undisputed facts, without more, show that the procedural-rule exception does not apply.

But there is much more. As an initial matter, the IFR directly and expressly removes the regulatory right to an interview. *See* Mot. 14; 91 Fed. Reg. at 47102, 47103, 47105, 47108, 47110 & n.40, 47111. After all, prior regulations provided the "right to an interview" and stated the specific circumstances in which an applicant waived that right. 8 C.F.R. § 208.10 (2025); *see also id.* §§ 208.4(a), 208.14(c) (2025). The IFR then expressly "remov[ed]" all of those "references to a 'right' to an interview." *E.g.*, 91 Fed. Reg. at 47102.

Defendants' only counterargument concerning the regulatory text is nonsensical. Defendants suggest that removing "*language* from existing regulations referring to a 'right' to an [asylum] interview" is somehow different from removing the regulatory right to an asylum interview itself. Opp'n 25. Defendants' argument seems to be that regulations expressly speaking of a right do not confer that right. Defendants offer no support for this remarkable position. And no wonder: when a regulation says there is "the right to an interview," 8 C.F.R. § 208.10 (2025), it means there is the right to an interview.

Defendants' only other contention is that "no statutory right to an interview has ever existed." Opp'n 25. But the question here is not whether the INA—like Defendants' prior

regulations—confers the right to an interview. The question is instead whether the IFR is substantive because its changes to Defendants' regulations alter rights or interests. It is.[8]

Defendants' arguments on the IFR's other substantive effects similarly lack merit. Plaintiffs showed that the IFR is substantive because it impedes the right to seek asylum in 8 U.S.C. § 1158(a)(1) by depriving many noncitizens of any meaningful opportunity to obtain an adjudication of their asylum claim before being deported to danger. Mot. 14-16. Nothing in Defendants' response shows otherwise. Opp'n 27. In particular, Defendants do not, and cannot, dispute either that many people to whom the rule applies will *never* have their asylum applications adjudicated on the merits or that unaccompanied children cannot meaningfully participate in immigration-court proceedings. Mot. 15. Nor do they dispute that, under pre-IFR procedures, the same noncitizens would have received an interview and subsequent adjudication from USCIS. Neither the fact that not everyone will be referred without an interview nor the Defendants' counterintuitive speculation that removing the ability to present testimony will somehow "lead to … improved understanding of the asylum process and … application quality," Opp'n 27, can alter that result.

Plaintiffs also showed that the IFR will alter the results of many cases that USCIS would have granted after an interview. Mot. 16-17; *see also* 91 Fed. Reg. at 47104 (conceding that some grantable cases will be referred). Defendants respond that noncitizens "have never known

---

[8] Defendants' contention that Plaintiffs seek an "entitle[ment] to yearslong delay" in which asylum applications remain pending," Opp'n 26, badly misrepresents Plaintiffs' position. Plaintiffs and noncitizens would be best served by prompt, full merits adjudications following an interview; indeed, Plaintiffs have urged Defendants to take various measures to eliminate the backlog. *See* Mot. 25-27; *infra* pp. 22-24. Furthermore, as Plaintiffs previously explained, *see* Mot. 18, the fact that USCIS did not create regulatory rights to an interview for *other* benefits, Opp'n 25-26 n.7, does not mean that there was no right to an asylum interview. To the contrary, the unique nature of that right underscores the critical nature of the interview in the affirmative asylum process.

precisely when USCIS would adjudicate their application," Opp'n 28, but the question is whether Plaintiffs and noncitizens know when to *update* an application. Before the IFR, they did; now, they do not. And Defendants' conclusory assertion that not knowing when evidence is needed "is not grounded in any right contemplated by the procedural exception," Opp'n 28, misses the mark. Absent that knowledge, noncitizens must either continuously update applications—an action that would overwhelm both applicants and Defendants—or face a situation in which much-delayed adjudications occur on records rendered obsolete and incomplete by the passage of time.

Defendants' final argument in support of their view that the IFR is merely procedural is the curious one that it is "speculative" to believe that noncitizens will have no opportunity to present asylum claims to an immigration judge. Opp'n 27. But the immigration courts now routinely pretermit applications without a merits adjudication—including under so-called Asylum Cooperative Agreements that purport to enable removal to a third country. *See, e.g.*, *Matter of A-C-M-*, 29 I&N Dec. 703, 707 (BIA 2026). Thus, while it may be difficult to know in advance whether any given individual will be subject to pretermission, it is *certain* that many people subjected to the IFR will suffer that fate. And given that the scope of appellate review is limited to the issues considered by the immigration judge, appeals from a pretermitted application, *see* Opp'n 27, also will not yield a merits adjudication.[9] The IFR, which favors defensive deportation hearings over non-adversarial asylum interviews, therefore alters both the right to seek asylum and the interest of asylum seekers and their counsel in having their claims

---

[9] Defendants' invocation of 8 C.F.R. § 208.14(c)(1), *see* Opp'n 27, fails for the reasons above. *See supra* p. 7.

resolved in a non-adversarial setting that does not involve the prospect of premature removal to a third country.

Finally, Defendants' brief, like the IFR, seeks shelter in *JEM Broadcasting Co. v. FCC*, 22 F.3d 320 (D.C. Cir. 1994). *See* Opp'n 28-29. But Defendants ignore the key facts of that case: that the change at issue did not remove the right to provide a critical type of evidence and also did not apply to pending applications. *See* Mot. 18 (citing *JEM Broadcasting*, 22 F.3d at 327-28). Defendants likewise fail to explain how that case can be persuasive given those distinctions. Moreover, although Defendants' brief includes the naked assertion that "Plaintiffs mischaracterize the interview as critical," Opp'n 28, that post-hoc assertion by counsel is flatly belied by Defendants' own repeated statements, which treat the interview as the keystone of the affirmative asylum process. *See* Compl. ¶¶ 45, 54-58 (citing Defendants' training materials).

### B. The Summary Referral IFR Is Arbitrary and Capricious

#### 1. The Summary Referral IFR fails to consider significant reliance interests

Plaintiffs showed that the Summary Referral IFR fails to consider two significant reliance interests held by individuals who applied for asylum before the IFR took effect: (1) the interest in being able to timely and completely update an application based on the interview date, and (2) the interest in trauma-informed questioning by an asylum officer. *See* Mot. 20-21. The IFR was required to "assess whether" these interests exist, "determine whether they were significant, and weigh" them "against competing policy concerns." *DHS v. Regents of the Univ. of Calif.*, 591 U.S. 1, 33 (2020) (*Regents*). Defendants point to nothing in the IFR that even mentions either subject. *See* Opp'n 33-36. That should end the matter. *See, e.g.*, *Cap. Power Corp. v. FERC*, 156 F.4th 644, 650 (D.C. Cir. 2025).

Defendants seek to argue the merits of these reliance interests even though the IFR does not. They contend that (1) USCIS previously encouraged the continuous, though utterly superfluous, updating of applications, and (2) the existence of an applicant's burden to show eligibility somehow renders nugatory the interest in being able to file complete evidence and provide testimony in a non-adversarial, trauma-informed setting. Opp'n 33-34. But "[i]t is 'a simple but fundamental rule of administrative law' that reviewing courts 'must judge the propriety of [agency] action solely by the grounds invoked by the agency.'" *Calcutt v. FDIC*, 598 U.S. 623, 624 (2023) (per curiam) (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)) (summarily reversing on *Chenery* grounds); *see, e.g.*, *Gonzales v. Thompson*, 547 U.S. 183, 184-86 (2006) (per curiam) (same). *Regents* is crystalline on this point. There may, in any given case, be "disclaimers" that are "pertinent in considering the strength of reliance interests." *Regents*, 591 U.S. at 31. "[B]ut that consideration must be undertaken by the agency in the first instance, subject to normal APA review." *Id.* It may not be short-circuited via litigation arguments made by counsel. Defendants' arguments therefore should not be considered.

In any event, Defendants' argument that Plaintiffs failed to "provide a reasonable explanation" for not continuously updating asylum applications, Opp'n 34, lacks merit. As Plaintiffs made clear, it would be affirmatively foolish to update things like country-conditions evidence when an interview could be many years away, by which time such information would be out of date. *See* Mot. 20. Further, Defendants' own regulations permit evidence to be submitted in the period between the issuance of an interview notice and the interview itself, so long as it is received 14 days before the interview, 8 C.F.R. § 208.9(e). And contrary to Defendants' assertion, Opp'n 34 n.10, Plaintiffs never raised a "general reliance interest" in an interview.

Defendants do eventually cite statements in the IFR, *see* Opp'n 35, but those statements do none of the things required by *Regents* to address reliance interests: they do not assess whether the reliance interests raised by Plaintiffs exist, much less determine their significance or weigh them against competing considerations. Defendants' parroting of the IFR's purpose and other purported consequences, Opp'n 35, is irrelevant. The statement that people can renew applications in immigration court, *id.*, has no relevance to the interest in being able to timely update an application with USCIS without the burden of doing so continuously. The fact that noncitizens have the formal right to an attorney in immigration court, *id.*, meanwhile, is a non-sequitur; even when a noncitizen can procure an attorney, their presence does not make immigration court trauma-informed or ensure that the case will not be pretermitted.

**2. The Summary Referral IFR fails to consider other important aspects of the problem**

Plaintiffs demonstrated that, in addition to the reliance interests discussed above, the Summary Referral IFR fails to consider (1) the risk of detention noncitizens face following a referral under the IFR and the consequences of that detention; (2) the IFR's effect on unaccompanied children; and (3) the inevitability that many referred applications will be pretermitted in immigration court, depriving applicants of both any type of hearing and any merits adjudication. Mot. 22-25. Defendants' response, Opp'n 36-40, is a mish-mash of post-hoc rationalizations and mischaracterizations of both the IFR and Plaintiffs' position.

Defendants lean heavily on the contention that the Summary Referral IFR is "limited." Opp'n 37. That contention grossly mischaracterizes the IFR's scope. Specifically, Defendants assert that the IFR's grounds for referral are "limited" to "'cases where one is barred from applying for or being granted asylum, does not merit asylum as a matter of discretion, or is not eligible on the merits of the[ir] claim.'" *Id.* (quoting 91 Fed. Reg. at 47116-17). But that is no

limit at all: the only conceivable bases for referring an asylum claim are a bar, the merits, and discretion. *See* 8 U.S.C. § 1158(a)-(b). Indeed, Defendants themselves never even attempt to identify any other possible basis for a referral. This supposed "limit" is thus, in reality, a sweeping rule that USCIS can forgo an interview on *any possible basis*—and that it can do so on discretionary grounds before reaching the merits, even though asylum officers previously considered the merits before making a discretionary determination. *See* 91 Fed. Reg. at 47124; Mot. 5.

The other supposed "limit" on the IFR is equally illusory. Defendants claim that the IFR is limited to "'cases where the [noncitizen] does not maintain a lawful status in the United States.'" Opp'n 37 (quoting 91 Fed. Reg. at 47117). But such noncitizens are the only asylum applicants who may be referred to immigration court; people with a lawful basis to remain receive a denial of asylum from USCIS and are not placed in removal proceedings. *See* 8 C.F.R. § 208.14(c). The IFR is maximal: it allows the referral on *any* applicable ground of *any* application for which referral is an option.

In addressing detention specifically, Defendants do not dispute either that detention has severe costs for noncitizens and significant costs for U.S. taxpayers or that the IFR fails to consider those costs. Instead, Defendants contend that "Plaintiffs' assertions about the interplay between the Rule and the risk of detention are tenuous at best." Opp'n 37. But that contention, which includes no reference whatsoever to the IFR, is a post-hoc assertion by counsel that may not be considered. It is also both unmoored from Defendants' own sweeping mandatory-detention policies and unsupported by data. *See* Mot. 22.

Defendants similarly fail to show that the Summary Referral IFR considers the needs of unaccompanied children. *See* Opp'n 37-38. Unable to do so, Defendants again seek to rely on

nonexistent "limits" in the IFR in the form of exemptions from certain asylum bars. *Id.* at 38. Those exemptions are not matters of agency grace; they are statutorily required. 8 U.S.C. § 1158(a)(2)(E). The IFR thus permits USCIS to refer the applications of unaccompanied children for any reason that applies to those applications.

Furthermore, the notion that "it is unlikely that the [Summary Referral IFR] will apply to unaccompanied children," Opp'n 38, has no basis in the regulatory text and is belied by the IFR's own admission that not all children will receive interviews, 91 Fed. Reg. 47113. Defendants could have issued a rule that categorically exempted unaccompanied children. They did not. And the post-decision evidence that USCIS has not *yet* applied the IFR to unaccompanied children, *see* Opp'n 38 (citing Lassen Dec. ¶ 9), does not excuse Defendants' abject failure to consider the effects of promulgating a rule that, by its plain text, applies to those children.[10]

Finally, the IFR fails to consider the fact that many asylum applications will be pretermitted. Defendants' contrary argument rests on a single footnote stating, without more, that "the length and nature of any hearing" in immigration court "is determined by the" immigration judge. 91 Fed. Reg. 47107 at n.22. That footnote cannot bear the weight Defendants place on it. In particular, it does not "weigh[] the possibility of pretermission." Opp'n 39. To the contrary, it seeks to wash Defendants' hands of any connection between the IFR and pretermission. That is impermissible: given the distinct possibility that the IFR will leave noncitizens without *any* hearing and without *any* adjudication on the merits of their asylum application, the IFR had to weigh that very significant cost against the purported benefits of the rule. It did not.[11]

[10] Post-decisional evidence is typically impermissible when considering the merits of an APA case. *See, e.g.*, *Utd. Space All., L.L.C. v. Solis*, 824 F. Supp. 2d 68, 87-88 (D.D.C. 2011).

[11] Defendants' remaining arguments, *see* Opp'n 39-40, are beside the point. The likelihood of many people never receiving a hearing or an adjudication exists whether or not the INA

**3. The Summary Referral IFR fails to consider reasonable alternatives**

Finally, Plaintiffs showed that the IFR fails to consider alternative methods, including many recommended by other DHS officials, for reducing the affirmative asylum backlog. Mot. 25-27. Defendants do not dispute either the provenance of those recommendations or that the IFR fails to consider them. *See* Opp'n 40-44. Nor do Defendants raise any argument at all about one key alternative: the commonsense choice to use the new asylum filing fee and annual asylum fee to increase agency resources as a means of backlog reduction. *See* Mot. 26. And while Defendants do attempt to argue the merits of other recommendations, Opp'n 42-43, those arguments are post hoc rationalizations by counsel and should be rejected as such under *Chenery*.

Defendants seek to evade *Chenery* by contending that the recommendation of creating a multi-year operational plan to reduce the affirmative asylum backlog need not have been considered because it is not "'facially reasonable.'" Opp'n 42 (quoting *Laclede Gas Co. v. FERC*, 873 F.2d 1494, 1498 (D.C. Cir. 1989)). That contention fails badly. Its sole basis is that planning involves "extensive resources and time." *Id*. But devoting resources to solving a problem is not an unreasonable method of solving the problem—especially given that the backlog has, far from "growing at breakneck speed," *id.* at 43, *decreased* during fiscal year 2026. *See* USCIS, *All USCIS Application and Petition Form Types (Fiscal Year 2026, Quarter 3)* (Sept. 8, 2026).[12] Moreover, the agency's time, while an important consideration, is never the *only*

---

guarantees a hearing to some or all applicants. Aside from their reading of 8 U.S.C. § 1158(d)(5)(A) as not requiring a hearing at all, *see* 91 Fed. Reg. at 47107, Defendants' arguments on this point are also post-hoc rationalizations barred by the *Chenery* principle. And in any event, Defendants' reading of the statute is—as Plaintiffs will show at summary judgment—incorrect. For now, it suffices to say that the statutory phrase "the initial interview or hearing *shall* commence" cannot reasonably be read as not requiring an interview or hearing of some kind. 8 U.S.C. § 1158(d)(5)(A)(ii) (emphasis added).

[12] https://tinyurl.com/3canzmf9.

consideration in making policy choices. *See, e.g.*, *Make the Rd. N.Y. v. Wolf*, 962 F.3d 612, 645 (D.C. Cir. 2020) (listing agency resources among other factors).

Moreover, a focus solely on *Defendants'* time would be particularly inappropriate here given that the effect of the IFR is to transfer countless asylum applications to the immigration courts, which themselves have a backlog of millions of cases. *See* 91 Fed. Reg. at 47103-04; Mot. 25 n.18. There is also no evidentiary support for Defendants' assertion that creating a plan "would require massive agency restructuring" or that DHS's Office of the Inspector General, which suggested the multi-year plan, would propose a facially unreasonable change. Opp'n 42.

To the extent Defendants argue that "smaller" alternatives proposed by their officials are unreasonable because they require agency time and resources, Opp'n 42, that argument fails for the same reasons. Defendants' contention that prioritizing cases in which the noncitizen has other pending applications for relief would not reduce the backlog, meanwhile, is erroneous because asylum cases would be mooted by the grant of other status to the noncitizen. And far from calling that alternative unreasonable, USCIS previously responded to this suggestion by recognizing that "[p]rioritizing caseloads … is critical" and promising to "evaluate whether there are other categories of cases that could be identified for more efficient processing." *USCIS Response to the Citizenship & Immigration Service Ombudsman's 2022 Annual Report to Congress* 20-21.[13]

Finally, Defendants appear to suggest that ending the practice of diverting asylum officers to other tasks, as the USCIS Ombudsman has repeatedly suggested, would be unreasonable because asylum officers must devote time to expedited removal (though the IFR does not say as much). *See* Mot. 26; Opp'n 43. But expedited removal is never mandatory: Defendants *always* have the discretion to process noncitizens at the border in a different manner. *See, e.g.*, *R.I.L.-R.*

---

[13] https://tinyurl.com/48s2xshv.

*v. Johnson*, 80 F. Supp. 3d 164, 171 (D.D.C. 2015). Such speculation about policy priorities by counsel cannot show that an alternative is unreasonable without offending the *Chenery* principle. Moreover, Defendants' otherwise singular focus on their own resources strongly recommends this change, which does not require the agency to expend *any* resources but instead involves the reallocation of existing resources to address the backlog. Indeed, such a step is one any reasonable agency would consider if it truly believed backlog reduction was a priority.[14]

Given that Plaintiffs' alternatives are reasonable—no surprise, given that Defendants' officials proposed almost all of them—the IFR had to consider them. It makes no difference that the IFR considered other methods that, like its chosen approach, involved penalizing asylum applicants. *See* Mot. 25; Opp'n 41-42. While an agency need not consider *every* alternative, it must consider ones that are significant and "neither uncommon nor unknown." *Pub. Citizen v. Steed*, 733 F.2d 93, 105 (D.C. Cir. 1984) (quotation omitted). The IFR failed to do so.

## III. Plaintiffs Will Suffer Irreparable Harm Absent a Stay

Defendants have done nothing to displace Plaintiffs' showing of irreparable harm. *See* Mot. 27-33. Indeed, as with their argument on standing, Defendants never even attempt to engage with the specific, detailed explanations Plaintiffs provided concerning how and why the

---

14 Defendants' post-action declaration supports Plaintiffs on this point. The declaration states that USCIS currently diverts very few asylum officers to expedited removal. *See* Lassen Dec. ¶ 10. (This is doubtless because the border has largely been closed to people seeking asylum under a policy the D.C. Circuit has held illegal. *See RAICES*, 174 F.4th 81.) And as shown above, the backlog has decreased this fiscal year. By contrast, the asylum backlog increased when more asylum officers were diverted from asylum adjudications. *See, e.g.*, USCIS, *All USCIS Application and Petition Form Types (Fiscal Year 2022, Quarter 4)* (Dec. 16, 2022), https://tinyurl.com/bp9zr2pb. The declaration thus confirms that Defendants should have considered continuing that reduction—or making it even more significant—as an alternative method of reducing the backlog.

IFR will harm them. Instead, Defendants rely on speculation at odds with the record and unexplained conclusory assertions.[15]

Defendants' speculation flows from the general assertion that Plaintiffs will not be harmed at all by the IFR. Opp'n 44-45. That assertion is belied by the record evidence showing that the IFR will upend Plaintiffs' business models. *See* Morris Dec. ¶ 28; Kafele Dec. ¶ 29; Brown Dec. ¶ 15; Avila-Cimpeanu Dec. ¶¶ 14, 44.[16] Defendants' more specific claims on this point likewise fail. Plaintiffs do have processes for immigration court cases, Opp'n 45, but they cannot, for capacity and other reasons, transfer all cases to that forum., *see* Morris Dec. ¶ 31; Brown Dec. ¶ 15; Avila-Cimpeanu Dec. ¶ 29; Kafele Dec. ¶¶ 20, 27. Likewise, while Plaintiffs supplement pending applications before the interview, *see* Opp'n 46; 8 C.F.R. § 208.9(e), the IFR forces them to supplement *every* application all at once in a truncated timeframe, *see* Morris Dec. ¶¶ 33-34; Kafele Dec. ¶ 31; Brown Dec. ¶ 18; Avila-Cimpeanu Dec. ¶ 21.

Defendants further speculate that Plaintiff Oasis does not *really* need to represent fewer clients. Opp'n 47. But the IFR adds significant work to individual cases by requiring each of Oasis's 1,100 cases to be constantly updated and also imposes a much higher chance of being referred to the resource-heavy forum immigration court. *See* Kafele Dec. ¶¶ 18-20, 27, 29-31. It is therefore entirely predictable that Oasis's five lawyers will be able to take on fewer cases.

---

15 Defendants also reprise their ad hominem attacks and their contention that Plaintiffs somehow believe the IFR will result in the summary referral of all applications. *See* Opp'n 45, 47. Those arguments fail for the reasons above. *See supra* pp. 4-5.

16 Plaintiffs have never disputed that "there is still plenty for [them] to do" at this moment. Opp'n 45. To the contrary, Plaintiffs' declarations make clear that the IFR has imposed immediate tasks on them that range from extremely onerous to impossible. Morris Dec. ¶¶ 33-35; Kafele Dec. ¶¶ 22-31; Brown Dec. ¶¶ 18, 24-25; Avila-Cimpeanu Dec. ¶¶ 21, 39, 50-51.

Defendants' argument that the representation of children by Plaintiff Florence Immigrant and Refugee Rights Project (Florence Project) will not be harmed depends on the notion that "USCIS would refer a child to immigration court without an interview in [only] very limited circumstances." Opp'n 48. But that is not what the IFR says; rather, it says that an unaccompanied child "may still be referred under the rule if an [asylum officer] determines the [child] is ineligible for asylum." 91 Fed. Reg. at 47113. Further, that Defendants have not *yet* applied the IFR to unaccompanied children, Opp'n 48, makes no difference because they *could* start applying the IFR to children at any time. The same is true of Defendants' more general argument that Plaintiffs are not harmed because Defendants are not currently applying the IFR as broadly as possible. Opp'n 45. Plaintiffs must represent their clients as though Defendants will apply the IFR to its full scope. Thus, regardless of how Defendants are applying it right now, the IFR causes the Plaintiffs harm that is "actual and not theoretical." *League of Women Voters of the United States v. Newby*, 838 F.3d 1, 8 (D.C. Cir. 2016) (*Newby*) (quotation omitted).

Defendants also include a set of unexplained assertions suggesting that Plaintiffs' injuries are not of the correct type. Defendants suggest that a "huge resource diversion" is needed for irreparable harm, Opp'n 46, but there is no authority for that proposition—and in any case, Defendants simply ignore the resource diversions that Plaintiffs have described, *see* Morris Dec. ¶ 25; Kafele Dec. ¶¶ 20, 24, 28; Brown Dec. ¶¶ 21, 29, 31; Avila-Cimpeanu Dec. ¶¶ 30, 32, 39-40. Defendants' reference to the IFR's "indirect downstream effects of how Plaintiffs choose to allocate their resources," Opp'n 46, is both unexplained and incoherent. Defendants also argue that financial injuries are irreparable only if "no adequate compensatory or other corrective relief will be available at a later date," *id.* (quotation omitted)—but then make no attempt to explain what corrective relief they believe is available to Plaintiffs, who seek no money damages.

Instead, Defendants pivot to their erroneous contention that Plaintiffs lack standing, suggesting that the financial harms the IFR causes Plaintiff Oasis are not cognizable. Opp'n 46. But Oasis is a legal service organization, and the losses it describes stem from its inability to provide legal services to certain clients. *See* Kafele Dec. ¶ 16. Moreover, the unsupported claim that Plaintiffs' financial harm is not traceable to the IFR, Opp'n 46, ignores Plaintiffs' meticulous explanations of how the IFR prevents them from accepting new cases. *See* Kafele Dec. ¶¶ 16, 29-31; Brown Dec. ¶¶ 18, 25; Morris Dec. ¶¶ 30, 33-35; Mot. 29-32. It is of no moment that Plaintiffs HIAS and Immigration Equality cannot precisely pin down the amount of financial loss the IFR will cause. *See E.Q.*, 835 F. Supp. 3d at 245; Opp'n 47. And the D.C. Circuit case on which Defendants rely, which refers to spending money for litigation against agency actions, Opp'n 48-49, is simply inapposite in the face of "[s]uch concrete and demonstratable injury to the organization's activities." *Havens*, 455 U.S. at 379. Plaintiffs have shown irreparable harm.

## IV. The Balance of the Equities and the Public Interest Favor the Plaintiffs

Defendants' arguments on the merged factors of the equities and the public interest miss the mark. Plaintiffs explained that the public has no interest in allowing agencies to perpetuate unlawful actions and that the harm to Defendants from continuing to apply longstanding regulations is minimal—especially in comparison to the harm that the Summary Referral IFR inflicts on Plaintiffs and on their clients. Mot. 33-34.

In response, Defendants first argue that Plaintiffs' strong showing on the merits is irrelevant. Opp'n 49. But D.C. Circuit precedent dictates otherwise. *See, e.g.*, *Ctr. for Taxpayer Rts. v. IRS*, __ F. 4th __, 2026 WL 2635380, at *13 (D.C. Cir. Sept. 8, 2026) ("Plaintiffs thus have the better of the balance, as they seek to prevent the IRS from making unlawful

disclosures."); *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 734 (D.C. Cir. 2022) ("Plaintiffs' likelihood of success on the merits lightens the Executive's stated interests.").

Defendants' assertion that the harm the IFR wreaks on asylum applicants is irrelevant to the public interest, Opp'n 49, similarly misstates the law. *See, e.g.*, *Newby*, 838 F.3d at 12 (risk of disenfranchisement of non-party voters). Defendants' suggestion that the harms to Plaintiffs all boil down to "financial hardship," Opp'n 49, is belied by Plaintiffs' declarations, which spell out severe harm to Plaintiffs' ability to provide services and to their missions. *See supra* pp. 2-6. And Defendants' claim that "[t]he public is harmed by allowing" affirmative asylum applicants as a group to "live freely within the country" while they await Defendants' long-delayed adjudications lacks evidentiary support and is also belied by (among many other things) the fact that asylum applicants legally work, 8 C.F.R. § 208.7(a), and pay taxes.

While grudgingly acknowledging that the IFR "may" result in referral to immigration court of some asylum applications that USCIS could otherwise have granted, Defendants contend that "this will be a rare occurrence." Opp'n 50 (quotation omitted). That contention flies in the face of both the evidence that Plaintiffs are highly successful in securing asylum grants even for clients the IFR assumes will have non-meritorious claims and Defendants' own repeated statements about interviews. *See supra* pp. 5-6. It also ignores the fact that many long-pending applications will erroneously appear weak because applicants have awaited an interview notice to update those applications—for the perfectly good reasons that it is extremely onerous to continuously update applications and that Defendants' regulations expressly permit the submission of evidence after notice of the interview. *See supra* p. 18. It is thus simply not true that the IFR "would not affect meritorious claims or strong applications." Opp'n 50.

Defendants' argument that it is urgently necessary that they implement the IFR immediately is belied by their own data, which shows that the affirmative asylum backlog was *decreasing*—*i.e.*, adjudications outpaced new applications—in the quarters before the IFR took effect. *See supra* p. 22. That argument also incorrectly assumes that Defendants lack other ways to further address the backlog. *See supra* pp. 22-24. It ignores both the immigration courts' interest in not having hundreds of thousands of cases added to *their* backlog, *see* 91 Fed. Reg. 47125, and the fact that immigration court cases require more time, labor, and resources from both applicants and the government than interviews with USCIS asylum officers, *see* Mot. 29-30 (citing declarations). And in any event, the agency's interest in reducing its backlog by summarily referring cases is not coextensive with the public interest—not least because the IFR is unlawful for all of the reasons above.

Next, Defendants argue that the IFR is "necessary to address public safety concerns." Opp'n 51. But there is no evidence in either the IFR or Defendants' submissions that affirmative asylum applicants pose an uncontrolled safety threat. That is no surprise, given that the INA includes a mechanism for removing noncitizens convicted of aggravated felonies, who are ineligible for asylum, without having to wait for USCIS interviews. 8 U.S.C. § 1228.

Defendants fare no better with their suggestion that USCIS previously could not conduct interviews until certain noncitizens were released from criminal custody. Opp'n 51. U.S. Immigration and Customs Enforcement (ICE) has long had the ability to issue a notice to appear in immigration court to noncitizens with pending affirmative applications—including noncitizens in criminal custody and those charged with a crime—and thereby obviate the need for asylum interviews. *See* 8 U.S.C. §§ 1226(a), 1229(a), 1229a(a). Defendants' complaints that ICE takes too long to do so, Opp'n 51, have no connection to the IFR and are best addressed to ICE.

Finally, Defendants argue that staying the IFR would intrude on the "efficient administration of the immigration laws." Opp'n 52 (quotation omitted). But Defendants may not adopt unlawful policies in pursuit of administrative efficiency—or even much more weighty concerns. *See, e.g.*, *NFIB v. Dep't of Labor*, 595 U.S. 109, 120 (2022) (staying a vaccine mandate even though the government said it would save more than 6,500 lives and prevent hundreds of thousands of hospitalizations); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 582 (1952) (affirming the district court's preliminary injunction of an allegedly illegal executive order even though a wartime President said his order was "necessary to avert a national catastrophe"); *see also Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 766 (2021) ("our system does not permit agencies to act unlawfully even in pursuit of desirable ends"). The equities and the public interest, like the other factors relevant to a § 705 stay, strongly favor Plaintiffs.

## V. Defendants' Arguments Concerning Remedies Lack Merit

Defendants raise three last-ditch arguments concerning remedies. None succeeds.

*First*, Defendants argue that a stay should be limited to the Plaintiffs, Opp'n 52-53, but they do so based on cases concerning injunctions rather than stays. That difference is dispositive. The D.C. Circuit recently held that a § 705 stay, unlike an injunction, "operate[s] on the legal source of authority for an agency to act at all" and thus does "not simply insulate certain parties from enforcement measures." *Ctr. for Taxpayer Rts.*, 2026 WL 2635380, at *14 (quotations omitted); *accord Cabrera*, 792 F. Supp. 3d at 106; *see also Nken v. Holder*, 556 U.S. 418, 428-29 (2009) (a stay "temporarily suspend[s] the source of authority to act," while an injunction "direct[s] an actor's conduct"). For that reason, "[c]ourts in this circuit … consistently applied § 705 to permit wholesale, rather than party-specific, stays of agency action" even before the D.C. Circuit's recent holding. *Cabrera*, 792 F. Supp. 3d at 106 (citing cases).

Defendants' contrary arguments would be unavailing even absent the D.C. Circuit's holding. Defendants rely heavily on *Trump v. CASA*, 606 U.S. 831 (2025), but the Supreme Court took care to limit the principles of that decision to injunctive relief while expressly excluding APA relief from its holding, *id.* at 847 n.10. *CASA* thus places no limits on the scope of relief available in this case. The opinion in *Starbucks Corp. v. McKinney*, 602 U.S. 339 (2024), *see* Opp'n 62-63, likewise concerns only injunctive relief, while the decision in *Sampson v. Murray*, 415 U.S. 61 (1974), concerned whether § 705 applied to the wrongful removal of a subordinate employee, not the scope of a stay of regulations under that section. And contrary to Defendants' suggestion, Opp'n 53, broad relief is necessary to ensure uniformity and consistency and prevent irreparable injury to legal service providers and noncitizens across the country. *See Gomez v. Trump,* 485 F. Supp. 3d 145, 203-04 (D.D.C. 2020).

*Second*, Defendants' request that this Court require Plaintiffs to post a bond, Opp'n 53-54, is contradicted by the plain text of Federal Rule of Civil Procedure 65(c). By its terms, that rule applies only where a court issues "a preliminary injunction or a temporary restraining order." Fed. R. Civ. P. 65(c). A stay under § 705 is neither of those things and is thus not subject to the bond requirement. *See, e.g.*, *Coal. for Indep. Tech. Research v. Rubio*, 836 F. Supp. 3d 215, 258 (D.D.C. 2026) (citing cases); *Am. Ass'n of Nurse Practitioners v. McMahon*, 836 F. Supp. 3d 175, 213-14 (D.D.C. 2026) (same).

*Third*, Defendants request a stay pending appeal or an administrative stay while they determine whether to appeal. Opp'n 54. Neither step is warranted. Plaintiffs have shown a clear likelihood of success on the merits; both Plaintiffs and thousands of noncitizens will be irreparably harmed by a stay; and the public has no interest in the perpetuation of unlawful administrative actions.

## CONCLUSION

The Court should issue a stay of the Summary Referral IFR's effective date under 5 U.S.C. § 705 pending a final judgment in this case.

Dated: September 22, 2026

Respectfully Submitted,

*/s/ Mary Georgevich*

Keren Zwick (D.D.C. Bar No. IL0055)
Richard Caldarone (D.C. Bar No. 989575)
Mary Georgevich (*pro hac vice*)
Maria Dambriunas (D.C. Bar No. 1738154)
Gerardo Romo*
Mark Scaggs*
NATIONAL IMMIGRANT JUSTICE CENTER
111 W. Jackson Blvd., Suite 800
Chicago, IL 60604
(312) 660-1531
kzwick@immigrantjustice.org
rcaldarone@immigrantjustice.org
mgeorgevich@immigrantjustice.org
mdambriunas@immigrantjustice.org
gromo@immigrantjustice.org
mscaggs@immigrantjustice.org

Melissa Crow (D.C. Bar No. 453487)
CENTER FOR GENDER & REFUGEE STUDIES
1901 Pennsylvania Avenue, NW
Suite 900, PMB 228
Washington, DC 20006
(202) 355-4471
crowmelissa@uclawsf.edu

Robert Pauw*
CENTER FOR GENDER & REFUGEE STUDIES
c/o Gibbs Houston Pauw
1000 Second Avenue, Suite 1600
Seattle, WA 98104
(206) 682-1080
rpauw@ghp-law.net

Peter Habib*
CENTER FOR GENDER & REFUGEE STUDIES
200 McAllister Street
San Francisco, California 94102
(415) 610-5729
habibpeter@uclawsf.edu

Anwen Hughes*
HUMAN RIGHTS FIRST
121 W. 36th St., PMB 520
New York, NY 10018
(212) 845-5244
HughesA@humanrightsfirst.org

**Application for admission or admission pro hac vice forthcoming*